Purchaser. The Purchaser will then have 30 days to resubmit the revised DCS. DOE shall approve or disapprove the revised DCS within 60 days of receipt. If the revised DCS is disapproved, DOE will submit to the Purchaser reasons for such disapproval, and proposed alternative DCS(s) for their consideration. If this DOE-proposed alternative DCS is not acceptable to the Purchaser, both parties shall promptly seek to negotiate acceptable schedule(s).

9. QUESTIONS ON THE DCS

If you have any questions or require more information for completing the DCS, please contact Mr. Alan Brownstein at (202) 586-4973, or Mr. Nick Graham at (202) 586-9634. Please direct all correspondence to DOE Contracting Officer, Office of Placement and Administration, PR-322.1, 1000 Independence Avenue, S.W., Washington, D.C., 20585.

## SPECIFIC INSTRUCTIONS FOR COMPLETION OF DCS

The following are specific instructions for completing the DCS. Each indicated entry of the DCS should be filled in with the information as described below. Requests for information which have been determined to not be currently needed by DOE have been prefilled with "Not Required" in the attached DCS.

1.1 DCS IDENTIFICATION NUMBER: A 12-digit unique identification number having the form YY-RRID-NNNN-SS, where

- YY = the last two digits of the Proposed Delivery Year
- RRID = RW-859 reactor identification number of the designated delivery site
- NNNN = the last four digits of the contract number associated with the SNF being designated for delivery, and
- SS = a two digit sequential code to uniquely identify the DCS within this Purchaser's annual allocation.

As an example, suppose Electric Power Company (Contract Number DE-CR01-83NE12345) submits a DCS to deliver SNF from Unit I (RW-859 ID Number 8801) in the year 1999. Assume that this is the third DCS that Electric Power Company plans to submit under this allocation. The unique identifier for this DCS would be 99-8801-2345-03. Type the number on the top right-hand corner of the DCS. If the Purchaser elects not to insert an identifying number, one will be assigned by DOE upon receipt of the DCS.

1.2 CONTACT PERSON: Enter the name and telephone number of the person the Department should contact if there are questions concerning the DCS.

1.3 CONTRACT NUMBER: Enter the number of the Contract under which the disposal fees were paid for the SNF designated on this DCS. For Purchasers with multiple Contracts, the entry relates to the Contract number associated with the SNF designated for delivery and may differ from the Contract number of the SNF which qualified the Purchaser for the allocation or the Contract number associated with the designated delivery site.

1.4 REACTOR/FACILITY INFORMATION: Enter the name of the designated delivery site where the SNF will be delivered to DOE. The facility may differ from the facility that generated the SNF that qualified the Purchaser for the allocation. Enter the street address (not mailing address) of the designated delivery site.

2.1 TYPE OF CASK REQUIRED: Indicate (in tons) the maximum loaded cask lifting weight (weight on the hook including lifting equipment and water in the cask) that you intend to use at the delivery location indicated in Item 1.4. If you plan to upgrade the cask handling capacity at this facility prior to shipment, this upgrade should be reflected in the maximum lifting weight. This information is to be used by DOE for

planning purposes and does not imply any commitment by DOE or the Purchaser. The identification of the specific cask will be determined during the Final Delivery Schedule (FDS) process.

2.2 SHIPPING LOT NUMBER: ("Not Required" has been entered.) A shipping lot is a specified quantity of SNF designated for delivery on a specific date. Since a DCS should not identify a specific date for delivery, assignment of a shipping lot number would be premature at this time.

2.3 PROPOSED SHIPPING MODE: Check the appropriate box for: (a) Truck, (b) Rail or (c) Barge, indicating your proposed shipping mode. Purchasers should indicate the mode of carriage that the cask identified in Item 2.1 will be delivered to DOE at the Purchaser's gate, f.o.b. carrier. An entry of "Truck" will indicate to DOE that the Purchaser proposes to deliver the cask on a truck trailer, an entry of "Rail" will indicate delivery on a rail car, and an entry of "Barge" will indicate that the Purchaser proposes to deliver the cask to a barge. Selection of shipping mode is independent of cask type and only indicates the carrier mode. Final selection of the shipping mode will be determined during the FDS process. If a Purchaser intends to upgrade a facility from truck to rail access, "Rail" should be indicated on the DCS. Similarly, if a facility has either rail or barge access but the Purchaser plans to deliver by truck, "Truck" should be indicated on the DCS.

