No. 03-2622C
(Judge Lettow)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

ENTERGY NUCLEAR INDIAN POINT 2, LLC,

Plaintiff,

v.

UNITED STATES OF AMERICA,

Defendant.

---

# DEFENDANT'S CORRECTED RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON LIABILITY, AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT ON LIABILITY

---

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

HAROLD D. LESTER, JR.
Assistant Director

JOSHUA E. GARDNER
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 305-7583
Fax: (202) 307-2503

Attorneys for Defendant

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

August 3, 2004

TABLE OF CONTENTS

PAGE(S)

STATEMENT OF THE ISSUES . . . . . 1

STATEMENT OF FACTS . . . . . 2

SUMMARY OF ARGUMENT . . . . . 2

ARGUMENT . . . . . 3

I. THE STANDARD FOR SUMMARY JUDGMENT . . . . . 3

II. ENIP HAS NO BASIS UPON WHICH TO CLAIM LIABILITY AGAINST THE GOVERNMENT FOR BREACH OF CONTRACT PRIOR TO SEPTEMBER 6, 2001, BECAUSE ENIP WAS NOT A PARTY TO THE STANDARD CONTRACT UNTIL THIS TIME . . . . . 4

A. ENIP Has The Burden Of Establishing Its Standing . . . . . 4

B. ENIP Cannot Satisfy Its Burden Of Establishing That It, Rather Than The Company That Assigned Its Contract To ENIP, Has Suffered An Injury-In-Fact Prior To September 6, 2001 . . . . . 5

III. DOE's OBLIGATION TO BEGIN ACCEPTANCE OF ENIP'S SNF AND/OR HLW BEGAN IN 2002, NOT 1998, AND THEREFORE THE FINDING OF LIABILITY PRIOR TO 2002 IS INAPPROPRIATE . . . . . 7

A. The Delivery Commitment Schedules That ConEd Submitted To DOE And That DOE Approved Constitute Binding Commitments That Provide A Contractual Basis For Determining Liability In This Case . . . . 7

B. ENIP's Assertion That The Court's Decision in *Maine Yankee* Is Dispositive As To The Issue Of The Date Of DOE's Liability Is Misplaced . . . . . 12

C. Other Decisions Of This Court, Finding That The Delivery Commitment Schedule Provisions Of The Standard Contract Do Not Define The Parties' Delivery And Acceptance Obligations Under The Contract, Render The Contract's Schedule Terms Meaningless And Render The Contract Too Indefinite To Enforce . . . . . 14

CONCLUSION . . . . . 21

# TABLE OF AUTHORITIES

CASES PAGE(S)

Anderson v. Liberty Lobby, Inc.,
477 U.S. 242 (1986) . . . . . . . . . . 3

Avia Group International, Inc. v. L.A. Gear California, Inc.,
853 F.2d 1557 (Fed. Cir. 1988) . . . . . . . . . . 3

Aviation Contractor Employees, Inc. v. United States,
945 F.2d 1568 (Fed. Cir. 1991) . . . . . . . . . . 20

Beacon Oil Co. v. O'Leary,
71 F.3d 391, 395 (Fed. Cir. 1995)... . . . . . . . . . . 13

Bel Pre Health Care Center, Inc. v. United States,
24 Cl. Ct. 495 (1991), aff'd, 980 F.2d 745 (Fed. Cir. 1992) . . . . . . . . . . 18

City of Tacoma, Department of Public Utilities v. United States,
31 F.3d 1130 (Fed. Cir. 1994) . . . . . . . . . . 20

Commonwealth Edison Co. v. United States,
56 Fed. Cl. 652 (2003) . . . . . . . . . . 14

Cosmo Construction Co. v. United States,
451 F.2d 602 (Ct. Cl. 1971) . . . . . . . . . . 6

Coyle's Pest Control, Inc. v. Cuomo,
154 F.3d 1302 (Fed. Cir. 1998) . . . . . . . . . . 19

David Nassif Associates v. United States,
214 Ct. C 644 F.2d 4 (1981) . . . . . . . . . . 18, 19

David Nassif Associates v. United States,
214 Ct. C 557 F.2d 249 (1977) . . . . . . . . . . 17, 18

Friends Of The Earth, Inc. v. Laidlaw Environmental Services,
528 U.S. 167 (2000) . . . . . . . . . . 4

TABLE OF AUTHORITIES (cont'd)

CASES PAGE(S)

Gould, Inc. v. United States,
935 F.2d 1271 (Fed. Cir. 1991) . . . . . . . . . . 15

Indiana Michigan Power Co. v. United States,
57 Fed. Cl. 88 (2003) . . . . . . . . . . 15, 16, 17

Lujan v. Defenders of Wildlife,
504 U.S. 555 (1992) . . . . . . . . . . 4, 5

Maine Yankee Atomic Power Co. v. United States,
225 F.3d 1336 (Fed. Cir. 2000) . . . . . . . . . . 13, 14

Massengill v. Guardian Mgt. Co.,
19 F.3d 196 (5th Cir. 1994) . . . . . . . . . . 19

Mays v. Trump Indiana, Inc.,
255 F.3d 351 (7th Cir. 2001) . . . . . . . . . . 18

Miccosukee Tribe of Indians v. Florida State Athletic Commission,
226 F.3d 1226 (11th Cir. 2000) . . . . . . . . . . 4, 5

Mingus Constructors, Inc. v. United States,
812 F.2d 1387 (Fed. Cir. 1987) . . . . . . . . . . 3

Modern System Tech. Corp. v. United States,
979 F.2d 200 (Fed. Cir. 1992) . . . . . . . . . . 18

Neeley v. Bankers Trust Co. of Tex.,
757 F.2d 621 (5th Cir. 1985) . . . . . . . . . . 18

Puritan Assocs. v. United States,
215 Ct. Cl. 976, 978 (1977) . . . . . . . . . . 6

Ridge Runner Forestry v. Veneman,
28 F.3d 1058 (Fed. Cir. 2002) . . . . . . . . . . 17

