by requiring restructuring of the nation's electric industry, conditions and circumstances that might inhibit the desired growth of a competitive electric generation industry would be alleviated. In response to the federal initiative to open energy markets to increased competition on a national level, a number of states, including New York, initiated their own industry-restructuring programs designed to promote open competition for energy services at the state level, and to vertically disaggregate the provision of electric services by encouraging or mandating the divestiture of electric generating units by regulated public utility companies.

51. In 1996, NYPSC issued Opinion 96-12 which required regulated electric utility companies in New York to submit proposals for restructuring the way they conducted their business, including the separation of their generation from their transmission and distribution functions, preferably through the divestiture of their electric generation assets (initially excluding nuclear facilities), for the purpose of fostering the creation of a competitive electric marketplace in the State.

52. In response to Opinion 96-12, in 1997, Con Edison entered into a Settlement Agreement adopted by NYPSC, which provided that Con Edison would commence the divestiture of its fossil generation assets.

53. On August 27, 1997, NYPSC issued a Notice Soliciting Comments ("Notice"), which included a discussion with respect to methodologies for the future valuation of nuclear assets, with the stated objective that by 2002, nuclear electric generating plants would compete with other forms of generation in a fully competitive marketplace for electrical generation. The Notice concluded that notwithstanding particular issues, such as post-retirement requirements involving SNF, associated with nuclear assets, nuclear electric generating facilities could participate in a competitive

divestiture process if those elements particular to nuclear electric generation were dealt with outside the divestiture process.

54. At the time of the Notice, no operating nuclear electric generating facility in the country had been sold to a third-party purchaser in an arms-length transaction. The Notice stated that a competitive market could be established for nuclear generation "provided the selling utility retains responsibility for decommissioning and disposal of spent fuel irradiated prior to implementation of a competitive market." Therefore, by 1997, the disposition of SNF in the context of a DOE breach was acknowledged by governmental authorities to be an impediment to achieving a true market price for nuclear electric generating assets.

55. Further, the Notice recognized that the sale of nuclear electric generating assets could fail due to a lack of qualified purchasers capable of dealing with, and willing to assume, SNF and related decommissioning issues. To attract additional qualified purchasers, the Staff of NYPSC recommended that selling utilities be required to retain the SNF and decommissioning risks.

**THE AUCTION PROCESS**

56. In 1999, in response to the Notice, and consistent with the efforts of NYPSC to establish a competitive wholesale market for electric generation, Con Edison offered Indian Point for sale through a competitive auction process.

57. Con Edison identified and solicited the interest of potentially eligible bidders that were preliminarily thought to be operationally and financially qualified to become holders of the NRC operating licenses for Indian Point. Each of the potential bidders was sent an Early Interest Letter ("EIL") that described in general terms the

assets to be marketed and the sales process that would be followed. EIL recipients were invited to express their interest in participating in the auction.

58. The EIL process produced only several potential bidders that expressed an interest in the auction and were deemed qualified to participate in Phase 1. Each of those bidders was provided a confidential Offering Memorandum and afforded the opportunity to engage in initial due diligence. The informational materials confidentially provided to potential bidders and such due diligence activities as were engaged in by them extensively covered Indian Point decommissioning and SNF issues. Confidentiality was maintained throughout the auction process regarding the number and identity of the bidders.

59. At the conclusion of Phase 1, the bidders were invited to submit non-binding indicative bids for Indian Point. Only half of the Phase 1 bidders submitted indicative bids and were invited to participate in Phase 2, during which additional detailed information regarding the facilities and operations of Indian Point was provided.

60. At the conclusion of Phase 2, the bidders were asked to submit final, binding bids. Entergy was ultimately selected as the winning bidder, and on November 9, 2000, Con Edison and Entergy entered into an Asset Purchase and Sale Agreement (the "APSA"), contemplating Con Edison's sale of Indian Point to Entergy.

61. On information and belief, the low level of participation in the auction process for Indian Point was due in large part to the enhanced risks perceived by potential buyers associated with the uncertainties created by DOE's breach for both SNF disposal and decommissioning generally.

62. In order to effectuate the transfer of the operating licenses for Indian Point as required by the APSA and NRC licensing requirements, on December 12, 2000, Con Edison and Entergy jointly filed a petition with the NRC seeking its approval for the license transfer. In that context and consistent therewith, pursuant to Section 2.03(v) of the APSA, upon license transfer, Entergy was to assume all future liabilities and obligations with respect to decommissioning and the management, storage, removal, transportation, and disposal of SNF, as well as any future payments into the Nuclear Waste Fund. Accordingly, it was incumbent on Con Edison and Entergy to satisfy the NRC that the transaction provided Entergy with sufficient resources to fulfill Indian Point SNF obligations in accordance with the NRC's rules and regulations.

