**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| **ENTERGY NUCLEAR INDIAN POINT 2, LLC,**<br><br>Plaintiff,<br><br>v.<br><br>**THE UNITED STATES,**<br><br>Defendant. | No. 03-2622C<br>(Judge Lettow) |

**PLAINTIFF'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT ON LIABILITY AND RESPONSE IN OPPOSITION TO DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT ON LIABILITY**

Alex D. Tomaszczuk
**SHAW PITTMAN LLP**
1650 Tysons Boulevard
McLean, Virginia 22102
(703) 770-7940
(703) 770-7901(Fax)
Counsel of Record
for Plaintiff
Entergy Nuclear Indian Point 2, LLC

Of Counsel:

Jay E. Silberg
Devon E. Hewitt
Michael G. Lepre
Daniel S. Herzfeld
Jack Y. Chu
**SHAW PITTMAN LLP**
2300 N Street, N.W.
Washington, D.C. 20037
(202) 663-8000
(202) 663-8007 (Fax)

September 20, 2004

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ ii

INDEX OF APPENDIX ........ v

SUMMARY OF ARGUMENT ........ 1

ARGUMENT ........ 3

I. PLAINTIFF MAY SEEK DAMAGES BEGINNING FROM SEPTEMBER 6, 2001 BASED ON THE GOVERNMENT'S JANUARY 31, 1998 BREACH OF CONTRACT ........ 3

A. Plaintiff May Recover Damages From September 6, 2001 Based On The Purchase And Sale Agreement With ConEd ........ 4

B. DOE Breached The Indian Point 1 and 2 Standard Contract And Every Standard Contract On January 31, 1998 ........ 6

C. DOE's January 31, 1998 Breach Of Contract Caused Damages To Plaintiff Resulting In An Injury-In-Fact ........ 9

II. PLAINTIFF'S SUBMISSION OF A DELIVERY COMMITMENT SCHEDULE HAS NO BEARING ON THE QUESTION OF DOE'S LIABILITY FOR BREACH OF PLAINTIFF'S STANDARD CONTRACT ........ 12

A. Submission Of A DCS Form Was Not A Condition Precedent To DOE's Obligations Under The Standard Contract ........ 13

B. Because Of DOE's Breach, Plaintiff Was Not "Obligated" To Continue To Submit DCSs Or Submit FDSs ........ 14

C. Plaintiff Was Not Required To Submit Further DCS Forms Or To Submit FDS Forms Because Doing So Would Have Been Futile ........ 16

D. Other Aspects Of The DCS Submittal Process Were Flawed ........ 17

E. The Government's Criticisms Of This Court's Rulings On The DCS Provisions Of The Standard Contract Are Meritless ........ 20

CONCLUSION ........ 27

# TABLE OF AUTHORITIES

**CASES** **Page**

Ala. Power Co. v. United States,
307 F.3d 1300 (11th Cir. 2002) .......... 26

Atacs Corp. v. Trans World Communications, Inc.,
155 F.3d 659 (3d Cir. 1998) .......... 25

Aviation Contractor Employees, Inc. v. United States,
945 F.2d 1568 (Fed. Cir. 1991) .......... 25

Commonwealth Edison Co. v. United States,
56 Fed. Cl. 652 (2003) .......... *passim*

Coyle's Pest Control, Inc. v. Cuomo,
154 F.3d 1302 (Fed. Cir. 1998) .......... 25

David Nassif Assocs. v. United States,
644 F.2d 4 (Ct. Cl. 1981) .......... 24

Effects Assocs., Inc. v. Cohen,
908 F.2d 555 (9th Cir. 1990) .......... 14

First Hartford Corp. Pension Plan & Trust v. United States,
194 F.3d 1279 (Fed. Cir. 1999) .......... 9

First Nationwide Bank v. United States,
48 Fed. Cl. 248 (2000) .......... 24

Friends of the Earth, Inc. v. Laidlaw Envt'l Servs.,
528 U.S. 167 (2000) .......... 9

Ginsberg v. Austin,
968 F.2d 1198 (Fed. Cir. 1992) .......... 4

Gulf States Creosotin Co. v. Loving,
120 F.2d 195 (4th Cir. 1941) .......... 4

Hercules, Inc. v. United States,
292 F.3d 1378 (Fed. Cir. 2002) .......... 24

Howell v. United States,
51 Fed. Cl. 516 (2002) .......... 24

Indiana Mich. Power Co. v. DOE,
88 F.3d 1272 (D.C. Cir. 1996) .......... 7, 8, 26

Indiana Mich. Power Co. v. United States,
57 Fed. Cl. 88 (2003) .......... *passim*

Lorenz v. United States,
296 F.2d 746 (Ct. Cl. 1961) .......... 16

Maine Yankee Atomic Power Co. v. United States,
225 F.3d 1336 (Fed. Cir. 2000) .......... *passim*

Massengill v. Guardian Mgmt. Co.,
19 F.3d 196 (5th Cir. 1994) .......... 25

Morris v. United States,
33 Fed. Cl. 733 (1995) .......... 16

Northern Heel Corp. v. Compo Indus., Inc.,
851 F.2d 456 (1st Cir. 1988) .......... 15, 16

Northern States Power Co. v. DOE,
128 F.3d 754 (D.C. Cir. 1997) .......... 8, 26

Northern States Power Co. v. United States,
224 F.3d 1361 (Fed. Cir. 2000) .......... 8

Omaha Pub. Power Dist. v. Employers' Fire Ins. Co.,
327 F.2d 912 (8th Cir. 1964) .......... 15

R.A. Weaver & Assocs. v. Haas & Haynie Corp.,
663 F.2d 168 (D.C. Cir. 1980) .......... 15

Robinson v. United States,
305 F.3d 1330 (Fed. Cir. 2002) .......... 12

Roedler v. DOE,
255 F.3d 1347 (Fed. Cir. 2002) .......... 8

RT Computer Graphics, Inc. v. United States,
44 Fed. Cl. 747 (1999) .......... 14

Tennessee Valley Authority v. United States,
60 Fed. Cl. 665 (2004) .......... 11, 12, 24

Yankee Atomic Elec. Co. v. United States,
No. 98-126C, Slip op. (Fed. Cl. June 26, 2003) .......... 22

**STATUTES AND REGULATIONS**

42 U.S.C. § 10222 .......... 6

10 C.F.R. § 961.11 .......... *passim*

Notice of Inquiry,
59 Fed. Reg. 27,007 (May 25, 1994) .......... 7

Final Interpretation of Nuclear Waste Acceptance Issues,
60 Fed. Reg. 21,793 (May 3, 1995) .......... 6, 7

**MISCELLANEOUS**

29 Richard A. Lord, Williston on Contracts § 74:10 (4th ed. 2003) .......... 4

3 E. Allan Farnsworth, Farnsworth on Contracts § 11.3 (2d ed. 2002) .......... 4

1A Corbin, Corbin on Contracts at 97 (1963) .......... 25

Restatement (Second) of Contracts § 245 (1981) .......... 15

Restatement (Second) of Contracts § 350 (1981) .......... 12

# INDEX TO APPENDIX

**Description** **Page**


Deposition of David Zabransky, Excerpts ............ 1

1987 Annual Capacity Report (June 1987)(Appendices omitted) ............ 8

1988 Annual Capacity Report (June 1988)(Appendices omitted) ............ 30

1990 Annual Capacity Report (December 1990)(Appendices omitted) ............ 53

1991 Annual Capacity Report (December 1991)(Appendices omitted) ............ 78

1991 Instructions for Completing the Appendix C Delivery Commitment Schedule
General Instructions ............ 96
Specific Instructions ............ 100