2.4 PROPOSED DELIVERY DATE: Enter the appropriate delivery date (year) for the SNF to be delivered in accordance with your allocation (listed in the ACR). The actual date will be determined during the FDS process.

2.5 DOE ASSIGNED DELIVERY COMMITMENT DATE: This entry will be completed by DOE.

2.6 RANGE OF DISCHARGE DATES (Earliest to Latest): Enter the range of discharge dates from which the SNF will be selected for delivery. Purchasers are encouraged to be as specific as possible. For example, the Purchaser may know that there is certain SNF that they prefer not to deliver under this DCS (e.g., SNF in dry storage) and exclude that SNF from the range of discharge dates. A Purchaser may include other than standard SNF in the range of discharge dates, although confirmation of the technical feasibility of delivery of the other than standard SNF on the agreed to schedule will be required prior to submittal of an FDS. Canistered nonfuel waste should not be included in this entry at this time.

2.7 METRIC TONS OF URANIUM (Initial): Enter the MTU for this proposed delivery. If several DCSs are submitted for one allocation period, the total quantity of SNF designated for delivery must not exceed the allocation in the ACR; exceeding the allocation will result in disapproval of the DCS(s).

(Discharged) "Not Required" has been entered. The Contract makes provisions for allocation only on the basis of Initial MTU content.

2.8 **NUMBER OF ASSEMBLIES--BWR/PWR/Other:** Enter the number of SNF assemblies corresponding to the Metric Tons Uranium indicated in Item 2.6 in the appropriate blank for BWR, PWR or Other (e.g., HTGR, TRIGA). If the SNF in the designated range of discharge dates encompasses assemblies with a wide range of MTU/assembly, state the maximum number of assemblies that may be delivered. Since the actual number of assemblies to be delivered may vary according to the specific SNF selected for delivery, adjustments to the number of assemblies will be made during the FDS process.

3.0 **CERTIFICATIONS:** An individual duly authorized to bind the Purchaser must sign the DCS, certifying that the Purchaser has the legal right to deliver such SNF to DOE. Insert the appropriate signatory's title and date.

4.0 **NOTIFICATION OF DOE APPROVAL:** The signatures of DOE's Technical Representative and the Contracting Officer will indicate that the DCS has been approved.

OMB No.
Expires:

# U.S. DEPARTMENT OF ENERGY

## APPENDIX C - DELIVERY COMMITMENT SCHEDULE

This information is being collected under mandatory authorities vested in the U.S. Department of Energy under Public Law 97-425 and Article V.B. of the Standard Contract for Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste (10 CFR 961). Data collected on this form are not considered to be confidential. Public [illegible] burden for this collection of information is estimated to average 5 hours per response, including the time for reviewing instructions, searching existing da[illegible] gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any [illegible] of this collection of information, including suggestions for reducing this burden, to the Office of Statistical Standards, EI-73, 1000 Independence Ave., S.W., Washington, D.C. 20585 and to the Office of Information and Regulatory Affairs, Office of Management and Budget, Washington, D.C. 20503.

## 1.0 IDENTIFICATION INFORMATION

1.1 DCS Identification Number: ____________________

1.2 Contact Person:
(a) Name: ____________________
(b) Telephone (Include Area Code): ____________________

1.3 Contract Number: ____________________

1.4 Reactor/Facility Information:
(a) Name: ____________________
(b) Address: ____________________
(c) City, State & Zip Code: ____________________

## 2.0 DELIVERY COMMITMENT INFORMATION

2.1 Type Cask Required (Maximum loaded lifting weight, in tons): ____________________
2.2 Shipping Lot Number: (Not Required) (Assigned by DOE)
2.3 Proposed Shipping Mode: Truck ______ ; Rail ______ ; Barge ______
2.4 Proposed Delivery Date: ____________________
2.5 DOE Assigned Delivery Commitment Date: (Not Required) (Assigned by DOE)
2.6 Range of Discharge Dates: (Earliest to Latest) Mo / Day / Yr to Mo / Day / Yr
2.7 Metric Tons Uranium: (Initial) ______ (Discharged) ______ (Not Required)
2.8 Number of Assemblies: BWR ______ PWR ______ Other ______

## 3.0 CERTIFICATIONS

**Purchaser hereby certifies that the spent nuclear fuel to be delivered pursuant to this Delivery Commitment Schedule is of domestic origin, has been discharged from a civilian nuclear power reactor, is covered by Purchaser's Contract (identified in Item 1.3 above) and that purchaser has the legal right to deliver such spent nuclear fuel to DOE.**

3.1 ____________________
Authorized Purchaser Signature — Date

3.2 ____________________
Name (Please Type or Print)

3.3 ____________________
Title (Please Type or Print)

TITLE 18 USC 1001 makes it a crime for any person to knowingly and willfully make to any agency of the United States any false, fictitious, or fraudulent statements as to any matter within its jurisdiction.