TABLE OF AUTHORITIES(cont'd)

CASES PAGE(S)

Shann v. Dunk,
84 F.3d 73 (2d Cir. 1996) . . . . . . . . . . 18

Sweats Fashions, Inc. v. Pannill Knitting Company, Inc.,
833 F.2d 1560 (Fed. Cir. 1987) . . . . . . . . . . 3

The Pantry, Inc. v. Stop-N-Go Foods, Inc.,
796 F. Supp. 1164 (S.D. Ind. 1992) . . . . . . . . . . 6

Transamerica Equipment Leasing Corp. v. Union Bank,
426 F.2d 273 (9th Cir. 1970) . . . . . . . . . . 18

White's Place, Inc. v. Glover,
222 F.3d 1327 (11th Cir. 2000) . . . . . . . . . . 5

Winstar Corp. v. United States,
21 Cl. Ct. 112 (1990), aff'd on reh'g en banc, 64 F.3d 1531 (Fed. Cir. 1995),
aff'd, 518 U.S. 839 (1996) . . . . . . . . . . 6

DOCKETED CASES

Consolidated Edison Company of New York, Inc. v. United States,
No. 04-0033 (Bruggink, J.) . . . . . . . . . . 5

Southern Nuclear Operating Co. v. United States,
No. 98-614C (Fed. Cl. April 7, 2004) . . . . . . . . . . 14

Yankee Atomic Electric Co. v. United States,
No. 98-126C (Fed. Cl. June 26, 2003) . . . . . . . . . . 14

STATUES AND REGULATIONS

42 U.S.C. §§ 10101-10270 . . . . . . . . . . 16

10 C.F.R. § 961.11, Art. V.B . . . . . . . . . . Passim

# INDEX TO APPENDIX


| DOCUMENT | PAGE |
|---|---|
| Portions of the Administrative Record of the DOE Standard Contract Rulemaking for Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste | 1 |
| Edison Electric Institute Comments, March 7, 1983 | 1 |
| Statement of M.C. Cook, Vice President, Florida Power & Light Company, March 1, 1983 | 35 |
| Northern States Power Comments, March 3, 1983 | 38 |
| Cincinnati Gas & Electric Comments, March 4, 1983 | 43 |
| Consumers Power Company Comments | 45 |
| Public Service Company of Colorado Comments | 50 |
| Cleveland Electric Illuminating Company Comments | 52 |
| Gulf States Utilities Comments | 56 |
| Wisconsin Public Service Corporation Comments | 62 |
| Yankee Atomic Electric Company Comments, March 4, 1983 | 64 |
| Public Service Electric and Gas Company Comments | 66 |
| Long Island Lighting Company Comments, March 3, 1983 | 70 |
| Northeast Utilities Comments, March 3, 1983 | 72 |
| Alabama Power Company Comments, March 4, 1983 | 74 |
| Kansas Gas and Electric Company Comments, March 1, 1983 | 78 |
| Iowa Electric Light and Power Company Comments, March 3, 1983 | 81 |
| Mississippi Power & Light Company Comments, March 4, 1983 | 84 |

INDEX TO THE APPENDIX (cont'd)


| DOCUMENT | PAGE |
|---|---|
| Portland General Electric Company Comments, March 4, 1983 | 89 |
| Detroit Edison Comments, March 3, 1983 | 92 |
| Florida Power & Light Company Comments, March 7, 1983 | 94 |
| Duquesne Light Company Comments, March 4, 1983 | 96 |
| Pacific Gas and Electric Company Comments, March 4, 1983 | 99 |
| TVA Comments | 104 |
| Houston Lighting and Power Company Comments | 106 |
| Middle South Services, Inc. Comments, March 7, 1983 | 107 |
| Vermont Yankee Nuclear Power Corp. Comments, March 7, 1983 | 110 |
| Consolidated Edison Company of New York Comments, March 7, 1983 | 113 |
| Dairyland Power Cooperative Comments, March 7, 1983 | 115 |
| Georgia Power Comments, March 4, 1983 | 118 |
| Letter from Secretary Hodel to Senator Johnston, September 7, 1984 | 122 |
| Letter from J. Michael Farrell to Honorable Philip R. Sharp, April 1, 1987 | 126 |
| Memo from Ronald A. Milner, December 20, 1991 | 141 |
| Letter from M. Detmer to J.M. Buchheit, March 4, 1992 | 143 |
| Letter from M. Detmer to Michael E. Thomas, March 4, 1992 | 153 |
| Letter from M. Detmer to J.E. McKissick, March 4, 1992 | 163 |

INDEX TO THE APPENDIX (cont'd)

DOCUMENT PAGE

Portions of Mission Plan for the Civilian Radioactive Waste Management Program, June 1985 . . . . . 188

Portions of OCRWM Mission Plan Amendment, June 1987 . . . . . 205

Portions of Annual Capacity Report, June 1987 . . . . . 208

Portions of Annual Capacity Report, June 1988 . . . . . 211

Portions of Annual Capacity Report, December 1990 . . . . . 214

Portions of Annual Capacity Report, December 1991 . . . . . 219

Portions of 1992 Acceptance Capacity Report, Revision 1, May 1993 . . . . . 227

Portions of Acceptance Priority Ranking and Annual Capacity Report, March 1995 . . . . . 234

Portions of *Indiana Michigan Power Co., et. al, v. Northern States Power Co.*, Nos. 95-1279, 95-1321, 95-1463, Petition For Review From Final Decision Of United States Department Of Energy . . . . . 243

Approved Delivery Commitment Schedules Submitted By Consolidated Edison of New York . . . 252

Consolidated Edison of New York's Standard Contract For Disposal Of Spent Nuclear Fuel And/Or High-Level Radioactive Waste . . . . . 258

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| ENTERGY NUCLEAR INDIAN POINT 2, LLC<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | <br><br><br><br>No. 03-2622C<br>(Judge Lettow) |

DEFENDANT'S CORRECTED RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON LIABILITY, AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT ON LIABILITY

Pursuant to Rule 56(b) of the Rules of this Court ("RCFC"), defendant, the United States, respectfully requests that the Court deny the motion for summary judgment on liability filed by plaintiff, Entergy Nuclear Indian Point 2, LLC ("ENIP") in this case. Additionally, defendant respectfully requests that the Court grant the Government's cross-motion for summary judgment on liability. There are no genuine issues of material fact that would preclude judgment as a matter of law in defendant's favor. In support of our motion, we rely upon the following brief and appendix, the accompanying proposed findings of uncontroverted fact, and the pleadings filed by ENIP in this case.