63. As part of the NRC approval process, the NRC staff submitted a number of Requests for Additional Information ("RAI"), inquiring further as to the level of decommissioning trust funding that the parties had agreed upon, as well as Entergy's financial ability to fulfill Indian Point SNF-related obligations, both present and long-term. In particular, the NRC staff wanted to know how Entergy proposed to satisfy the need to make additional capital investments in order to ameliorate DOE's SNF default which imminently required the provision of additional and costly SNF storage at Indian Point 2. Entergy represented to the NRC staff in its responses to the RAIs that the terms of the transaction provided it with ample financial resources to meet all of its obligations with respect to SNF on-site storage and management, as well as for the future decommissioning of Indian Point, and that "there is no unfunded financial liability associated with the decommissioning of IP1 and IP2" (i.e., Indian Point). Being satisfied with Entergy's RAI responses, the NRC staff recommended

approval of the license transfer application, which approval was granted by the NRC by Order dated August 27, 2001.

64. By Petition dated January 11, 2001, Con Edison and Entergy sought approval from NYPSC of the terms and conditions of the APSA for Indian Point, and approval was granted on August 31, 2001.

65. The APSA expressly reserves to Con Edison all claims against DOE related to breaches of the Standard Contract up to the closing date of the sale.

## DAMAGES SUFFERED BY CON EDISON

66. When on January 31, 1998 DOE reneged on its sixteen year-old statutory and contractual obligations to commence disposal of SNF, this failure on DOE's part to perform significantly diminished the value of Indian Point. When Indian Point was divested, this diminished value was reflected in the auction process, and ultimately in the terms and conditions of sale for an otherwise extremely valuable nuclear electric generating asset. DOE's failure to timely and completely fulfill its mandates under NWPA and its commitments under the Standard Contract directly resulted in such prospective purchasers, as were actually willing to entertain acquisition of nuclear electric generating facilities such as Indian Point, to account for the increased costs, risks, and uncertainties brought about by DOE in their respective valuations of the asset.

67. As a direct and proximate result of DOE's failure to perform its statutory and contractual obligations, Con Edison suffered significant damages. These damages fall into two general categories, namely (a) significant diminution in the market value for Indian Point which caused Con Edison to realize significantly less value as a result of the sale of Indian Point than would have been the case had DOE met

its obligations under NWPA and the Standard Contract, and (b) increased costs and expenditures incurred by Con Edison up to the closing date of Con Edison's sale of Indian Point to store and maintain SNF, and other related costs.

**DIMINISHED VALUE REALIZED BY CON EDISON**

68. DOE's failure to perform its statutory and contractual obligations to remove SNF caused a number of potential purchasers for nuclear electric generating facilities such as Indian Point to be artificially and improperly constrained, thereby reducing the beneficial effects of a competitive auction for these assets. Due to the increased risk and anticipated expense associated with storing SNF on-site indefinitely, potential buyers elected not to participate in the sales process for Indian Point, thereby shifting market power to a limited universe of potential buyers who were prepared to entertain assumption of SNF risks in the face of DOE's defaults. Had DOE been performing its SNF obligations, Con Edison would have received the benefits of a more competitive sales process, and the perceived future economic benefits of Indian Point as a source of electric sales revenues would have been significantly greater and more assured. However, DOE's failure to perform resulted in Con Edison receiving less value for Indian Point than it would and should have received had DOE fulfilled its statutory and contractual SNF obligations.

69. DOE's failure to meet its obligations under NWPA and the Standard Contract diminished the market value of Indian Point because the remaining useful economic life of the facility could not be determined. Absent a place to store the SNF or confidence DOE would fulfill its statutory and contractual obligations at any particular time, if ever, the continued operation of the plant for any significant period would not be possible. As a result, the value of the plant was substantially depleted, since the

future prospects of electric sales revenues were uncertain. The value of the plant was also diminished because the re-use value of the site will be deferred indefinitely until decommissioning and SNF removal are complete. Prospective purchasers of Indian Point reflected this limitation of prospects for assured future operation and re-use in their value assessments.