Voided DCS Forms ............ 104

DOE Letters Stating DCS Forms Could Not be Approved or Disapproved ............ 114

Defendant's Response to Utility Plaintiffs' Request for Admissions (April 18, 2002) ............ 128

2004 Instructions for Completing the Appendix C Delivery Commitment Schedule ............ 132

Excerpt from GAO, Nuclear Waste: Operation of Monitored Retrievable Storage Facility is Unlikely by 1998 (Sept. 1991) ............ 138

2004 Acceptance Priority Ranking & Annual Capacity Report (July 2004)(Appendices omitted) ............ 140

Excerpt from Purchase and Sale Agreement Between Entergy Nuclear Indian Point 2, LLC and Consolidated Edison Company of New York, Inc. (Nov. 9, 2000) ............ 148

Excerpt from Complaint, Consolidated Edison Co. of New York, Inc. v. United States ............ 155

Additional Completed DCS Forms for Indian Point 2 and DOE Letters Stating These DCS Forms Could Not be Approved or Disapproved ............ 160

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| **ENTERGY NUCLEAR INDIAN POINT 2, LLC,**<br><br>Plaintiff,<br><br>v.<br><br>**THE UNITED STATES,**<br><br>Defendant. | No. 03-2622C<br>(Judge Lettow) |

**PLAINTIFF'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT ON LIABILITY AND RESPONSE IN OPPOSITION TO DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT ON LIABILITY**

Pursuant to RCFC 56, Plaintiff Entergy Nuclear Indian Point 2, LLC hereby submits this reply in support of its May 28, 2004 motion for summary judgment on liability and its response in opposition to Defendant the United States' (the "Government") July 29, 2004 (as corrected August 3, 2004) cross-motion for summary judgment on liability ("Government Motion").[1]

**SUMMARY OF ARGUMENT**

The Court should grant Plaintiff's Motion for Summary Judgment on Liability. In its cross-motion the Government does not deny its liability for breach of the United States Department of Energy's ("DOE") Standard Contract for Disposal of Spent Nuclear Fuel and/or High-level Radioactive Waste ("Standard Contract") with Plaintiff. Instead, the Government merely contends that its liability should run from January 31, *2002* rather than January 31, 1998. This is incorrect.

[1] In support of this filing, Plaintiff is submitting an "Appendix to Plaintiff's Reply In Support Of Its Motion For Summary Judgment On Liability And Response In Opposition To Defendant's Cross-Motion For Summary Judgment on Liability." That Appendix is cited herein as "Pl. App."

The Government asserts that the Government's liability to Plaintiff cannot run from January 31, 1998 because Plaintiff was not a party to the Standard Contract until September 6, 2001 when Consolidated Edison Company of New York, Inc. ("ConEd") assigned the contract to Plaintiff and, therefore, lacks standing to receive damages prior to an approved DCS after September 6, 2001. However, Plaintiff does not seek to receive damages incurred by ConEd prior to September 6, 2001, but only damages caused by DOE's breach after that date. Based on its purchase and sale agreement with ConEd, Plaintiff has a right to seek damages for the period after September 6, 2001 based on DOE's breach of the Standard Contract's January 31, 1998 performance commencement date. Thus, there is no standing question in this case.

The Government's liability for breach of contract is based on its January 31, 1998 default, and this breach caused damages to Plaintiff beginning on September 6, 2001. In violation of Article II of the Standard Contract, DOE did not begin to accept Spent Nuclear Fuel ("SNF") from nuclear utilities as of January 31, 1998. In fact, DOE has indicated that it will not begin to perform under the Standard Contract until 2010, at the earliest. The U.S. Courts of Appeals for the District of Columbia and Federal Circuits have found that DOE's failure to begin accepting SNF as of January 1998 resulted in a breach of the Standard Contract for all Standard Contract holders – the entire nuclear industry. Those findings apply to Plaintiff's Standard Contract.

DOE's breach of the Standard Contract did injure Plaintiff's assignor – ConEd – and has continued to injure Plaintiff since it was assigned the Standard Contract. Once DOE failed to begin accepting SNF from utilities as of January 1998, this delay created a domino effect resulting in DOE being unable to accept Plaintiff's (and all other nuclear utilities') SNF in a timely manner under the Standard Contract. Due to this delay, Plaintiff began incurring damages

in 2001 when it purchased the Indian Point 1 and 2 Nuclear Power Stations ("Indian Point 1 and 2") and has continued to incur substantial damages to store SNF that DOE was contractually obligated to take.

The Government asserts that DOE's liability to Plaintiff is dependent on the Indian Point 1 and 2 plants' approved Delivery Commitment Schedules ("DCS"). Government Motion at 2-3. The Government alleges that the submittal of a DCS was a condition precedent to DOE's obligation to accept SNF under the Standard Contract. The Government's DCS argument should be rejected because (1) submission of a DCS form was not a condition precedent to DOE's acceptance of SNF deliveries; (2) even if submitting a DCS form were a condition precedent, once DOE breached the Standard Contract Plaintiff no longer had to satisfy that "condition;" (3) submitting a DCS (or Final Delivery Schedule ("FDS")) would have been futile (because DOE stopped approving DCSs) and, therefore, was not required by law; and (4) the DCS process as implemented by DOE was flawed and inconsistent with the Standard Contract. Furthermore, the Government's assertions regarding other decisions of this Court regarding the DCS process are meritless.

For these reasons, Plaintiff respectfully requests that this Court (1) grant Plaintiff's motion for summary judgment on liability setting the date of breach as January 31, 1998 and (2) deny the Government's cross-motion for summary judgment.

## ARGUMENT

### I. PLAINTIFF MAY SEEK DAMAGES BEGINNING FROM SEPTEMBER 6, 2001 BASED ON THE GOVERNMENT'S JANUARY 31, 1998 BREACH OF CONTRACT

In its motion, the Government asserts that Plaintiff lacks standing to pursue its claim for breach of contract prior to the date it purchased the Indian Point 1 and 2 plants – September 6, 2001. Plaintiff agrees that it only seeks damages incurred beginning September 6, 2001. Where

the parties disagree, however, is whether Plaintiff may seek its damages beginning from September 6, 2001 based on the Government's January 31, 1998 breach. First, based on the Indian Point 1 and 2 plants' purchase and sale agreement, Plaintiff may seek damages incurred from September 6, 2001. Second, it is unquestionable that DOE breached the Indian Point 1 and 2 Standard Contract on January 31, 1998. Third, the Government's January 31, 1998 breach of contract will cause an "injury in fact" to Plaintiff and, therefore, Plaintiff has standing to seek damages from September 6, 2001 based on DOE's January 31, 1998 breach.

### A. Plaintiff May Recover Damages From September 6, 2001 Based On The Purchase And Sale Agreement With ConEd

Plaintiff may pursue damages from the January 31, 1998 breach based on the assignment language in the purchase and sale agreement between Plaintiff and ConEd and the interpretation Plaintiff and ConEd have followed in pursuing damages claims in this Court. Generally, it is recognized that parties may assign a breach of contract claim as part of an assignment of underlying contract rights even where the breach has already taken place. Gulf States Creosotin Co. v. Loving, 120 F.2d 195, 199 (4th Cir. 1941) ("A cause of action for breach of contract had therefore already arisen, and it is not disputed that such a cause of action is assignable."); 29 Richard A. Lord, Williston on Contracts § 74:10 (4th ed. 2003) (noting that "a right to damages for breach of contract is assignable"); cf. Ginsberg v. Austin, 968 F.2d 1198, 1201 (Fed. Cir. 1992) (noting that the law generally will presume an assignor keeps a breach of contract cause of action except where delineated by an agreement to the contrary). The parties' actions in interpreting an assignment agreement will be probative in determining the assignment of claims. 3 E. Allan Farnsworth, Farnsworth on Contracts § 11.3 (2d ed. 2002) ("Whether the owner of a right has manifested an intention to transfer it is a question of interpretation to be answered from all circumstances, including words and other conduct.").