## 4.0 NOTIFICATION OF DOE APPROVAL

4.1 Approved by DOE

____________________
Technical Representative — Title — Date

4.2 ____________________
Contracting Officer — Date

This Page Intentionally Left Blank

This Page Intentionally Left Blank

This Page Intentionally Left Blank

This Page Intentionally Left Blank

This Page Intentionally Left Blank

This Page Intentionally Left Blank

This Page Intentionally Left Blank

This Page Intentionally Left Blank

This Page Intentionally Left Blank

This Page Intentionally Left Blank

This Page Intentionally Left Blank

This Page Intentionally Left Blank

This Page Intentionally Left Blank

This Page Intentionally Left Blank

This Page Intentionally Left Blank

DOE/RW-0005
Volume 1 of 3 Volumes

# Mission Plan for the Civilian Radioactive Waste Management Program

## Volume I

Part I Overview and Current Program Plans
Part II Information Required by the Nuclear Waste Policy Act of 1982

June 1985

U.S. Department of Energy
Office of Civilian Radioactive Waste Management
Washington, D.C. 20585

**Department of Energy**
Washington, DC 20585

TO: Members of Congress and Other Recipients

SUBJECT: Submittal of the Mission Plan as Required by the Nuclear Waste Policy Act of 1982

I am pleased to submit the Mission Plan for the Civilian Radioactive Waste Management Program as required by the Nuclear Waste Policy Act of 1982. I consider that this Plan meets the directive to "provide an informational basis sufficient to permit informed decisions to be made in carrying out the repository program and the research, development, and demonstration programs required under this Act." This document presents our best estimate at the present time of the objectives and the strategy of the Civilian Radioactive Waste Management Program and of the facilities, institutional activities, management approach and information needed to implement the program.

In accordance with the requirements of the Act, the Department of Energy (DOE) submitted a draft of this Mission Plan for comment to the States, affected Indian tribes, the Nuclear Regulatory Commission, other Government agencies, and the public. Approximately 2500 individual comments were received from 102 respondents. In addition to expanding the discussions of various topics in the Mission Plan as suggested in the comments and making changes where appropriate, detailed responses were prepared to address all of the issues raised in the comments. These responses are presented in Volume II of this set of three volumes. Volume III reproduces all of the comments received on the draft Mission Plan.

I believe we have addressed fairly and responsibly all of the comments. We appreciate everyone's interest and involvement as we continue to implement this important national program.

During the conduct of this program, I pledge the best efforts of DOE's Office of Civilian Radioactive Waste Management to observe the following operating principles: to safeguard the public trust; to be open and responsive; to cooperate and act in an evenhanded manner; and to strive for technical excellence, management excellence, and cost effectiveness. With these principles in mind and with the cooperation of all interested parties, I am confident the program will succeed.

Ben C. Rusche

Ben C. Rusche, Director
Office of Civilian Radioactive
Waste Management

# Chapter 1

# INTRODUCTION

The United States has no facilities for the permanent disposal of the highly radioactive waste generated during the production of electricity in nuclear power plants and during the production of nuclear materials for national defense. As more commercial nuclear power plants have come on line in recent years, the rate at which the resulting highly radioactive wastes have been accumulating has been increasing.

Although nuclear activities produce small volumes of wastes in comparison with other activities that generate hazardous wastes, nuclear wastes have the unique characteristic of being radioactive, and therefore they require special handling and storage. While such wastes have been safely stored for decades with no discernible adverse effects on the health and safety of the public, they will remain radioactive for thousands of years. The Federal Government has established the principle that the management of these wastes is the responsibility of the present generation and should not be left for future generations. Recognizing that a national problem has been created by the accumulation of radioactive wastes and that a safe and environmentally acceptable method of permanent disposal is needed, the Congress enacted the Nuclear Waste Policy Act of 1982, which, among other provisions, established the Office of Civilian Radioactive Waste Management in the U.S. Department of Energy (DOE). This document describes the plan the DOE is pursuing to comply with the mandate of the Congress to achieve a solution to this problem.