STATEMENT OF THE ISSUES

1. Whether ENIP has standing to assert liability against the Government based upon alleged breaches that occurred prior to its assignment of the Standard Contract on September 6, 2001.

2. Whether the Department of Energy's liability to ENIP should be established as of January 31, 2002, the date of DOE's first post-assignment approved scheduled acceptance of spent nuclear fuel ("SNF") and/or high-level waste ("HLW"), as identified in an approved

delivery commitment schedule ("DCS").

## STATEMENT OF FACTS

For our statement of facts, we respectfully refer the Court to our proposed findings of uncontroverted fact, which accompany this motion.

## SUMMARY OF ARGUMENT

ENIP claims that the Government "breached ENIP's Standard Contract when it failed to begin disposal of ENIP's and other utilities' spent nuclear fuel on January 31, 1998." SJ Mot. at 1-2. Consequently, ENIP seeks the entry of an order establishing DOE's liability as of January 31, 1998. Id. However, ENIP's request is improper for two independent reasons.

First, ENIP was not a party to the Standard Contract on January 31, 1998. Indeed, on September 6, 2001, the original contract holder, Consolidated Edison Company of New York ("ConEd"), assigned the Standard Contract to ENIP. The Department of Energy had no obligation to accept any of ENIP's SNF and/or HLW until some time after the date of the assignment. Consequently, ENIP lacks standing to contend that the Court should enter an order on liability as of January 31, 1998.

Second, under the terms of the Standard Contract, DOE was not obligated to accept SNF from every Standard Contract holder on January 31, 1998. Instead, as discussed below, the Standard Contract establishes a mechanism by which specific acceptance obligations from individual Standard Contract holders, including the specific amounts of SNF and/or HLW that are to be accepted during specific periods of time and at specific locations under specific Standard Contracts, are created and defined. ConEd, the original contract holder with DOE, acted in accordance with the Standard Contract's contractual mechanism for creating these

specific acceptance obligations, submitting delivery commitment schedules ("DCSs") to DOE that DOE subsequently approved.

Under this contractual mechanism, the 2002 delivery commitment schedule is the first approved schedule to which ENIP could potentially be entitled as an assignee to the Standard Contract. Therefore, because DOE had no obligation to accept any of ENIP's SNF and/or HLW until January 31, 2002, at the earliest, that is the appropriate date at which DOE's potential liability under the Standard Contract should be established.

## ARGUMENT

### I. THE STANDARD FOR SUMMARY JUDGMENT

Summary judgment is an acceptable and favored procedural means for disposition of claims or issues as to which there are no genuine issues of material fact in dispute. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1390 (Fed. Cir. 1987). It is "a salutary method of disposition designed to secure the just, speedy and inexpensive determination of every action." Sweats Fashions, Inc. v. Pannill Knitting Company, Inc., 833 F.2d 1560, 1562 (Fed. Cir. 1987) (quoting Celotex Corp. v. Catrett, 477 U.S. 317 (1986)). "[T]here is no genuine issue of material fact for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." Avia Group Int'l, Inc. v. L.A. Gear California, Inc., 853 F.2d 1557, 1560 (Fed. Cir. 1988) (quoting Anderson, 477 U.S. at 249-50). When the moving party is entitled to judgment as a matter of law, summary judgment is appropriate. RCFC 56(c). In this case, there is no dispute over any facts that could preclude the Government's entitlement to summary judgment upon the issue presented here.

## II. ENIP HAS NO BASIS UPON WHICH TO CLAIM LIABILITY AGAINST THE GOVERNMENT FOR BREACH OF CONTRACT PRIOR TO SEPTEMBER 6, 2001, BECAUSE ENIP WAS NOT A PARTY TO THE STANDARD CONTRACT UNTIL THIS TIME

### A. ENIP Has The Burden Of Establishing Its Standing

ENIP's motion for summary judgment on liability is premised upon the assumption that DOE's partial breach of the Standard Contract resulting from DOE's failure to begin SNF acceptance from the commercial nuclear utility industry by January 31, 1998, automatically created an injury-in-fact to each and every member of the commercial nuclear utility industry. However, ENIP overlooks the fact that it had absolutely no rights under or interest in the Standard Contract prior to the assignment by ConEd of its contractual rights to ENIP. Consequently, DOE had no obligation to accept ENIP's SNF and/or HLW before September 6, 2001, and ENIP consequently lacks standing to assert DOE's liability for alleged breaches that occurred prior to this date.

The "irreducible constitutional minimum" of standing places the burden upon the plaintiff to establish each of three elements: (1) a "concrete and particularized" injury in fact that is "not conjectural or hypothetical;" (2) a causal connection between the alleged violation and the injury; and (3) the ability of the court to redress the injury by a favorable decision:

> [T]o satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

Friends Of The Earth, Inc. v. Laidlaw Envtl. Servs., 528 U.S. 167, 180-81 (2000) (citations omitted); see Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992) (complainant bears

the burden of establishing all three elements of standing). "The plaintiff has the burden to 'clearly and specifically set forth facts sufficient to satisfy [] Art. III standing requirements.'" Miccosukee Tribe of Indians v. Florida State Athletic Comm'n, 226 F.3d 1226, 1230 (11th Cir. 2000) (quoting Whitmore v. Arkansas, 495 U.S. 149, 155 (1990)); see White's Place, Inc. v. Glover, 222 F.3d 1327, 1329 (11th Cir. 2000) (plaintiff has the burden "to allege and then to prove facts sufficient to support jurisdiction"). "If the plaintiff fails to meet its burden, this court lacks the power to create jurisdiction by embellishing a deficient allegation of injury." Miccosukee Tribe, 226 F.3d at 1230.