70. Shortly after DOE failed to initiate disposal of SNF on January 31, 1998, and as a result of DOE's failure, Indian Point began to rapidly approach the date by which it would have to shut down because there was no place to store its SNF. At the time of the sale of Indian Point, the need to construct and then operate for an indefinite period a costly on-site dry cask storage facility as a pre-condition to continued commercial operation of Indian Point 2 was immediately apparent.

71. Dry cask storage involves the construction of a large facility at the nuclear plant site within which SNF that has been removed from wet storage and placed in enormous casks weighing up to 100 tons each will be stored. The pursuit of a campaign to utilize dry cask storage technology at a particular site involves the design, local and federal permitting, and construction of the actual storage facility, equipment procurement and installation, and extensive procedure development and personnel training. A dry cask storage facility can take up to five years or longer to complete and make operational, assuming that all objections can be overcome and permits obtained, and can cost in the tens of millions of dollars. Each separate cask utilized in a dry cask storage facility costs approximately $1 million, with the initial cask order for a facility of Indian Point's size typically being more than a dozen casks. Further, at the time of the Indian Point sale, there was no assurance that such a facility would be approved,

whether capacity would be restricted, or as to what the nature of any permit or license conditions imposed and associated costs might be.

72. Obtaining NRC approval of the license transfer for Indian Point was an essential and critical element of the sales transaction between Con Edison and Entergy. An integral element of obtaining, maintaining, and transferring an NRC license for a nuclear power plant such as Indian Point is the obligation of the license holder to provide sufficient funds to cover the full costs of decommissioning the licensed facilities in accordance with NRC requirements, including the management and subsequent removal of all SNF from the site. Entergy assured the NRC that all future costs it would be required to bear as part of the decommissioning of Indian Point, including those costs related to the long term on-site maintenance of SNF, were being covered as part of the sales transaction, including the funds that Con Edison was required to transfer at closing. These costs were significantly greater than would otherwise have been the case due to DOE's failure to perform its obligations under NWPA and the Standard Contract.

73. As part of the NRC license transfer process and the NRC staff review of the license transfer application, the NRC staff performed a Safety Evaluation. A review of that staff analysis reveals that the NRC staff was significantly concerned with the lack of available storage capacity for SNF within the wet storage pool at Indian Point 2. The NRC staff posed specific and pointed questions to Entergy as to how it intended to address the rapidly approaching date when Indian Point 2 would no longer be able to operate because it had run out of SNF storage space. Entergy's response to the NRC stated that the NRC's concerns would be dealt with through the installation of an on-site dry cask storage facility, and that "the costs of dry cask storage have been

accounted for in the financial projections provided to the NRC in the application." Entergy therefore publicly acknowledged, for the purpose of and in order to obtain the NRC's approval to assume responsibility for the operation and ownership of Indian Point and its SNF, that it had been obliged to fully account for increased SNF storage costs in the Indian Point cost and revenue projections that Entergy had submitted to the NRC. Such increased SNF storage costs resulted from DOE's improper actions, in that they would not have been necessary but for DOE's failure to begin accepting SNF pursuant to NWPA and the Standard Contract. The recognition that significant on-site SNF storage costs would be imminently necessary at Indian Point lowered the perceived value of the asset.

74. Moreover, contemporaneous with Con Edison's divestiture activities, it became clear throughout the utility industry that DOE intended to continue fee collections at preexisting levels until at least 2010 (see, for example, the 1998 DOE Plan which was sent to all Standard Contract holders, including Con Edison, which plan set forth DOE's projected fee collections and expenditures for the SNF program). The fact that DOE had actually implemented the fee collection elements of the 1998 DOE Plan following the breach of its statutory and contractual obligations and the *Indiana Michigan* ruling finding SNF disposal and fee obligations to be reciprocal were also apparent and widely recognized in the utility industry. These factors, arising subsequent to the DOE's breach, caused potential buyers of Indian Point, including Entergy, necessarily to assume the continuation of such fees at the rate of approximately $6 to $8 million per year in the case of Indian Point, and to factor these payments into their valuation models, thereby further diminishing the value of Indian Point.

75. On information and belief, Entergy factored into its valuation and reduced the price for Indian Point to reflect all known and anticipated additional expenses associated with on-site storage of SNF and future Nuclear Waste Fund fees announced by DOE in the 1998 DOE Plan.