Plaintiff and ConEd delineated their claims based on DOE's breach of the Indian Point 1 and 2 Standard Contract. In the Purchase and Sale Agreement between Plaintiff and ConEd, the parties stated that the sale of the Indian Point 1 and 2 plants excluded "any claims or causes of action in respect of damages to property or economic loss related or pertaining to the Department of Energy's breach or default under the DOE Standard Contract accrued prior to Closing . . . ." Generating Plant And Gas Turbine Asset Purchase and Sale Agreement by and Between Consolidated Edison Company of New York, Inc. and Entergy Nuclear Indian Point 2, LLC at 27 (Nov. 9, 2000), Pl. App. at 152. The closing date for the sale of the Indian Point 1 and 2 plants occurred on September 6, 2001. Gov't App. at 303.

The Purchase and Sale Agreement has been interpreted by the parties to mean that ConEd may assert claims for damages incurred prior to the September 6, 2001 closing date and that Plaintiff may assert claims for damages incurred based on the Government's breach after the closing date. See, e.g., ConEd's Complaint ¶ 8, Pl. App. at 157-58 ("Con Edison seeks damages for such costs as it *incurred up to the date of sale* of Indian Point that would not have been incurred had DOE performed its statutory and contractual obligations pertaining to SNF disposal.") (emphasis added); id. ¶ 9, Pl. App. at 158 ("[A]s a seller of a nuclear electric generating facility, Con Edison is seeking damages associated with the diminished value it realized in the sale of Indian Point resulting from DOE's failure to meet its obligations under the Act and the Standard Contract, as well as other related costs incurred *up to the closing date of the sale*. Unlike the existing owner/operator cases, Con Edison's damages are fixed and readily ascertainable *as of the closing date of its sales transaction*.") (emphasis added). Thus, it is clear that ConEd is seeking damages based on the Government's breach prior to the closing date and, thereby, Plaintiff may seek damages caused by the Government's January 31, 1998 breach for

the period after the September 6, 2001 closing date. See, e.g., Entergy Nuclear Indian Point 2, LLC's Response to Defendant's Notice of Directly-Related Cases, Motion to Reassign, and Motion to Transfer at 3 (Aug. 23, 2004).

**B. DOE Breached The Indian Point 1 and 2 Standard Contract And Every Standard Contract On January 31, 1998**

There simply is no question that the Government breached the Indian Point 1 and 2 Standard Contract on January 31, 1998 and that Plaintiff may recover damages incurred beginning with the September 6, 2001 closing date.

Under the Nuclear Waste Policy Act of 1982 ("NWPA"), DOE was required to begin disposing of the nation's commercially-generated SNF "not later than January 31, 1998," in return for the payment of fees by utilities and others that generated or held title to SNF. See 42 U.S.C. § 10222(a)(5)(B). As also required under the NWPA, in 1983 DOE drafted the Standard Contract. See 42 U.S.C. § 10222(a); 10 C.F.R. § 961.11. Each of the nation's nuclear utilities, including Plaintiff, executed a Standard Contract with DOE. See Department of Energy's Final Interpretation of Nuclear Waste Acceptance Issues, 60 Fed. Reg. 21,793, 21,794 (May 3, 1995). Plaintiff's Standard Contract – indeed all of the Standard Contracts – embodies the reciprocal obligations mandated by the NWPA, pursuant to which ConEd and Plaintiff agreed to pay fees in return for DOE's obligation to begin disposing of SNF no later than January 31, 1998. Specifically, Article II of the Standard Contract states: "[t]he services to be provided by DOE under this contract shall begin, after commencement of facility operations, not later than January 31, 1998 and shall continue until such time as all SNF … has been disposed of." Standard Contract, Art. II; 10 C.F.R. § 961.11.

In 1994, however, "[DOE] announced that it could not begin disposing of nuclear waste by January 31, 1998, as the [Standard] [C]ontract required, because the repository it planned to

build to store the waste would not be available until at least 2010." Maine Yankee Atomic Power Co. v. United States, 225 F.3d 1336, 1338 (Fed. Cir. 2000); See Notice of Inquiry, 59 Fed. Reg. 27,007, 27,007-08 (May 25, 1994). In 1995, DOE issued a Final Interpretation of Nuclear Waste Acceptance Issues ("Final Interpretation"), expressly denying that DOE had a statutory and contractual obligation to begin disposing of SNF by January 31, 1998. See 60 Fed. Reg. 21,793. In the Final Interpretation, DOE stated that, since passage of the NWPA, it "has become apparent that neither a repository nor an interim storage facility constructed under the [NWPA] will be available by 1998." Id. at 21,794. DOE projected that the "earliest possible date for acceptance of waste for disposal by DOE would be 2010." Id.

The United States Court of Appeals for the District of Columbia Circuit has found that DOE's failure to begin disposing of SNF by January 31, 1998 violated the Standard Contract. In Indiana Mich. Power Co. v. DOE, 88 F.3d 1272, 1276 (D.C. Cir. 1996), the D.C. Circuit ruled that DOE's obligation under the NWPA to commence SNF acceptance no later than January 31, 1998, was "without qualification or condition." The D.C. Circuit rejected DOE's argument that the 1998 deadline was conditioned upon the operation of a repository under the NWPA, finding that such an interepretation of the Standard Contract "blue-pencil[ed] out" the 1998 deadline, destroying the "*quid pro quo* created by Congress." Id. According to the D.C. Circuit, DOE's proposed "treatment of [the NWPA] is not an interpretation but a rewrite." Id. The D.C. Circuit concluded that the NWPA, and similarly the Standard Contract, required DOE to "begin disposing of [SNF] by a day certain." Id.

Despite the D.C. Circuit's ruling in Indiana Michigan, DOE nevertheless announced that it would not begin disposing of SNF by the January 31, 1998 deadline. As a result, a number of utilities petitioned the D.C. Circuit for a writ of mandamus seeking to compel DOE's compliance

with the D.C. Circuit's decision in Indiana Michigan. In that case, Northern States Power Co. v. DOE, 128 F.3d 754 (D.C. Cir. 1997), the D.C. Circuit reiterated its finding in Indiana Michigan that DOE had an "unconditional duty" under the Standard Contract to begin disposing of utilities' SNF by January 31, 1998. In fact, the D.C. Circuit remarked: "[w]e would have expected that the Department would proceed as if it had just been told that it had an unconditional obligation to take the nuclear materials by the January 31, 1998, deadline. Not so." Id. at 757.

Similarly, the Federal Circuit has held that DOE breached the Standard Contract. According to the Federal Circuit in Maine Yankee, Congress found DOE's obligation to begin disposal of spent nuclear fuel by January 31, 1998 "so important" when it promulgated the NWPA that Congress "took the unusual action of specifying that all contracts must contain this explicit requirement." Maine Yankee, 225 F.3d at 1341-42; see also generally Northern States Power Co. v. United States, 224 F.3d 1361 (Fed. Cir. 2000). Thus, the Federal Circuit found, DOE's breach of its obligation to begin disposing of spent nuclear fuel by January 1998 "*involved all the utilities that had signed the contract – the entire nuclear electric industry*." Maine Yankee, 225 F.3d at 1342 (emphasis added); see also Roedler v. DOE, 255 F.3d 1347, 1350 (Fed. Cir. 2002). Accordingly, under Indiana Michigan, Northern States, and Maine Yankee , when the Government failed to begin accepting SNF as of January 1998 as required under Article II of Plaintiff's Standard Contract, the Government breached that Contract. In fact, in every spent nuclear fuel case in which the Court of Federal Claims has addressed the question,[2] it has found the Government liable for breach of the Standard Contract.