The DOE recognizes the difficult technical and institutional challenges that must be overcome during the course of this program. The technical challenge is great because the isolation of these wastes involves long time periods not often considered in other human endeavors. The institutional challenge is complex because a small number of States (and possibly affected Indian tribes) will be asked to host, for the good of the Nation, permanent waste-disposal facilities. And radioactive-waste shipments will traverse many States whether or not the wastes originated in those States.

The DOE pledges to work diligently in full compliance with the law, and with the full involvement and participation of affected parties, to achieve a solution to this national problem. Those involved in the program are dedicated to making technically sound decisions and to working with affected parties to identify potential negative impacts and to avoid, mitigate, or compensate for such impacts.

## 1.1 BACKGROUND

In 1984, domestic nuclear power plants generated more than 13 percent of the electricity produced in the United States. Nuclear power has surpassed hydroelectric power to become the second leading energy source for electricity generation in the United States after coal.

tors of high-level waste and spent fuel) and, accordingly, creating in the Treasury of the United States a special Nuclear Waste Fund to be composed of the payments made by those using the services (Section 302).

2. Committing the Federal Government to study monitored retrievable storage in parallel with geologic repositories (Section 141).

3. Providing for a federally owned and operated system of interim-storage facilities for no more than 1900 MTU of spent fuel from civilian reactors whose owners cannot reasonably provide adequate storage capacity at the reactor site (Section 131) and creating an Interim Storage Fund to make certain that those using the services will pay the full costs (Section 136).

4. Setting out an extensive system of checks and balances through public involvement, along with written consultation-and-cooperation (C&C) agreements, to ensure Federal accountability to, and communication with, States and affected Indian tribes (Section 117).

## 1.3 POLICY GOALS AND PROGRAM OBJECTIVES

Unprecedented technical and institutional challenges require resolution before the intent and the letter of the Act are achieved. First, the public must be convinced that the interests of the Nation are best served by consolidating the radioactive waste dispersed throughout the country in a limited number of geologic repositories designed for permanent disposal. The national interest must take precedence over parochial concerns. Next, the DOE must be able to achieve the tasks set forth in an unusually precise and complex schedule and to persuade the citizens of the country that the waste disposal program will be safe, efficient, and on schedule. Furthermore, the conflicting and competing interests that are mirrored by the tension between program schedule and technical certitude must be resolved. Finally, the DOE must grapple with the contentious issues that often accompany a task as complex and enduring as its waste-management program while never wavering from its commitment to build and operate the required disposal facilities.

The following policy goals guide the formulation and the implementation of the DOE's program:

1. The protection of public health and safety and environmental acceptability are of paramount importance.

2. The program must be credible to the public by virtue of its integrity and technical excellence.

3. The program must neither subsidize nor penalize nuclear power as an energy source.

4. The program must be conducted in a cost-effective manner, with full cost recovery.

2. The acceptance of waste for disposal beginning not later than January 31, 1998.

3. Safe transportation of wastes to the repository.

4. Protection of the health and safety of the public and environmental acceptability.

5. The provision of limited interim storage for utilities determined by the Nuclear Regulatory Commission to require such storage.

6. Encouragement to waste generators to effectively use existing storage facilities for the safe storage of the waste at the reactor site until the waste is accepted for disposal.

7. Full and open public participation.

8. Full cost recovery, with the costs borne equitably by the waste generators.

## 2.3 THE IMPROVED-PERFORMANCE PLAN

The improved-performance plan (see Figure 2-2) reflects the opportunities built into the Act to evaluate options for enhancing the authorized plan in meeting the requirements of the Act. Careful analyses of the provisions of the Act and of programmatic options have shown that increased confidence and improved performance can be achieved by emphasizing systems integration--that is, by considering all of the elements of the program as part of a single system, optimized as a unit to best meet the program requirements.