To satisfy the injury-in-fact requirement, the plaintiff must demonstrate "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." Lujan, 504 U.S. at 560 (internal quotations and citations omitted). Injury-in-fact, like the other elements of standing, "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at successive stages of litigation." Id. at 561.

### B. ENIP Cannot Satisfy Its Burden Of Establishing That It, Rather Than The Company That Assigned Its Contract To ENIP, Has Suffered An Injury-In-Fact Prior To September 6, 2001

On September 6, 2001, ConEd assigned its contract for Indian Point 1 and 2 to ENIP. In its letter notifying DOE of its assignment of the Standard Contract to ENIP, ConEd stated that "Con Edison has, effective September 6, 2001, assigned Con Edison's rights and obligations under the Contract to Entergy, with the exception of all claims and causes of action in respect of damages to property or economic loss related to or pertaining to the Department of Energy's breaches or defaults under the Contract accrued as of September 6, 2001, whether relating to

periods prior to or following September 6, 2001." A. 303 (Emphasis added).[1]

Under these circumstances, ENIP has no standing to assert that the Government is liable for any alleged breaches that occurred prior to September 6, 2001. The existence of a breach of contract is but one element of the issue of liability. See The Pantry, Inc. v. Stop-N-Go Foods, Inc., 796 F. Supp. 1164, 1166 (S.D. Ind. 1992) ("Plaintiff requested a judgment finding in Plaintiff's favor on the issue of liability and not merely a component element of that issue (whether there was a breach)"); Winstar Corp. v. United States, 21 Cl. Ct. 112, 117 (1990) ("court requires further briefing on several elements of plaintiffs' contract claim which are necessary to determine liability," including "whether a breach occurred" and, "if so, whether it resulted in injury"), aff'd on reh'g en banc, 64 F.3d 1531 (Fed. Cir. 1995), aff'd, 518 U.S. 839 (1996) (emphasis added).

The Court of Claims has recognized that, before a Government contractor is entitled to judgment on entitlement, it must establish as part of its proof that it suffered some damage, beyond mere speculation, because of the Government's actions: "Even if, as here, the assessment of damages is reserved for the quantum phase of the case, the plaintiff as part of its proof of entitlement, must show it was damaged to some extent, by defendant's derelictions, and it has

[1] ConEd also has sued the Government seeking damages for breach of the Standard Contract. See Consolidated Edison Company of New York, Inc. v. United States, No. 04-0033 (Bruggink, J.). Because ConEd and ENIP potentially are seeking duplicative and/or inconsistent damages based upon the same contract, the Government anticipates filing with the Court a motion to consolidate these two cases. The Government anticipates that it will file the motion with this Court, as the earlier-filed case, pursuant to RCFC 40.2(a)(3), with a copy filed in ConEd.

failed to do so . . . ." Puritan Assocs. v. United States, 215 Ct. Cl. 976, 978 (1977);[2] see Cosmo Constr. Co. v. United States, 451 F.2d 602, 605 n.3 (Ct. Cl. 1971) ("A wrong done, but from which no loss or damage results . . . will not sustain an action.") (citation omitted). In an action involving issues of both entitlement and quantum, "evidence on damages or quantum is not totally excluded [from consideration of entitlement], because there must be some evidence of damage to support a finding on liability. . . . sufficient to demonstrate that the issue of liability is not purely academic." Id. at 605-06.

Here, ENIP could not have suffered an injury as a result of DOE's failure to begin SNF acceptance from the commercial nuclear utility industry by January 31, 1998, as ENIP was not assigned ConEd's rights under the Standard Contract until September 6, 2001. Instead, any injury that ENIP incurred necessarily would result from DOE's failure to accept ENIP's SNF at some point after the date of assignment, and as provided for by the approved delivery commitment schedules. Consequently, ENIP has no basis for arguing that DOE had an obligation to accept its SNF and/or HLW on January 31, 1998, or that such an alleged breach of this obligation caused it to incur damages.

## III. DOE's OBLIGATION TO BEGIN ACCEPTANCE OF ENIP'S SNF AND/OR HLW BEGAN IN 2002, NOT 1998, AND THEREFORE THE FINDING OF LIABILITY PRIOR TO 2002 IS INAPPROPRIATE

### A. The Delivery Commitment Schedules That ConEd Submitted To DOE And That DOE Approved Constitute Binding Commitments That Provide A Contractual Basis For Determining Liability In This Case

In addition to the fact that ENIP lacks standing to assert liability against the Government

[2] Although Westlaw states that this is an unpublished disposition, the opinion is actually published in the United States Court of Claims Reports. See 215 Ct. Cl. at 976.

prior to September 6, 2001, the delivery commitment schedules submitted by ConEd, and subsequently approved by DOE, establish that DOE's first post-assignment obligation to accept SNF and/or HLW would have occurred between January 31, 2002 and January 30, 2003. Although ENIP claims that DOE's delay in beginning SNF acceptance by January 31, 1998, constitutes a partial breach of the Standard Contract, that breach, in and of itself, does not render DOE liable to ENIP. Nor does it establish that ENIP has incurred any damages as a result of DOE's alleged breach of the Standard Contract. Instead, DOE's contractual liability arises from its inability to accept SNF identified in an approved DCS and final delivery schedule.

The Standard Contract created a mechanism by which contract holders would obtain commitments from DOE that would define the specific 12-month periods – beginning January 31, 1998 – within which DOE would accept specific amounts of SNF from specific contract holders. That contractual mechanism required all contract holders, when they wanted DOE to accept their SNF, timely to submit a delivery commitment schedule ("DCS") to DOE at least 63 months prior to the desired SNF acceptance date, followed by submission of a final delivery schedule. See 10 C.F.R. § 961.11, Art. V.B. Submission of a DCS, followed by actions necessary to obtain DOE's approval of that DCS, constituted a condition precedent to DOE's obligation to accept any SNF from any particular contract holder.