76. Under the Standard Contract, DOE was entitled to assess and collect, and the Standard Contract holder was obligated to pay into the Nuclear Waste Fund, only such fees as were authorized by NWPA. By the time of the Indian Point sales transaction, it was evident to potential buyers that DOE intended, and had already begun, to disregard the fee provisions of the Standard Contract, and instead to assess and collect amounts in excess of those authorized by NWPA and the Standard Contract. The 1998 DOE Plan made it clear that DOE intended to continue the over-collection of fees essentially indefinitely. However, the Standard Contract does not authorize DOE: a) to collect amounts to support DOE's breach of its obligations well into the 21st Century; b) to anticipate its liability as would ultimately be determined by the COFC and to embark upon a program of pre-collecting such amounts from Standard Contract holders; c) to pre-collect funds to repay or support operations damaged by DOE's failure to remove SNF; or d) to collect from and assign to Standard Contract holders cost responsibility for DOE's cost overruns associated with a noncompliant and significantly delayed waste disposal program. Notwithstanding this lack of authorization, DOE engaged in just such activities, which deprived Con Edison of the value of its assets and its entitlements under the Standard Contract, and, contrary to the provisions of the Standard Contract, improperly required Con Edison as the Indian Point Standard Contract holder to suffer the financial consequences of DOE's unauthorized actions.

## INCREASED SNF-RELATED COSTS INCURRED BY CON EDISON

77. Prior to its sale of Indian Point, Con Edison had been harmed as a direct and proximate result of DOE's failure to meet its statutory and contractual SNF obligations. That harm took the form of capital and operational expenditures it was obligated to incur due to DOE's misconduct which would otherwise not have been necessary.

78. As a result of DOE's inaction, Con Edison made substantial pre-closing capital and operating/maintenance expenditures to store and maintain Indian Point SNF. These outlays would not have been necessary had DOE fulfilled its obligation to begin accepting and disposing of SNF by January 31, 1998. As a result of DOE's failure to begin acceptance of SNF for disposal, Con Edison was required to incur costs in order to accommodate additional on-site SNF storage. Con Edison also incurred significant costs related to Indian Point's SNF storage, including developing an on-site dry cask storage facility, which costs would not have been incurred had DOE met its statutory and contractual SNF-related obligations.

## COUNT I

## BREACH OF CONTRACT

79. Con Edison repeats and re-alleges here all the allegations as set forth in paragraphs 1 through 78 above.

80. The Standard Contract creates unconditional obligations on DOE to begin accepting Con Edison's SNF by January 31, 1998. In consideration thereof, Con Edison paid more than $115 million into the Nuclear Waste Fund.

81. DOE has failed to perform its obligations under the Standard Contract to begin accepting SNF by January 31, 1998 (and has not done so to this day). DOE also

failed to perform its obligations under the Standard Contract pertaining to Nuclear Waste Fund fees. DOE's failure to do so constitutes a breach of the Standard Contract for which Con Edison is entitled to damages.

82. DOE's breach of the Standard Contract severely diminished the market value of Con Edison's nuclear electric generating facilities as reflected in the purchase price and other terms of the sales transaction, including the required levels of funding of the decommissioning trust accounts. Con Edison also incurred additional pre-closing costs, as well as other damages associated with efforts to provide for additional storage of SNF.

## COUNT II
## BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

83. Con Edison repeats and re-alleges here all the allegations as set forth in paragraphs 1 through 82 above.

84. The Standard Contract contains an implied covenant of good faith and fair dealing. This covenant requires DOE to cooperate with Con Edison and to reasonably and in good faith perform its duties under the Standard Contract and not to take actions that are detrimental to Con Edison's contractual rights.

85. DOE has breached the implied covenant of good faith and fair dealing by its fee assessment practices, and by failing to take appropriate action to meet its contractual commitment to begin accepting Con Edison's SNF for disposal by January 31, 1998. Prior to the closing date of Con Edison's sale of Indian Point (and to this day), DOE failed to provide a commitment as to when, if ever, it would accept SNF for disposal.

86. As a direct and proximate result of DOE's breach of the implied covenant of good faith and fair dealing, Con Edison has suffered damages as alleged above.

## COUNT III

## UNCOMPENSATED TAKING

87. Con Edison repeats and re-alleges here all the allegations as set forth in paragraphs 1 through 86 above.

88. DOE was unconditionally obligated under NWPA to begin acceptance of Con Edison's SNF by January 31, 1998. NWPA conferred upon Con Edison a right to have DOE dispose of Con Edison's SNF in a manner and at a cost consistent with the intent of Congress.