[2] Northern States Power Co. v. United States, No. 98-484C (Wiese, S.J.); Florida Power & Light Co. v. United States, No. 98-483C (Sypolt, J.); Commonwealth Edison Co. v. United States, No. 98-621C (Hewitt, J.); Yankee Atomic Elec. Co. v. United States, No. 98-126C

### C. DOE's January 31, 1998 Breach Of Contract Caused Damages To Plaintiff Resulting In An Injury-In-Fact

According to the Government, "DOE's partial breach of the Standard Contract resulting from DOE's failure to begin SNF acceptance from the commercial nuclear utility industry by January 31, 1998" did not create an injury "to each and every member of the commercial nuclear industry." Government Motion at 4. Specifically, the Government argues that its delay has not caused an injury-in-fact to Plaintiff prior to September 6, 2001, because DOE was not obligated to begin accepting SNF from Plaintiff by January 31, 1998, but instead its obligations ran only to ConEd for the January 31, 1998 breach. Id. at 5-7. For the reasons discussed below, the Government is wrong.

Generally, to establish standing a party "must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Friends of the Earth, Inc. v. Laidlaw Envt'l Servs., 528 U.S. 167, 180-81 (2000); First Hartford Corp. Pension Plan & Trust v. United States, 194 F.3d 1279, 1290 (Fed. Cir. 1999). There is no question that Plaintiff is suffering and will continue to suffer "injury in fact" that is directly traceable to the Government's breach, which can be redressed by awarding damages for breach of contract. Furthermore, Plaintiff has standing to sue for damages after September 6, 2001 caused by the Government's January 31, 1998 breach of contract.

---

(Merow, S.J.); Connecticut Yankee Atomic Power Co. v. United States, No. 98-154C (Merow, S.J.); Maine Yankee Atomic Power Co. v. United States, No. 98-474C (Merow, S.J.); Indiana Mich. Power Co. v. United States, No. 98-486C (Hodges, J.); and Southern Nuclear Operating Co. v. United States, No. 98-614C (Merow, S.J.).

The Standard Contracts state that DOE will issue Annual Capacity Reports ("ACR") and annual Acceptance Priority Rankings ("APR"). Standard Contract Arts. IV.B.5(a) and (b); 10 C.F.R. § 961.11. The ACR, to be used "for planning purposes," was to set forth the projected annual receiving capacity for DOE's spent fuel storage facility(ies) and the annual acceptance ranking for the disposal of SNF. Id., Art. IV.B.5(b). The APR, in turn, was to identify and prioritize the SNF to be stored based on the age of the SNF. Id., Art. IV.B.5(a). Specifically, the APR, with a few exceptions,[3] gives "[t]he oldest fuel or waste … the highest priority for acceptance." Id. Art. IV. B.5(a). In this way, the APR establishes a queue of utilities, the order of which was to reflect the "annual receiving capacity for DOE facility(ies)" and the age of SNF currently stored by the various contract holders. Id.

Given that the Plaintiff was assigned the Indian Point 1 and 2 Standard Contract on September 6, 2001, Plaintiff nevertheless suffered damages and continues to suffer damages based on the Government's January 31, 1998 breach. As explained above, the APR/ACR process was designed to establish a queue of utilities, based on the age of each utility's fuel. While Plaintiff cannot claim damages incurred prior to September 6, 2001, Plaintiff was nonetheless damaged by DOE's failure to begin taking SNF from utilities by January 31, 1998. Once DOE breached its obligation to begin disposing of SNF from the first utility in the queue by January 31, 1998, that breach caused a domino effect on DOE's ability to timely accept delivery of SNF from all other utilities in the queue. Accordingly, any utility whose deliveries would fall sometime after January 1998 necessarily would have their deliveries delayed by the amount of time at least equal to DOE's delay in beginning its overall performance.

[3] The Standard Contracts provide that, notwithstanding the age of SNF, priority may be given to SNF removed from a reactor that "has reached the end of its useful life and has been shut down permanently for whatever reason." Id., Art. VI.B.1(b). "Emergency deliveries" of SNF may also be accepted. Id., Art. V.D.

Due to these predictable cascading delays, Plaintiff has already been damaged by the January 31, 1998 breach beginning from the date of the assignment – September 6, 2001. In Plaintiff's case, these costs include, for example, (1) amounts expended to design, license, construct, and operate a dry storage facility; (2) purchase of HOLTEC HI-STORM-100 dry fuel containers; (3) purchase of ancillary equipment needed for dry fuel storage; (4) replacement of the Plaintiff's fuel building crane; (5) major modifications to existing structures to permit SNF cask loading; and (6) costs expended for the Private Fuel Storage off-site SNF storage option. Thus, Plaintiff has in fact suffered injury resulting from DOE's January 31, 1998 breach.

The Government's Motion also mischaracterizes Plaintiff's position on this issue. Contrary to the Government's claims, Plaintiff is *not* arguing that the Government owes damages to Plaintiff incurred between January 31, 1998 and September 6, 2001. Government Motion at 2, 20-21. Rather, as discussed above, Plaintiff contends that DOE's breach of its obligation to begin taking deliveries from nuclear utilities as of January 31, 1998 postponed DOE's ability to begin taking deliveries from Plaintiff after September 6, 2001 (the dated of assignment), thereby causing Plaintiff to incur damages beginning on September 6, 2001 based on the Government's January 31, 1998 breach.

Plaintiff's position has been adopted by the Court of Federal Claims in other SNF cases. In Tennessee Valley Authority v. United States, 60 Fed. Cl. 665, 674 (2004), for example, this Court noted that Tennessee Valley Authority ("TVA") was not entitled to have its own SNF removed beginning in January 1998, and that the earliest scheduled pickup of TVA's SNF would not have occurred until July of 2002. Nevertheless, this Court determined that TVA is entitled at trial to show that the Government's breach of the January 31, 1998 deadline damaged TVA.

As this Court pointed out, DOE notified all utilities in 1995 that it would not begin collecting SNF on time. Id. at 674. Thus, "[w]hen it became obvious to TVA that DOE would not perform under the contract, TVA was justified, indeed obligated, to take steps to minimize its losses in light of DOE's imminent non-performance." Id. As this Court found in TVA, under the Restatement (Second) of Contracts: "Once a party has reason to know that performance by the other party will not be forthcoming, … he is expected to take such affirmative steps as are appropriate in the circumstances to avoid loss by making substitute arrangements or otherwise." Id. (quoting Restatement (Second) of Contracts § 350 cmt. b); see also Robinson v. United States, 305 F.3d 1330, 1334 (Fed. Cir. 2002) ("Reasonable efforts in the form of affirmative steps are required to mitigate damages.").

Applying these principles, this Court found that TVA's construction of dry storage facilities for spent nuclear fuel "must be viewed as an affirmative step toward mitigation to avoid loss for the government's partial, ongoing breach." TVA, 60 Fed. Cl. at 674. This Court, therefore, held that TVA would be permitted to recover costs for dry storage facility construction, to the extent TVA can demonstrate at trial a causal connection between those costs and DOE's breach. Id. at 674-75. Similarly, the Court here should allow Plaintiff the opportunity at trial to show that its damages were caused by DOE's January 31, 1998 breach of the Standard Contract, even though Plaintiff's damages from that breach did not begin to accrue until ConEd assigned Plaintiff the Indian Point 1 and 2 Standard Contract on September 6, 2001.