This concept of optimizing the system by integrating all the facilities and components applies not only to the authorized plan but also to any other waste-management system that could be developed to meet the requirements of the Act. In particular, the Act requires the DOE to complete a detailed study of the need for, and the feasibility of, monitored retrievable storage (MRS) and submit a proposal to Congress for the construction of one or more MRS facilities. Analyses to date continue to reinforce the tentative conclusion that an MRS facility fully integrated into the overall waste-management system can significantly enhance several important program objectives. The improvements include the following:

1. Improved transportation efficiency because spent-fuel consolidation and packaging at the MRS facility would reduce the number of shipments to the repository with concomitant reductions in potential environmental impacts and risks to the public.

2. Increased reliability and flexibility in operating the system in an integrated cost-effective manner by incorporating an additional facility that can regulate the flow of waste to the repository.




Figure 2-2. Improved-performance system with integral MRS facility.

3. Improved confidence in the DOE's ability to meet schedules, particularly in beginning to accept quantities of waste no later than January 31, 1998. The integral MRS facility would be scheduled for initial operation as early as 1996.

4. Ability to accept significantly larger quantities of waste in the early years of operation, substantially reducing the added cost of providing increased at-reactor storage capabilities.

5. Ability to focus repository licensing efforts on demonstrating the long-term isolation capability of the site because many of the operational functions (i.e., waste preparation) would be handled at the MRS facility.

The studies and analyses necessary to fully describe the MRS facility and to define its potential costs and benefits are being prepared. The final results will be presented in a proposal to be submitted for Congressional consideration, as required by the Act. Should the Congress authorize the construction of an integrated MRS facility, the improved-performance plan will become the reference program plan, and the integrated system described in this document will be the reference waste-management system.

## 2.4 CONTINGENCY PLANS

The preceding sections outline the strategy of the DOE's waste-management program. However, all those involved in, and concerned about, these activities recognize that this program is highly controversial; involved in it are a number of important constituencies with widely varying views of how, when, and whether elements of the program should be carried out. The Act is a remarkable piece of legislation in that there is general agreement on its key provisions: the timely development of a geologic repository for the permanent disposal of spent fuel and high-level waste is in the national interest, and the Act provides sufficient authority to get the job done. The Act further anticipated potential conflicts between the various constituencies and provided a means for resolving ultimate disputes, such as the one that could arise between a chosen host State and the Federal Government. Nevertheless, a program intended to span more than a century, with some choices by Congress, States, affected Indian tribes, and the nuclear power industry yet to be made, requires that contingency plans be considered.

The number and the detail of the options that could be considered are potentially great. But the Act and the accomplishments of the program to date provide increasing confidence in the DOE's ability to follow its strategy. Therefore, the contingencies identified below and shown in Figure 2-3 are limited to major areas of uncertainty and will be more fully defined as the evolving situation requires.

The Act specifies a schedule and a process for the siting of repositories. It gives the affected State and any affected Indian tribe on whose reservation a repository would be located the right to file a notice of disapproval after a repository site has been recommended to Congress, and this notice can be overridden only by a joint resolution of Congress. Should a notice of disapproval be made and not overturned, the President is required to recommend another site for the first repository within one year, with the same approval provisions to apply. Thus, the first repository could become operational on time, it could be substantially delayed, or successive notices of disapproval not overridden by Congress could prevent its construction.

The baseline program assumption, of course, is that the repository is built on schedule. Should the repository be substantially delayed, one of two contingency approaches would be pursued. If the MRS facility is authorized by Congress and constructed, it can begin to accept spent fuel in a timely manner and package and store it (up to the authorized storage-capacity limit) until a repository becomes operational. If the MRS facility is not authorized, or if it is significantly delayed, increasing quantities of spent fuel will have to be stored at reactor sites. In that event, the pools for storing the fuel will continue to be filled, and additional onsite storage capacity through the use of dry storage in casks or similar technologies will have to be employed.

If site characterization shows that none of the candidate sites for the first repository are suitable or should successive notices of disapproval be made and upheld, the DOE has two main contingency plans. If an MRS facility has been authorized and constructed, it can accept spent fuel on or ahead of schedule, packaging and storing it (up to the authorized storage-capacity limit) until the "second" repository is authorized (which, of course, would




Figure 2-3. Contingency plans.

then become the first repository) and becomes operational. If an MRS facility has not been authorized, spent fuel will continue to be stored at reactor sites in spent-fuel pools and possibly in dry storage.