The Standard Contract identifies a general framework for determining the order, or priority, of SNF acceptance from the various contract holders. It provides that "acceptance priority [for contract holder SNF and HLW] shall be based upon the age of the SNF and/or HLW as calculated from the date of discharge of such material from the civilian nuclear power reactor." 10 C.F.R. § 961.11, Art. VI.B.1. It further provides that "DOE will first accept from Purchaser

the oldest SNF and/or HLW for disposal in the DOE facility, except as otherwise provided for in paragraphs B and D of Article V" and in paragraph B.1.b of Article VI. Id. Therefore, the Standard Contract generally requires that the "order" of DOE's acceptance of contract holders' SNF be based upon an "oldest fuel first" scenario, subject, among other things, to definitization of an allocation commitment to accept SNF through the contract holder's submission of, and DOE's approval of, a delivery commitment schedule.

Pursuant to the terms of the Standard Contract, and beginning not later than July 1, 1987, DOE was to "issue an annual capacity report for planning purposes," which would "set forth the projected annual receiving capacity for the DOE facility(ies) and the annual acceptance ranking relating to DOE contracts for the disposal of SNF and/or HLW including, to the extent available, capacity information for ten (10) years following the projected commencement of operation of the initial DOE facility." 10 C.F.R. § 961.11, Art. IV.B.5.b. The Standard Contract provided DOE with the authority to identify and publish for planning purposes the rates of SNF acceptance that it anticipated, at any given time, might be utilized by DOE once SNF acceptance began. See id. Further, beginning on April 1, 1991, DOE was to "issue an annual acceptance priority ranking for receipt of SNF and/or HLW at the DOE repository," based upon "the age of SNF and/or HLW as calculated from the date of discharge of such material from the civilian nuclear power reactor" and with "[t]he oldest fuel or waste . . . hav[ing] the highest priority for acceptance," except as provided in Articles V.B, V.D, and VI.B.3. Id., Art. IV.B.5.a.

Further, beginning January 1, 1992, following DOE's issuance of the 1991 Annual Capacity Report and Acceptance Priority Ranking, the contract holders were required to submit delivery commitment schedules to DOE, "in the form set forth in Appendix C" to the Standard

Contract, in which they would "identify all SNF and/or HLW the Purchaser wishes to deliver to DOE beginning sixty-three (63) months thereafter." 10 C.F.R. § 961.11, Art. V.B.1 (emphasis added). Accordingly, if the 1991 ACR identified a 1998 allocation for SNF acceptance from a particular contract holder, and if the contract holder wanted to use that 1998 allocation, the contract holder would have to submit a DCS for 1998 acceptance no later than September 30, 1992. See id.; A. 145-52 ("Instructions For Completing The Appendix C Delivery Commitment Schedule").

DOE was to "approve or disapprove such schedules within three (3) months after receipt." 10 C.F.R. § 961.11, Art. V.B.1. "In the event of disapproval, DOE [was to] advise the Purchaser in writing of the reasons for disapproval and request a revised schedule from the Purchaser, to be submitted to DOE within thirty (30) days after receipt of DOE's notice of disapproval." Id. DOE had 60 days to approve or disapprove any revised DCS submission. Id., Art. V.B.2. "In the event of disapproval [of the revised DCS submission], DOE [was to] advise the Purchaser in writing of the reasons for such disapproval and [to] submit [DOE's] proposed schedule." Id. If the contract holder disagreed with DOE's proposed schedule, the parties were required "promptly [to] seek to negotiate mutually acceptable schedule(s)." Id.

Upon approval by DOE, the delivery commitment schedule defined, among other things, the first year in which DOE was obligated to begin acceptance of a contract holder's SNF, and the amount of SNF that DOE was to take from a particular contract holder in a given year. 10 C.F.R. § 961.11, Appendix C. As the Standard Contract expressly provided, the SNF that DOE was to accept for any particular year "shall be specified in a delivery commitment schedule as provided in Article V below." Id., Art. II. Absent a delivery commitment schedule, DOE had no basis for

identifying any SNF that a contract holder intended to deliver to DOE within a given year. Further, the "oldest fuel first" acceptance priority ranking in Article VI.B.1 of the Standard Contract was made expressly contingent upon the DCS provisions in Article V.B, indicating that, absent a submitted and approved DCS for a given year, a contract holder would lose its priority, or right to SNF acceptance, for that year. Thus, a contract holders' submission of a DCS, and DOE's approval thereof, determined the first year in which DOE was obligated to begin acceptance of the contract holder's SNF and HLW.

Indeed, a contract holder's failure to submit a delivery commitment schedule at least 63 months before its acceptance allocation waives its position in the acceptance queue for that particular allocation period. The Standard Contract requires that, beginning January 1, 1992, the contract holder "shall submit to DOE the [delivery commitment schedules] which shall identify all SNF and/or HLW the Purchaser wishes to deliver to DOE beginning sixty-three (63) months thereafter." 10 C.F.R. § 961.11, Art. V.B.1 (emphasis added). Further, the Standard Contract defines the scope of the Standard Contract as relating to the acceptance by DOE of SNF "specified in a delivery commitment schedule as provided in Article V below." Id. § 961.11, Art. II. Until a contract holder submits a DCS for a particular year, DOE cannot approve a specific delivery commitment to that contract holder for that year. See id. § 961.11, Art. V.B.1. Accordingly, absent an approved DCS through which a contract holder commits to delivering a specific amount of SNF to DOE in a given year, there is no basis in the Standard Contract upon which DOE could, or would, be able to accept any SNF from a contract holder in that year. If a contract holder elects not to submit a DCS for a particular year in which DOE had provided it an allocation, the contract holder has waived its rights to acceptance for that allocation period.