89. DOE's failure to commence taking custody of Con Edison's SNF by January 31, 1998 as required by the Act, and its fee assessment practices announced in the 1998 DOE Plan and subsequently implemented, deprived Con Edison of the full use and value of its nuclear electric generating facilities, caused it to incur substantial unnecessary capital and other expenses, and severely diminished the value of these facilities. This failure constitutes a taking of Con Edison's vested property rights without just compensation.

90. Con Edison possessed a protected property interest in the benefits of NWPA, including paying into the Nuclear Waste Fund only what the statute authorizes. DOE's disregard of this interest and its continued collection after January 31, 1998 of amounts in excess of those authorized by NWPA resulted in a systematic and unreasonable over-collection of those fees and a taking of Con Edison's property in violation of the Due Process and Takings Clauses of the Fifth Amendment. NWPA did

not authorize DOE: a) to collect amounts to support DOE's breach of its obligations well into the 21st Century; b) to anticipate its damage liability as would ultimately be determined by the COFC and to embark upon a program of pre-collecting such amounts from Standard Contract holders; c) to pre-collect funds to repay or support operations damaged by DOE's failure to remove SNF; or d) to collect from and assign to Standard Contract holders cost responsibility for DOE's cost overruns associated with a noncompliant and significantly delayed waste disposal program. Notwithstanding this lack of authorization, DOE has engaged in just such activities, depriving Con Edison of the value of its assets and property interest and improperly requiring Con Edison to suffer the financial consequences of DOE's unauthorized actions.

91. DOE's failure to begin acceptance of Con Edison's SNF has destroyed Con Edison's reasonable, investment-backed expectations arising from NWPA. DOE's conduct has deprived Con Edison of the full economic use of its nuclear electric generating facilities and related property, and reduced the tangible and intangible value of Indian Point as a going concern.

92. DOE's failure to perform its contractual and statutory responsibilities were clearly aimed at and intended to benefit the general public interest at the expense of Con Edison. DOE is obligated to undertake the exercise of proper procedures to ensure due process and the calculation of just compensation from the date of taking. DOE failed to exercise those procedures and failed to provide just compensation.

93. By reason of the foregoing, DOE has taken Con Edison's property in violation of the Fifth Amendment to the U.S. Constitution and is liable to Con Edison for just compensation.

## PRAYER FOR RELIEF

WHEREFORE, Con Edison respectfully requests that the Court enter judgment in its favor and against the United States as follows:

(1) On Count I, for damages in an amount to be established at trial;

(2) On Count II, for damages in an amount to be established at trial;

(3) On Count III, for just compensation in an amount to be established at trial;

(4) Pre-judgment and post-judgment interest as permitted by law;

(5) Costs of suit, including reasonable attorneys' fees, as permitted by law; and

(6) Such other and further relief as this Court may deem proper.

Date: January 13, 2004

Respectfully submitted,

Richard J. Conway
DICKSTEIN SHAPIRO MORIN
& OSHINSKY LLP
2101 L Street, N.W.
Washington, D.C. 20037
(202) 785-9700
*Counsel of Record for*
*Consolidated Edison Company of New York, Inc.*

Of Counsel: David M. Nadler
Nicholas W. Mattia, Jr.
Bradley D. Wine
DICKSTEIN SHAPIRO MORIN
& OSHINSKY LLP
2101 L Street, N.W.
Washington, D.C. 20037
(202) 785-9700

Brent L. Brandenburg, Esq.
Assistant General Counsel
Consolidated Edison Company of New York, Inc.
4 Irving Place -- Room 1830
New York, NY 10003
(212) 460-4333

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| CONSOLIDATED EDISON COMPANY, Plaintiff, | ) | |
| v. | ) | No. ______________ |
| UNITED STATES OF AMERICA, Defendant. | ) | |

**CONSOLIDATED EDISON'S CORPORATE DISCLOSURE STATEMENT**

Pursuant to RCFC 7.1, Consolidated Edison Company of New York, Inc. ("Consolidated Edison"), through its undersigned counsel respectfully submits the following corporate disclosure statement:

Consolidated Edison is a wholly owned subsidiary of its parent holding company, Consolidated Edison, Inc. Consolidated Edison, Inc., incorporated in New York in 1997, is a publicly held corporation.

Dated: 1/13/04

Respectfully Submitted,

Richard J. Conway
Dickstein Shapiro Morin & Oshinsky LLP
2101 L Street, N.W.
Washington, DC 20037-1526

Counsel of Record for Plaintiff
Consolidated Edison Company