## II. PLAINTIFF'S SUBMISSION OF A DELIVERY COMMITMENT SCHEDULE HAS NO BEARING ON THE QUESTION OF DOE'S LIABILITY FOR BREACH OF PLAINTIFF'S STANDARD CONTRACT

The Government goes to great length to set forth its understanding regarding how the APR/ACR process and the submittal of DCS forms were to operate under the Standard Contract. See Government Motion at 8-13. According to the Government, submission of a DCS

"constituted a condition precedent to DOE's obligation to accept any SNF from any particular contract holder." Id. at 8. The Government repeatedly asserts that the DCSs submitted by ConEd essentially constitute binding commitments that set forth the rights of the parties under the Standard Contract. Id. at 2-3, 7-13.

The Court should reject the Government's DCS argument because (1) submission of a DCS form was not a condition precedent to DOE's obligations under the Standard Contract; (2) even if submission of a DCS was a condition precedent, once DOE breached the Standard Contract Plaintiff (and its assignor ConEd) no longer had an obligation to submit further DCSs (or FDSs); (3) because DOE unilaterally suspended the DCS process, submitting a DCS (or FDS) would have been futile and, therefore, was not required by law; and (4) the DCS submittal process as implemented by DOE was flawed and inconsistent with the Standard Contract as found by several Judges of this Court. On every occasion in which it has addressed the issue, the Court of Federal Claims has rejected DOE's attempt to use the APR/ACR and DCS process as a basis for limiting its liability.[4] Contrary to the Government's meritless arguments, prior decisions of this Court do not challenge the viability of the ACR or DCS mechanism in the Standard Contract, but instead recognize that DOE manipulated that process.

**A. Submission Of A DCS Form Was Not A Condition Precedent To DOE's Obligations Under The Standard Contract**

Submission of a DCS form was not a condition precedent to DOE's obligation to take SNF from Plaintiff (or any other utility) under the Standard Contract. Conditions precedent

[4] See, e.g., Commonwealth Edison Co. v. United States, 56 Fed. Cl. 652, 666 (2003) (finding that the ACR and the DCS submissions were for planning purposes and "[t]he parties could not have expected that planning documents would create binding contractual obligations"); Indiana Mich. Power Co. v. United States, 57 Fed. Cl. 88, 98 (2003) ("The Contract does not use Annual Capacity Reports and Delivery Commitment Schedules to determine the Acceptance Rate. The Department of Energy did not consider these forms to be binding.").

generally are disfavored by courts and "will not be read into a contract unless required by the plain, unambiguous language." Effects Assocs., Inc. v. Cohen, 908 F.2d 555, 559 n.7 (9th Cir. 1990); accord RT Computer Graphics, Inc. v. United States, 44 Fed. Cl. 747, 756 (1999). Nothing in the Standard Contract suggests that submission of a DCS by Plaintiff is a condition precedent to DOE's obligation to take SNF.

Article V of the Standard Contract addressed "Delivery of SNF and/or HLW." That article states that a utility shall "deliver to DOE and DOE shall, as provided in this contract, accept the SNF and/or HLW." Standard Contract, Art. V.; 10 C.F.R. § 961.11. The article does *not* state that DOE's obligation is contingent upon a utility first submitting a DCS. DOE's obligation to take SNF from utilities also is referenced in several other Standard Contract articles, none of which conditions the obligations expressed therein upon the submission of a DCS. See Standard Contract, Arts. II, IV.B. & VI.; 10 C.F.R. § 961.11.

**B. Because Of DOE's Breach, Plaintiff Was Not "Obligated" To Continue To Submit DCSs Or To Submit FDSs**

Even if submission of a DCS constituted a condition precedent to DOE's performance – which it clearly did not – Plaintiff's "obligation" to continue to submit DCSs (or to submit FDSs) was extinguished by the Government's breach of contract.

According to the Government, Standard Contract holders were to submit DCS forms after DOE issued an APR/ACR. Government Motion at 9-10. The DCS form was to identify the SNF that the contract holder wished to deliver to DOE "beginning sixty-three months thereafter." Id. at 10; Standard Contract, Art.V.B.1.; 10 C.F.R. § 961.11. As discussed above, by the mid-1990s at the latest it was clear that DOE would not meet the mandated start date, and by January 1998 DOE in fact had not begun to perform. Because DOE breached the January 1998 deadline, any "obligation" of Plaintiff to submit a DCS form was extinguished long before the date on which

such DCS would have been due. See Restatement (Second) of Contracts § 245 (1981) ("Where a party's breach by non-performance contributes materially to the non-occurrence of a condition of one of his duties, the non-occurrence is excused."); Northern Heel Corp. v. Compo Indus., Inc., 851 F.2d 456, 461 (1st Cir. 1988).

As the court noted in Northern Heel, a breaching party relinquishes "any right to disclaim the contract because of the victim's failure to satisfy conditions precedent." 851 F.2d at 461-62; see also R.A. Weaver & Assocs. v. Haas & Haynie Corp., 663 F.2d 168, 176 (D.C. Cir. 1980); Omaha Pub. Power Dist. v. Employers' Fire Ins. Co., 327 F.2d 912, 916 (8th Cir. 1964). According to the court in Omaha Public Power, the "theory underlying this rule appears to be based on the equitable maxim that one cannot profit from or escape liability for his own wrongdoing." 327 F.2d at 916. Thus, given DOE's breach, Plaintiff (or its assignor) was not obligated to continue to submit DCS forms or begin submitting FDS forms (even if the submission of such forms were a condition precedent to DOE's performance).[5]

---

[5] While Plaintiff (or ConEd) was not required to continue to submit DCSs, it appears that ConEd submitted DCS forms for all of the Indian Point 1 and 2 allocations in the 1995 APR/ACR. See 1995 APR/ACR at 6, Gov't App. at 241 (providing allocations for Years 1, 2, 3, 5, 7, 8, and 9); see also 1991 ACR at 5, 9, Pl. App. at 88, 92 (providing delivery years for the projected waste acceptance schedule, where allocations for ConEd would be for 1998, 1999, 2000, 2002, 2004, 2005, 2006). This is not reflected in the Government's findings or appendix. For example, the Government has only included DCS forms it approved for 1998, 1999, 2000, 2002, and 2007; the 2002 and 2007 DCSs are of questionable authenticity, for example (1) lacking an approval date next to the DOE approval signature, (2) lacking any signature from a utility representative, (3) identifying the utility contact person as "Mr. Whomever," (4) lacking a complete DCS identification number, (5) spelling the address of the plant incorrectly – "Bleakly" when it should be "Bleakley," and (6) stating incorrectly that Indian Point 1's discharges were from 1974 to 1992, when Indian Point 1's last discharge was in 1974, the year that reactor was shut down. Gov't App. at 252-57. Plaintiff objects to these questionable DCSs. Fed. R. Evid. 901, 1003. Noticeably absent is a DCS form submitted for 2002 that DOE voided after approving the allocation; this absent DCS provided for an allocation of 32.74 MTU rather than the 5 MTU in the questionable DCS form attached in the Government appendix. Compare Pl. App. at 161 with Gov't App. at 255. Furthermore, the Government has not included in its appendix three

### C. Plaintiff Was Not Required To Submit Further DCS Forms Or To Submit FDS Forms Because Doing So Would Have Been Futile

Moreover, any effort by Plaintiff to submit a DCS form (or an FDS form) and seek DOE's approval after 1995 would have been futile. And the law does not require the performance of a futile act. Northern Heel, 851 F.2d at 461 ("[t]he law should not be construed idly to require parties to perform futile acts or to engage in empty rituals"); see also Lorenz v. United States, 296 F.2d 746, 748 (Ct. Cl. 1961) ("It is not to be presumed that the law requires the doing of a futile act."); Morris v. United States, 33 Fed. Cl. 733, 751 n.16 (1995).[6]

The Standard Contract required DOE to approve or disapprove DCS forms within three months of their submission. Standard Contract, Art.V.B.1.; 10 C.F.R. § 961.11. Notwithstanding this express contract obligation, DOE, in fact, refused to approve or disapprove DCS forms submitted by utilities in 1996 and thereafter. See Deposition of David Zabransky ("Zabransky Dep.") at 32 (April 17, 2002) (admitting that DOE had delivery commitment schedules submitted to it that it has neither approved nor disapproved); Pl. App. at 1. Beginning in March 1997, DOE issued letters to nearly all utilities in which DOE stated that it could not approve or disapprove their DCS forms. See DOE Letters, Pl. App. at 114-27; id. at 160, 162,

---

additional DCS forms that were neither approved nor disapproved by DOE. See Pl. App. at 162-67.