Should no repository be constructed and an MRS facility not be authorized, utilities would continue to be responsible for storing the spent fuel at reactor sites. In this event, the Nation would return to the situation where it had no viable, assured method for the permanent disposal of spent fuel and high-level waste. It should be added that a number of other methods of disposal have been proposed and evaluated in the past. In accordance with the Act, research and development continues on some techniques (e.g., subseabed disposal), and, should future progress demonstrate their practicality, they would be considered in program decisionmaking.

Contingency plans are being further developed for each of the program areas below the level of detail discussed in this chapter. More information on these contingency plans is provided in the subsequent chapters of this Mission Plan and in various program documents listed in the bibliography.

Contingency plans will continue to be pursued as necessary until a satisfactory solution has been demonstrated. Failure to solve this national problem would prolong the potential risks resulting from the dispersed accumulation of radioactive waste--risks that Congress appropriately recognized and responded to by passing the Nuclear Waste Policy Act.

In summary, the DOE plans to conduct those authorized activities that will lead to a capability to permanently dispose of spent fuel and high-level waste. The DOE will evaluate, propose, and, where appropriate, add features that will enhance the credibility, reliability, and performance of the program. The DOE will continue to prepare contingency plans that could become operational as needed in the future.

## 2.5 ADDITIONAL CONSIDERATIONS

A number of additional factors must be considered in understanding and carrying out the strategy of the program. Some of the principal factors are briefly discussed below.

### 2.5.1 DEFENSE WASTE

The President recently accepted the DOE's confirmation of the Act's presumption that high-level waste generated in defense programs should be emplaced in one or more of the civilian geologic repositories. This conclusion emerged from an evaluation of the use of the civilian repositories for the disposal of such defense waste. Since the evaluation concluded that there are no compelling reasons related to health and safety, national security, regulations, transportation, or public acceptability to develop, build, and operate a repository for defense waste only, the DOE is planning to emplace defense waste in the civilian repositories. Negotiations are under way with other DOE offices to both establish an equitable cost-sharing method and to develop a waste-acceptance schedule that integrates the two major waste streams.

### 2.5.2 OTHER HIGH-LEVEL WASTES

The Act includes in the definition of high-level radioactive waste "other highly radioactive material that the [Nuclear Regulatory] Commission, consistent with existing law, determines by rule requires permanent isolation." There are a number of additional wastes that may be designated high-level wastes by virtue of a future NRC rulemaking. The program is maintaining the flexibility to be able to accept wastes, including other DOE-generated defense wastes, that may require permanent disposal. The full costs would be borne by

the owners and generators, and a cost formula and waste-acceptance schedule would be established after such a designation.

### 2.5.3 SECOND REPOSITORY

The Act authorizes the DOE to conduct siting activities for a second repository and to submit to Congress a proposal for the authorization of a second repository. Furthermore, the Act stipulates that the first repository is to have a limited capacity until the second repository is in operation. The specified limits are spent fuel containing no more than 70,000 metric tons of uranium (MTU) or the high-level waste resulting from the reprocessing of such a quantity of spent fuel. Since current projections indicate that approximately 130,000 MTU of civilian spent fuel will require disposal through the year 2020, a second repository is required to accommodate the expected inventory. In the discussion of Section 2.6, the operating assumption, consistent with the intent of the Act, is that there will be at least two repositories.

## 2.6 PROGRAM ASSUMPTIONS FOR WASTE-SYSTEM COMPONENTS

Table 2-1 presents a select set of reference assumptions currently used in program planning and development. These assumptions cover the types and quantities of waste to be disposed of in a repository, the modes by which the waste will be transported and the expected distances, and the capacities and schedules for the two repositories and the MRS facility. The assumptions and their interrelationships are subject to change on the basis of future Congressional actions, DOE recommendations, future rates of spent-fuel generation, actual program progress, technological advancements, and a host of other variables. The values or ranges specified in Table 2-1 are intended to provide a representative magnitude of system-component capability. The various components can be adjusted as future conditions warrant.

Table 2-1. Program Assumptions About the Waste and the Components of the Waste-Management System

I. ASSUMPTIONS ABOUT THE WASTE

A. Waste Types

1. Spent fuel from commercial nuclear reactors is the dominant waste form. The spent-fuel assemblies are assumed to be consolidated and packaged before emplacement in a geologic repository.

2. Existing commercial high-level waste (from the West Valley Demonstration Project) is assumed to be accepted for disposal. No new commercial high-level waste is assumed to require disposal.