The delivery commitment schedule thus defined the amount of SNF and/or HLW that DOE would accept from a contract holder in a given year, and established the first year in which DOE was obligated to begin that acceptance. Further definitization of the timing for SNF and/or HLW acceptance came through the submission, review, and approval of final delivery schedules. Specifically, not less than 12 months before the delivery date "for delivery of SNF and/or HLW covered by an approved [DCS], the contract holder holding that DCS was required to "submit to DOE final delivery schedules . . . ," which DOE would review and either approve or disapprove. 10 C.F.R. § 961.11, Art. V.C. The final delivery schedule required identification of the proposed "delivery first estimate" to further define the specific dates for SNF and HLW acceptance during the assigned year. As with the DCS submittal and approval process, if the parties could not agree upon the final delivery schedule, the parties were required "promptly [to] seek to negotiate mutually acceptable schedule(s)."[3] Id.

In this case, ConEd followed the procedures described above in submitting DCSs. Indeed, DOE approved each of the DCSs submitted by ConEd. As discussed above, ConEd sold its Indian Point plants and assigned its DOE contract to ENIP on September 6, 2001. Therefore, prior to this date, DOE was not obligated to accept ENIP's SNF. Rather, at most, DOE had an obligation to accept ConEd's SNF and/or HLW in 1998, 1999 and 2000.

---

[3] If the parties could not agree upon a disapproved delivery commitment schedule or a final delivery schedule after negotiation, the Standard Contract's "Disputes" clause would apply. 10 C.F.R. § 961.11, Art. XVI.A. Pursuant to that clause, "any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail or otherwise furnish a copy to the Purchaser." Id. The contracting officer's decision is final and conclusive unless, within 90 days from the purchaser's date of receipt of the decision, the purchaser appeals in writing to the Department of Energy Board of Contract Appeals. Id.

Indeed, because there was no scheduled acceptance for 2001, the first possible acceptance of ENIP's SNF and/or HLW would have occurred between January 31, 2002 and January 30, 2003. Because ConEd transferred its nuclear plant and assigned its DOE contract to ENIP on September 6, 2001, and because DOE was not obligated to accept ENIP's SNF until January 31, 2002, at the earliest, ENIP did not accrue any rights against DOE arising from the Standard Contract prior to this date. Consequently, the entry of liability as of January 1998 is inappropriate under the circumstances of this case.

B. ENIP's Assertion That The Court's Decision in *Maine Yankee* Is Dispositive As To The Issue Of The Date Of DOE's Liability Is Misplaced

In its motion for summary judgment on liability, ENIP suggests that it was entitled to have DOE begin accepting its SNF by January 31, 1998. However, any such requirement would completely conflict with the "oldest fuel first" acceptance requirement in the Standard Contract. Moreover, ENIP implies that the Government's position that plaintiff is not entitled to damages directly stemming from the January 31, 1998 acceptance date are barred by the United States Court of Appeals for the Federal Circuit's decision in Maine Yankee Atomic Power Co. v. United States, 225 F.3d 1336 (Fed. Cir. 2000). ENIP is incorrect. At the time that the Government filed its interlocutory appeal in Maine Yankee in July 1999, all three of the plaintiffs-appellees in that appeal had previously submitted and obtained approval of DCSs that required DOE to begin acceptance of specific amounts of their SNF either by January 31, 1998, or January 31, 1999. Accordingly, because the date for DOE to begin acceptance of these plaintiffs-appellees' SNF had already passed, DOE had already committed its partial breach, and no reason existed to note the contractual mechanisms for establishing the specific SNF delivery and acceptance

commitments. As a result, unlike this case, the Government did not raise in the Maine Yankee appeal the point concerning the DCS process or the lack of specific commitments absent approved DCSs under the Standard Contract's schedule terms.

Because the Government did not, and did not need to, raise the issue presented here in the Maine Yankee appeal, the Maine Yankee decision does not constitute stare decisis regarding whether DOE partially breached the Standard Contract with regard to the plaintiff in this case. "Stare decisis applies only to legal issues that were actually decided in a prior action" and not to issues that "were not litigated or resolved" in a prior action. Beacon Oil Co. v. O'Leary, 71 F.3d 391, 395 (Fed. Cir. 1995). Because the issues regarding plaintiff's need to submit DCSs and the role of DCSs in the contractual scheme of defining acceptance commitments was not evaluated or decided in Maine Yankee, that decision does not constitute stare decisis regarding that issue and does not, in any event, establish that DOE breached every single Standard Contract on January 31, 1998, in a manner that creates liability to each contract holder.

C. Other Decisions Of This Court, Finding That The Delivery Commitment Schedule Provisions Of The Standard Contract Do Not Define The Parties' Delivery And Acceptance Obligations Under The Contract, Render The Contract's Schedule Terms Meaningless And Render The Contract Too Indefinite To Enforce

As the Court is aware, this Court has issued two published decisions and two unpublished decisions resolving motions regarding the effect of the DCSs in the cases in which they were issued. In those cases, the Court has either determined that the DCSs are meaningless or have reserved the issue for trial. However, with all due respect, the Court's decisions in those cases do not consider the practicalities of the acceptance of SNF necessitated by the Standard Contract.

The Court's decision in Commonwealth Edison Co. v. United States, 56 Fed. Cl. 652

(2003), the rationale of which the Court adopted by unpublished orders in Yankee Atomic Electric Co. v. United States, No. 98-126C (Fed. Cl. June 26, 2003) (Merow, S.J.), and Southern Nuclear Operating Co. v. United States, No. 98-614C (Fed. Cl. April 7, 2004) (Merow, S.J.), rejected the Government's arguments that the schedule provisions contained in the Standard Contract provide the mechanism for determining the SNF acceptance schedule. Yet, the Court did not explain – from a practical standpoint – the manner in which SNF acceptance would, could, or will work absent reference to that schedule mechanism. Finding that the delivery commitment schedule ("DCS") process did not limit the contract holder's damages or limit its right to the acceptance of larger amounts of SNF than identified in those DCSs, the Court found that the DCS process was only "non-binding and preliminary." Id. at 663. Yet, the Court did not explain the manner in which SNF acceptance could practically operate under the Standard Contract without reference to the DCS process: specifically, without the DCS process, the Standard Contract contains no requirement that the contract holder notify the Department of Energy ("DOE") of the amount of SNF it wants DOE to take in any particular year (either in advance or on the day that acceptance is desired); no notice of the location, date, or time for that acceptance within a particular year; and no notice of the characteristics of the SNF that will need to be accepted at that time or the size of the cask that DOE will have to procure to transport the SNF.