[6] In Morris, for example, the plaintiff contracted to buy a parcel of land from the Small Business Administration ("SBA"), with closing set for September 6, 1991. Prior to the closing date the SBA advised the plaintiff that it would be unable to close until November 1991. In rejecting the Government's argument that the plaintiff's failure to tender payment in accordance with the contract relieved the government of liability, the court stated:

> While technically Mr. Morris' tender of payment was a condition precedent to the Government's obligation to convey, both parties knew and agreed that the government was unable to convey the property at the appointed time. Therefore, tender was not required to put the government in breach as the law will not require the doing of a futile act.

See Morris, 33 Fed. Cl. at 751 n. 16 (citations omitted).

164, 166 (letters to ConEd). Furthermore, around the same time that DOE began to "hold" DCS forms submitted by utilities, DOE also unilaterally voided a number of DCS forms (including one from ConEd) that had been submitted by utilities in 1996 and had been previously approved. See Voided DCS Forms, Pl. App. at 104-13, 161; Zabransky Dep. at 596, 603-604 (April 19, 2002), Pl. App. at 5-7.

DCS forms submitted after 1995 would not have been approved by DOE.[7] It would have been futile for Plaintiff to submit additional forms (DCS or FDS), even if required to do so under DOE's process (which Plaintiff was not). For that reason, whether or not Plaintiff submitted additional DCS forms (or began submitting FDS forms) is irrelevant to the question of the Government's liability for breach.

**D. Other Aspects Of The DCS Submittal Process Were Flawed**

Although the Government's Motion places considerable emphasis on the role of DCSs, in reality the entire DCS process as implemented by DOE was flawed and inconsistent with the Standard Contract.

For example, contrary to Standard Contract requirements, DOE did not allow utilities to submit DCSs identifying "all SNF and or HLW [they wished] to deliver to DOE." Standard Contract Art. V.B.1.; 10 C.F.R. § 961.11. Rather, in the 1991 ACR and in separate instructions to utilities DOE required that utilities submit DCS forms identifying for delivery *only* those SNF

---

[7] Indeed, Mr. David Zabransky – DOE's current Contracting Officer and former Contracting Officer's Technical Representative – admitted that it would have been impossible for a utility to obtain an approved DCS:

> Q. Because of the suspension of the DCS process it's impossible for a utility to have a DCS approved, correct?
> A. That's correct.

Zabransky Dep. at 353 (Apr. 18, 2002), Pl. App. at 4; see also Zabransky Dep. at 42 (Apr. 17, 2002), Pl. App. at 2 (admitting that, given the Department of Energy's "current guidance" at that time, it was not possible for a utility to get a DCS approved).

allocations reflected in DOE's most recent ACR. DOE Annual Capacity Report December 1991 ("1991 ACR") at 7, Pl. App. at 90; 1991 DOE Instructions for Completing the Appendix C Delivery Commitment Schedule ("1991 DCS Instructions") at ¶ 7(a), Specific Instructions at ¶ 2.7, Pl. App. at 97, 101. Those directions, however, were completely at odds with the procedures set forth in the Standard Contract. As Judge Hodges held in Indiana Michigan, "the Standard Contract does not permit defendant to limit plaintiff's substantive rights in the guise of 'instructions.'" Indiana Mich., 57 Fed. Cl. at 98. In Commonwealth Edison, Judge Hewitt commented that DOE's efforts to limit the amount of SNF requested by utilities in their DCSs "may be a breach of DOE's duty of good faith and fair dealing." Commonwealth Edison, 56 Fed. Cl. 652 at 665.

The Government's argument that Plaintiff is limited to damages based on DCSs submitted ignores the fact that DOE itself did not consider DCSs to be binding. The ACRs upon which utilities were asked to rely when completing their DCSs expressly stated that the information contained therein "is not contractually binding on either DOE or the Purchasers." DOE Annual Capacity Report June 1987 at 2, Pl. App. at 16; 1991 ACR at 1-2, Pl. App. at 84-85. Similarly, in the 1991 instructions issued by DOE to utilities regarding the completion of the DCS forms, DOE again explicitly advised utilities that "all DCSs previously approved by DOE may need to be reevaluated by DOE and the Purchasers." 1991 DCS Instructions at ¶ 7(c), Pl. App. at 97. DOE, in fact, *did* reevaluate previously-approved DCS forms.[8] As set forth above,

---

[8] In 2004, DOE issued new instructions (along with the new 2004 APR/ACR) directing utilities to submit DCSs and effectively acknowledging that the entire process conducted in the 1990s is irrelevant. 2004 DCS Instructions, Pl. App. at 132-37. In particular, the 2004 DCS Instructions state, "DOE recognizes that many Purchasers have submitted and DOE has approved DCSs based upon the January 31, 1998 operations date included in the Standard Contract. Purchasers should submit new DCSs based upon the currently planned operation date of 2010." 2004 DCS Instructions ¶ 7(a), Pl. App. at 133.

in the first quarter of 1997 DOE unilaterally voided a number of previously-approved DCS submissions. Moreover, the Court of Federal Claims previously has recognized that DOE did not consider the ACR and DCSs binding, stating:

> The Contract contemplated that DOE would use these reports for planning purposes only. The Capacity Reports disclaimed any other purpose, stating that they were not binding on either party.

Indiana Mich., 57 Fed. Cl. at 98 (citation omitted); Commonwealth Edison, 56 Fed. Cl. at 663 (concluding that the ACR and DCS "mechanism does not create a contractually binding obligation for either party").

Furthermore, the SNF allocations used by the Government in the 1991 ACR and 1995 APR/ACR, which ACRs were used to submit DCSs, were counterfeit. That allocation was based on the assumption that DOE would accept Standard Contract holders' SNF at a maximum rate of 900 MTU annually, utilizing the capacity of a Monitored Retrievable Storage Facility ("MRS"). But by the time DOE issued the 1995 APR/ACR, the MRS was no longer an option and in fact was never constructed. See Indiana Mich. Power Co. v. United States, 57 Fed. at 99; Zabransky Dep. at 345 (Apr. 17, 2002), Pl. App. at 3 ("At that point in time in 1994 . . . [t]here was no active program looking for a voluntary MRS"). A 3,000 MTU annual acceptance rate, as reflected in the APR/ACR DOE recently issued in 2004 (see 2004 APR/ACR at 3, Tbl. 1, Pl. App. at 144), and in virtually all other DOE documents relating to the nuclear waste program, would have been the appropriate rate necessary, at a minimum, to meet the program's objectives. See Indiana Mich., 57 Fed. Cl. at 99-100 (rejecting the 900 MTU rate, and adopting a 3000 MTU rate based upon "uniform support" for such a finding). Had DOE used the appropriate rate, the Indian Point 1 and 2 plants would have had allocations for an additional 187 MTU, more than doubling the amount of spent fuel allocations for the Indian Point 1 and 2 plants over the first 10 years of operation of the nuclear waste management system. Compare 2004 APR/ACR at 2

(Tbl. 1) & 3 (allocating approximately 330.6 MTU to Plaintiff over the first 10 years based on a 3,000 MTU steady-state acceptance rate), Pl. App. at 144-45 with 1995 APR/ACR at 6, Gov't App. at 241 (allocating approximately 143.4 MTU to Plaintiff's assignor – ConEd – over the first 10 years based on a 900 MTU steady-state acceptance rate).