Without requirements for advance notice, such as that required by the DCS provisions, and given the long lead times that many aspects of DOE's performance take (such as the procurement of the transportation casks), DOE could never perform the Standard Contract if interpreted as it has been in the ComEd case. Further, the ComEd Court failed to explain how,

given its belief that the DCS provisions of the Standard Contract are meaningless, DOE would be able to perform its obligations to accept SNF. Certainly, contract provisions cannot be interpreted in a manner that renders them meaningless. See Gould, Inc. v. United States, 935 F.2d 1271, 1274 (Fed. Cir. 1991) (contract interpretation should not render portion of contract meaningless). Yet, the ComEd decision renders the DCS provisions meaningless and, further, would make the Standard Contract virtually impossible to perform. As previously discussed, the Court should find that the DCS provisions in the Standard Contract have meaning and, given that they provide the sole means of establishing workable and practical SNF acceptance schedules, provide the basis for establishing the acceptance schedule for use in establishing damages in these cases.

In Indiana Michigan Power Co. v. United States, 57 Fed. Cl. 88 (2003), the Court stated that its "obligation is to provide a rate of [SNF] acceptance that the Department of Energy would have employed in absence of the breach." Id. at 100 (emphasis added). With all due respect, that focuses upon the wrong question. The issue presented in Indiana Michigan required a determination of the rate of SNF acceptance that DOE was contractually obligated to satisfy. DOE cannot be held financially responsible in damages for a failure to take actions that it might have elected voluntarily to perform, even though it was not required to do so. The only damages that the Court can award are those based upon DOE's breach of its obligation to perform actions that it was contractually obligated to perform. Accordingly, the Court's finding in Indiana Michigan that "[n]othing in the record supports the collection rate that defendant would use – 900 metric tons per year," id. at 98, is irrelevant to the identification of the rate at which DOE was contractually obligated to accept SNF.

The Indiana Michigan Court also found, like the Court in ComEd, that the schedule terms of the Standard Contract did not define the contractual acceptance schedule and, in fact, found that both "Congress and the parties anticipated that the Department of Energy would collect fuels at a rate sufficient to eliminate the need for additional storage capacity on site and to reduce the backlog of already-stored materials." Id. at 99. Yet, the Court in Indiana Michigan cites no support for this assertion. As we establish in our motion, there is no language in the Nuclear Waste Policy Act, 42 U.S.C. §§ 10101-10270, or its legislative history that identifies any such congressional "anticipation," and we are aware of no documentation that supports a belief by DOE that it was contractually binding itself to such an obligation. In fact, as discussed in our motion, DOE declined during the administrative proceedings that resulted in the promulgation of the Standard Contract to place any such requirement in the Standard Contract. Further, the Indiana Michigan Court's finding that a "3,000-ton annual rate of delivery" is a reasonable term simply to insert into the Standard Contract has no basis and, in any event, cannot be done in a summary judgment proceeding. Not only does it ignore the DCS process and the agreements that DOE and numerous utilities had already made, it creates a contract to which the parties had never agreed.

In fact, the trial court's decisions in all four cases eliminate the existing schedule terms from the Standard Contract, leaving the Standard Contract with no mechanism for determining when, how, or where DOE will accept SNF and/or HLW or for allowing DOE, assuming that SNF acceptance had timely begun, to identify the SNF that it would need to accept, the dates on which it would need to accept it, and the locations at which it would need to accept. In essence, the Court's decisions have rendered the schedule terms of the Standard Contract so indefinite that

the Standard Contract is inoperable.

The Court of Claims has previously observed that, "[n]ormally, the task of supplying a missing, but essential, term (for an agreement otherwise sufficiently specific to be enforceable) is the function of the court." David Nassif Assocs. v. United States, 214 Ct. Cl. 407, 423, 557 F.2d 249, 258 (1977). However, the limitation upon the Court's ability to supply its own term is clearly stated: "for an agreement otherwise sufficiently specific to be enforceable." Id. Here, the trial court in the ComEd, Indiana, and Yankee cases has eliminated the contract's own schedule mechanism and substituted, or will have a trial through which it intends to substitute, a schedule term that the Court thinks would be reasonable. Yet, the acceptance schedule that the Court in Indiana Michigan selected for the contract is not based upon any information or language in the contract itself. To the contrary, the Court dismissed any reliance upon the agreements regarding schedule that the parties had already made, as identified in approved DCSs. Instead, the Court simply inserted its own term into the Standard Contract.

A court cannot make contracts for the parties. To be valid and enforceable, "a contract must have both consideration to ensure mutuality of obligation . . . and sufficient definiteness so as to 'provide a basis for determining the existence of a breach and for giving an appropriate remedy.'" Ridge Runner Forestry v. Veneman, 28 F.3d 1058, 1061 (Fed. Cir. 2002) (citations omitted). If an agreement is missing one or more essential terms, an agreement to agree on those terms is unenforceable because it lacks mutuality of intent and sufficient definiteness to determine the rights and liabilities of the parties. See Modern Sys. Tech. Corp. v. United States, 979 F.2d 200, 204 (Fed. Cir. 1992); Bel Pre Health Care Center, Inc. v. United States, 24 Cl. Ct. 495, 496 (1991) ("[i]f an essential term, such as the quantity term, has been omitted then there