DOE's faulty implementation of the DCS process, and the explicitly non-binding nature of the DCS submittals, doom the Government's argument now – made in the heat of litigation – that the submission of DCS forms determines the date for which (and the extent that) DOE is liable for breach of Plaintiff's Standard Contract.

### E. The Government's Criticisms Of This Court's Rulings On The DCS Provisions Of The Standard Contract Are Meritless

The Government also complains that other Judges of this Court have issued two published decisions and two unpublished decisions regarding the DCS process that allegedly fail to "consider the practicalities of the acceptance of SNF necessitated by the Standard Contract." Government Motion at 14. The Government attempts to rationalize how the schedule provisions in the Standard Contract "provide the mechanism for determining the SNF acceptance schedule." Government Motion at 15. As explained below, however, these decisions do not challenge the viability of the ACR and DCS procedures as a scheduling mechanism; rather, they recognize that the Government's manipulation of those procedures did not result in a reasonable basis upon which to establish an acceptance rate.

According to the Government, the Commonwealth Edison Court's rationale – which was adopted by Senior Judge Merow in Yankee Atomic and in Southern Nuclear – renders the Standard Contract's DCS provisions "meaningless" because it rejected the Government's arguments that the schedule provisions contained in the Standard Contract provided the mechanism for determining the SNF acceptance rate. Government Motion at 14, 16. The

Government claims, therefore, that these three decisions effectively make the Standard Contract "virtually impossible to perform." Id. at 16. The Government also criticizes the decision in Indiana Michigan, where Judge Hodges held that the Standard Contract's schedule terms did not define a contractual acceptance schedule. Id. at 17. The Government concludes that these four decisions, taken together, "eliminate the existing schedule terms from the Standard Contract," leaving the Standard Contract without a mechanism for determining how DOE would accept SNF and/or HLW. Id. The Government's arguments mischaracterize this Court's previous findings, and greatly exaggerate the impact of those decisions upon DOE's ability to administer the Standard Contract when it actually begins to perform.

Contrary to the Government's position, the Commonwealth Edison, Yankee Atomic, Southern Nuclear, and Indiana Michigan decisions do not render meaningless or eliminate the ACR and DCS "schedule terms" contained in the Standard Contract. Rather, those decisions found that the manner in which the Government manipulated the ACR and DCS procedures was inconsistent with the Standard Contract and, therefore, could not form the basis for establishing the acceptance rate to be used when determining a plaintiff's damages. Had DOE established a DCS process based upon an annual 3,000 MTU steady-state acceptance rate, there would have been no dispute. Only DOE's improper limitation of the annual acceptance rate need be modified to put the Standard Contract process back on a proper foundation.

For example, as noted above, according to the Commonwealth Edison decision, DOE may have breached its duty of good faith and fair dealing when it insisted that the total quantities of SNF designated on a DCS could not exceed the ACR allocation. Commonwealth Edison, 56 Fed. Cl. at 665. The Court in Commonwealth Edison noted other problems with DOE's implementation of the ACR and DCS procedures, such as DOE's disapproval of the plaintiff's

DCS submission for 2002 and its failure to respond to plaintiff's 2001 and 2003 submissions. Id. Judge Hewitt also pointed out that, in 1997, DOE notified utilities that it was waiving their obligation to submit revised DCSs because DOE was unable to approve or disapprove such submissions. Id. In addition, Judge Hewitt stressed that there was no evidence that the plaintiff ever submitted, or DOE ever approved, an FDS as required under the Contract. Id. Thus, Judge Hewitt found, "[e]ven if the process . . . could, if followed and completed in good faith, create a contractual obligation, the third step in the process was not completed because plaintiff did not submit and defendant did not approve a FDS for any year." Id. at 666. It was for these reasons, and not because the ACR and DCS procedures were "meaningless," that the Commonwealth Edison decision rejected the Government's argument that those procedures should be used to establish an acceptance rate for measuring a plaintiff's damages.[9]

The Court in Indiana Michigan was similarly critical of how DOE misused the ACR and DCS procedures to improperly limit the amount of SNF that utilities included in their DCSs. As that decision points out, although the Standard Contract required the plaintiff to identify the SNF that it expected DOE to remove, "[t]he Contract did not authorize the Department of Energy to limit its obligations to the utilities by applying statutory limitations that did not exist." Indiana Mich., 57 Fed. Cl. at 98. The Court added: "[t]he Contract does not suggest that approval [of DCSs] would be based upon Annual Capacity Reports," as DOE required. Id. Accordingly, Judge Hodges found that DOE improperly used the Standard Contract's "schedule terms" to limit plaintiff's substantive rights by issuing instructions limiting the plaintiff to "less than a third of the anticipated acceptance rate . . . ." Id. Like Judge Hewitt in Commonwealth Edison, Judge

[9] The Court in Yankee Atomic adopted the "well reasoned" decision of Commonwealth Edison regarding the acceptance rate. Yankee Atomic Elec Co. v. United States, No. 98-126C, slip op. at 2 (Fed. Cl. June 26, 2003).

Hodges in Indiana Michigan rejected the Government's arguments regarding the ACR and DCS procedures because DOE unfairly manipulated those procedures to establish an unreasonably low acceptance rate, not because the ACR and DCS provisions of the Standard Contract were to be ignored.[10] In fact, under those decisions the Standard Contract's ACR and DCS "schedule terms," properly implemented, could still provide the *planning mechanism* (including identifying the location, type, and characteristics of SNF to be delivered to the Government within a certain time period) for deliveries at the appropriate annual rate of delivery.

Moreover, it is clear that the ACR and DCS "schedule terms" were never meant to be used to establish the acceptance rate. Judge Hewitt has agreed, stating: "[n]or does the DCS submission process in Article V of the Standard Contract contain language which indicates that the DCS process is intended to create a binding acceptance rate for the parties." Commonwealth Edison, 56 Fed. Cl. at 662. Judge Hodges made a similar finding in Indiana Michigan, succinctly holding: "[t]he Contract does not use Annual Capacity Reports and Delivery Commitment Schedules to determine an Acceptance Rate." Indiana Michigan, 57 Fed. Cl. at 98 (footnote omitted).

The Government also raises a number of unpersuasive arguments to support its claim that the Contract is unenforceable without an acceptance rate term. First, the Government states that "[a] court cannot make contracts for the parties." Government Motion at 18. The Indiana Michigan, Commonwealth Edison, Yankee Atomic, and Southern Nuclear courts, however, did

[10] The Government also argues that the Indiana Michigan Court "ignore[s] . . . agreements that DOE and numerous utilities had already made." Government Motion at 17. Presumably, the Government is arguing that the DCS process created agreements regarding the acceptance rate. As explained above, however, it is clear that the ACR and DCS procedures were not binding; they did not create contractual arrangements between the parties.

not "make" contracts for the parties. They merely applied well-recognized contract interpretation principles to resolve a dispute. Of course, interpretation of a contract begins with analyzing the plain language of the written agreement. Hercules, Inc. v. United States, 292 F.3d 1378, 1380-81 (Fed. Cir. 2002). It is clear, however, that when an essential term is missing from a contract, it is the court's function to supply such a term. See David Nassif Assocs. v. United States, 644 F.2d 4, 5 (Ct. Cl. 1981) ("Normally, the task of supplying a missing, but essential term . . . is the function of the court"); see also First Nationwide Bank v. United States, 48 Fed. Cl. 248, 263 (2000); Howell v. United States, 51 Fed. Cl. 516, 520-21 (2002).