can be no basis for deciding whether the agreement has been broken; the definiteness necessary for enforceability is lacking"), aff'd, 980 F.2d 745 (Fed. Cir. 1992) (table); Transamerica Equip. Leasing Corp. v. Union Bank, 426 F.2d 273, 274 (9th Cir. 1970) ("[w]here an agreement is not sufficiently definite to enable a court to give it an exact meaning or where an essential element is reserved for future agreement of both parties, a legal obligation cannot result"). "Courts refuse to enforce agreements that contain indefinite promises or terms they deem essential because judicial clarification of the uncertainty entails great danger of creating intentions and expectations that the parties themselves never entertained." Neeley v. Bankers Trust Co. of Tex., 757 F.2d 621, 628-29 (5th Cir. 1985); see Mays v. Trump Indiana, Inc., 255 F.3d 351, 357-58 (7th Cir. 2001) ("mere agreement to agree does not a binding contract make" without agreement on "all essential terms that are to be incorporated in the document"); Shann v. Dunk, 84 F.3d 73, 78-81 (2d Cir. 1996) ("[w]e believe the issue of Shann's liability for the deferred payments was of such importance that, if the district court finds the parties failed to agree on it, the court would be required to void the contract for absence of an essential term").

Obviously, as indicated in the Court of Claims' decision in Nassif, certain terms of a contract that are "essential" to it in some respects may, in certain circumstances, be identified by the Court, which must consider what "the parties would have agreed upon at the time of their initial . . . negotiations . . . ." David Nassif Assocs. v. United States, 214 Ct. Cl. 372, 376, 644 F.2d 4, 7 (1981). However, at a certain point, the missing term becomes so essential to the formation of the contract that the Court, if it supplies the missing term itself, creates a contract to which the parties had never agreed. In Nassif, even though the cafeteria that the plaintiff was to build may have been an "essential" part of the contract, it was not the central part of the contract,

which, instead, was a 20-year lease of floor space in an office building. Here, the "missing" term that the plaintiff seeks to have the Court impose into the Standard Contract is one of the central aspects of the Standard Contract and will have an extraordinary effect upon the damages that the plaintiff could recover from the Government here. Depending upon the rate and schedule of SNF acceptance that the Court imposes into the Standard Contract, the damages in all of the pending SNF cases could vary from a very small amount of damages to, as alleged by plaintiffs, billions of dollars. This enormous variance in the effect of the acceptance schedule term upon the parties' rights, obligations, and damages cannot be said to be minor and, in fact, is one of the most essential terms of the Standard Contract. To the extent that the Court disagrees with the Government's arguments that the schedule provisions of the Standard Contract and the approved DCSs identify the parties' obligations in this case, the Court cannot merely impose its own view of what a reasonable schedule term should be. A rejection of the Government's schedule arguments would effectively render the Standard Contract too indefinite to enforce. See Massengill v. Guardian Mgt. Co., 19 F.3d 196, 202 (5th Cir. 1994) ("When a writing does not show the parties' agreement on a minor contract term, the reviewing court may supply a reasonable interpretation. . . . But essential contract terms may not be supplied by a court. 'If any essential term is left unresolved, there is simply no contract and no obligation on the parties.'" (emphasis added; citation omitted); see also Coyle's Pest Control, Inc. v. Cuomo, 154 F.3d 1302, 1306 (Fed. Cir. 1998) (refusing to read "reasonable" term into contract, court found contract unenforceable as indefinite quantity contract because it lacked minimum quantity term).[4]

[4] It is true that the appellate court has found that a contract term which allows for future negotiation "impliedly places an obligation on the parties to negotiate in good faith," Aviation Contractor Employees, Inc. v. United States, 945 F.2d 1568, 1572 (Fed. Cir. 1991), and that,

As established above, the Standard Contract provides a mechanism for establishing the SNF acceptance schedule, including the rate of SNF acceptance. The parties followed that mechanism for a significant period of time. Further, DOE published its Acceptance Priority Ranking and Annual Capacity Report, which identified the acceptance schedule for the first ten years of contract performance. As a result, a schedule exists that the Court should view as the contractual "schedule" for purposes of assessing damages. Absent the Court's reliance upon that prior schedule, we cannot identify any basis for the Court to impose its own schedule into this contract. It is beyond dispute that DOE was not obligated to accept SNF from every Standard Contract holder by January 31, 1998. Other than through the DCS process, ENIP cannot identify any specific acceptance obligation, with identification of a specific date by which DOE had to begin acceptance of ENIP's SNF, that ran directly to ENIP. Because DOE had no obligation to accept ENIP's SNF prior to 2002, the entry of an order finding DOE liable to ENIP as of January 30, 1998 is inappropriate. Rather, based upon the approved DCSs in this case, the Court should enter the date of liability as of January 31, 2002.

## CONCLUSION

For the foregoing reasons, the Court should deny plaintiff's motion for summary judgment on liability and grant the Government's cross-motion for summary judgment on liability.

---

where the contract and applicable regulations provide guidelines for negotiations of future agreements, the Court may "determine whether or not the government negotiated according to the contract." City of Tacoma, Dep't of Public Utilities v. United States, 31 F.3d 1130, 1132 (Fed. Cir. 1994). However, that review does not empower the Court to supply essential missing terms if the parties fail to reach an agreement following good faith negotiations. In any event, it does not provide the Court with the ability to create a contract for the parties where the "missing" terms are so essential to the central purpose of the contract that the absence of the terms renders the contract too indefinite to enforce.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/ Harold D. Lester. Jr.
HAROLD D. LESTER, JR.
Assistant Director

s/ Joshua E. Gardner
JOSHUA E. GARDNER
Trial Attorney
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
1100 L Street, N.W.
ATTN: Classification Unit,
8th Floor
Washington, D.C. 20530
Tel: 202-305-7583
Fax: 202-307-2503

OF COUNSEL:
JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

August 3, 2004

CERTIFICATE OF FILING

I hereby certify that on August 3, 2004, a copy of the foregoing "DEFENDANT'S CORRECTED RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON LIABILITY, AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT ON LIABILITY" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Joshua E. Gardner