The Government adds that the acceptance rate term is so essential to the Standard Contract that rejection of the Government's arguments regarding the ACR and DCS procedures would "render the Standard Contract too indefinite to enforce." Government Motion at 20. In support of that argument, the Government claims that if an essential term "is one of the central aspects" or "is one of the most essential terms of" a contract, it cannot be provided by the Court. Id. at 20-22. This Court, like the Indiana Michigan, Commonwealth Edison, Yankee Atomic, and Southern Nuclear Courts, should reject the Government's position.[11]

---

[11] The Government also asserts that a 3,000 MTU steady-state rate was not a reasonable finding by Judge Hodges in Indiana Michigan, because Judge Hodges concluded that "Congress and the parties anticipated that the Department of Energy would collect fuels at a rate sufficient to eliminate the need for additional storage capacity on site and reduce the backlog of already-stored materials." Government Motion at 17 (quoting Indiana Mich., 57 Fed. Cl. at 99). Yet, Judge Hodges was not alone in concluding it was anticipated that a sufficiently high acceptance rate was necessary to meet the objective of eliminating the need for the utilities to build additional at-reactor storage; both Judge Hewitt in Commonwealth Edison and this Court in TVA acknowledged this as a goal. Commonwealth Edison, 56 Fed. Cl. at 667 ("The deposition testimony of several DOE officials involved with the SNF program supports plaintiff's assertion that the intent of the NWPA and the parties was to avoid the construction by utilities of additional at-reactor storage. . . . DOE officials testified that the 3,000 MTU rate was determined to be the acceptance rate necessary to both prevent additional at-reactor storage and reduce the backlog of SNF."); TVA, 60 Fed. Cl. at 674 n.10 ("DOE's failure to perform under

When determining whether a contract is too indefinite to be enforced, a court first looks to whether the parties intended to create a contract. Aviation Contractor Employees, Inc. v. United States, 945 F.2d 1568, 1572 (Fed. Cir. 1991) ("once it is determined that the parties did indeed intend to create a contract, courts should be slow to deny enforcement on the basis of indefiniteness in the contract") (citing 1A. Corbin, Corbin on Contracts at 97 (1963)). Thus, even the omission of the contract's price, usually a contract's most essential term, "does not vitiate contract formation if the parties otherwise manifested their mutual assent to the agreement and the terms of that agreement are sufficiently definite." Atacs Corp. v. Trans World Communications, Inc., 155 F.3d 659, 667 (3d Cir. 1998). Although the acceptance rate term is missing from the Contract, the most critical obligations – Plaintiff's obligation to pay money into the Nuclear Waste Fund and DOE's corresponding obligation to begin disposing of SNF as of January 31, 1998 – are clearly set forth in the Standard Contract and are sufficiently definite to make the contract enforceable.[12]

---

the Standard Contract thus has led to the very thing the NWPA and the Standard Contract were designed to forestall, *i.e.,* the construction of dry storage facilities for spent nuclear fuel at nuclear power electricity generating plants throughout the United States."). Ultimately, however, this Court does not yet have to address this question to grant Plaintiff's motion for summary judgment on liability. Plaintiff likely will address the acceptance rate issue more fully in a dispositive motion during the damages phase of this case.

[12] In this regard, Plaintiff has not argued that the Contract's written provisions are to be ignored in any way, but instead will advocate incorporation of DOE's 3,000 MTU steady-state rate of acceptance, which is reasonable and consistent with the parties' expectations, to determine the damages in this case (rather than the artificially low rate DOE concocted based on the non-existent MRS). Indiana Michigan, 57 Fed. Cl. at 98. The Government has cited two inapposite cases for the principle that the contract is unenforceable, absent the use of the Government's artificially low acceptance rate. Massengill v. Guardian Mgmt. Co., 19 F.3d 196, 202, 205 (5th Cir. 1994) (finding that various contract formation documents were too contradictory to allow the court to conclude a contract between the parties was formed); Coyle's Pest Control, Inc. v. Cuomo, 154 F.3d 1302, 1305-06 (Fed. Cir. 1998) (concluding that the parties entered into a contract that was neither a requirements contract nor an indefinite quantity contract and, thus, the Court would not insert Federal Acquisition Regulation standard

There simply is no plausible basis for this Court to find that the parties to the Standard Contract did not intend to enter into a contract, or that the parties' obligations thereunder were too indefinite to be enforceable. The NWPA directed the parties to enter into contracts to formalize the Government's obligation to dispose of SNF and/or HLW. Accordingly, every commercial nuclear utility in the United States did just that. For more than 20 years, utilities have paid, and continue to pay, in excess of $10.5 billion into the Nuclear Waste Fund pursuant to the Standard Contract. See Ala. Power Co. v. United States, 307 F.3d 1300, 1303 (11th Cir. 2002). Moreover, as noted above, the D.C. Circuit has recognized that the Standard Contract created an "unconditional" obligation on the part of the Government to collect utilities' nuclear waste. Indiana Michigan, 88 F.3d at 1276-77; Northern States Power, 128 F.3d at 759-60. The Federal Circuit in Maine Yankee likewise found that DOE had an obligation under the Contract, which it breached, by not beginning to accept, transport, and dispose of SNF by January 31, 1998. Maine Yankee, 225 F.3d at 1343. These decisions remove any possible doubt concerning whether the Standard Contract is enforceable – even before the Judges of this Court, in several cases, rejected the Government's oft-repeated theory that the DCS process created a mechanism for determining a SNF acceptance schedule. Once again, however, the Government has tried to resurrect those arguments in this case, and the Court should reject them here as well.

---

clauses to transform the contract into either a requirements contract or indefinite quantity contract). Plaintiff's case is readily distinguishable from those cases because Plaintiff and DOE clearly intended to enter into a contract, and, as Judge Hodges concluded in Indiana Michigan, there is uncontradicted evidence that the intent of the parties was to use a 3,000 MTU steady-state rate for the removal of SNF and/or HLW.

## CONCLUSION

For these reasons, Plaintiff respectfully requests that this Court (1) grant Plaintiff's motion for summary judgment on liability setting the date of liability as September 6, 2001 based on the January 31, 1998 breach of the Standard Contract (2) and deny the Government's cross-motion for summary judgment making liability contingent on approved DCSs.

Dated: September 20, 2004

Respectfully Submitted,

s/Alex D. Tomaszczuk by s/Daniel S. Herzfeld
Alex D. Tomaszczuk
SHAW PITTMAN LLP
1650 Tysons Boulevard
McLean, Virginia 22102
(703)770-7940
(703)770-7901 (Fax)

Counsel of Record for Plaintiff
Entergy Nuclear Indian Point 2, LLC

Of Counsel:

Jay E. Silberg
Devon E. Hewitt
Michael G. Lepre
Daniel S. Herzfeld
Jack Y. Chu
**SHAW PITTMAN LLP**
2300 N Street, N.W.
Washington, D.C. 2007
(202)663-8000
(202)663-8007 (Fax)

Document #: 1299368 v.1