**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| **ENTERGY NUCLEAR INDIAN POINT 2, LLC,**<br><br>Plaintiff,<br><br>v.<br><br>**THE UNITED STATES,**<br><br>Defendant. | No. 03-2622C<br>(Judge Lettow) |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S**
**PROPOSED FINDINGS OF UNCONTROVERTED FACT**

In response to Defendant's (the "Government") Proposed Findings Of Uncontroverted Fact dated July 29, 2004, Plaintiff Entergy Nuclear Indian Point 2, LLC, states as follows:[1]

## I. THE ORIGINAL PROVISIONS OF THE NUCLEAR WASTE POLICY ACT

1. On January 7, 1983, the Nuclear Waste Policy Act of 1982 ("NWPA"), Pub. L. 97-425, 96 Stat. 2201 (codified at 42 U.S.C. §§ 10101-10270 (1982)), was enacted. The bases for Congress' passage of the NWPA included statutory findings that the public health and safety necessitated that the Government provide a solution for the permanent storage and disposal of spent nuclear fuel ("SNF") and high-level radioactive waste ("HLW"), but that the costs of the interim and permanent storage and disposal of SNF and HLW were the responsibility of those entities that created the SNF and HLW. 42 U.S.C. §§ 10131(a)(4)-(5) (1982).

[1] It appears to Plaintiff that the Government has not correctly cited the page numbers where certain documents are located in its appendix. In its responses, Plaintiff has responded to the document cited (which may or may not correspond to the appendix page cited by the Government). For the benefit of the Court, Plaintiff has attempted to identify the correct appendix page numbers where Plaintiff's response cites and quotes portions of documents in the Government appendix.

**RESPONSE:** Plaintiff agrees that the NWPA was enacted on the date set forth by the Government. Further responding, Plaintiff states that the Government's attempt at paraphrasing the NWPA is incomplete.

First, the specific health and safety concern with which Congress was concerned was that "a national problem has been created by the *accumulation of (A) spent nuclear fuel from nuclear reactors*; and (B) radioactive waste from (i) reprocessing of spent nuclear fuel; (ii) activities related to medical research, diagnosis, and treatment; and (iii) other sources." 42 U.S.C. § 10131(a)(2) (emphasis added).

Second, the statutory findings in the NWPA with regard to responsibility for interim storage specify that "the generators and owners of high-level radioactive waste and spent nuclear fuel have the primary responsibility to provide for, and the responsibility to pay the costs of, the interim storage of such waste and spent fuel *until* such waste and spent fuel is accepted by the Secretary of Energy in accordance with the provisions of this chapter." 42 U.S.C. § 10131(a)(5) (emphasis added). Under the NWPA, the Department of Energy ("DOE") was to dispose of SNF and HLW beginning "*not later than January 31, 1998* . . . ." 42 U.S.C. § 10222(a)(5)(B) (emphasis added).

2. In its statement of the statutory purposes underlying the NWPA, Congress identified the following four objectives: developing repositories to ensure the protection of the public and the environment from the hazards posed by SNF and HLW; establishing Federal responsibility and policy for the disposal of SNF and HLW; defining the relationship between the Federal Government and state governments regarding SNF and HLW disposal; and establishing

> . . . a Nuclear Waste Fund, composed of payments made by the generators and owners of such waste and spent fuel, that will ensure that the costs of carrying out activities relating to the disposal of such waste and spent fuel will be borne by the persons responsible for generating such waste and spent fuel.

Id. § 10131(b).

**RESPONSE:** Plaintiff agrees that the Government has accurately paraphrased three purposes of the NWPA and accurately quoted portions of 42 U.S.C. § 10131(b). Further responding, Plaintiff states that the Government fails to quote the portion of the NWPA that provides that "the generators and owners of high-level radioactive waste and spent nuclear fuel have the primary responsibility to provide for, and the responsibility to pay the costs of, the interim storage of such waste and spent fuel *until* such waste and spent fuel is accepted by the Secretary of Energy in accordance with the provisions of this chapter," 42 U.S.C. § 10131(a)(5) (emphasis added), or the part that provides that "in return for payment of fees [into the waste fund] established by this section, the Secretary, beginning not later than January 31, 1998, will dispose of high-level radioactive waste or spent nuclear fuel. . . ." 42 U.S.C. § 10222(a)(5)(B). In enacting these provisions, Congress envisioned a *quid pro quo* under which DOE is "responsible for disposing of [HLW or SNF] . . . in permanent disposal facilities, beginning not later than January 1998, in return for payment of fees established by this section." H.R. Rep. No. 97-491, pt. 1, at 59 (1982), reprinted in 1982 U.S.C.C.A.N. 3792, 3825.

3. The NWPA provided that the Secretary would enter into contracts with the owners and generators of SNF of domestic origin for "the acceptance of title, subsequent transportation, and disposal of such [SNF]." 42 U.S.C. § 10222(a)(1) (1982). The contracts had to "provide for payment to the Secretary of fees . . . sufficient to offset expenditures" described elsewhere in the statute. Id. The NWPA also required that the contracts with the nuclear utilities provide that:

> (A) following commencement of operation of a repository, the Secretary shall take title to the high-level radioactive waste or spent nuclear fuel involved as expeditiously as practicable upon the request of the generator or owner of such waste or spent fuel; and
>
> (B) in return for the payment of fees established by this section, the Secretary, beginning not later than January 31, 1998, will dispose of the high-level radioactive waste or spent nuclear fuel involved as provided in this subtitle.

42 U.S.C. § 10222(a)(5).

**<u>RESPONSE</u>:** Plaintiff agrees that the NWPA required DOE and nuclear utilities to contract for the disposal of SNF and that the contracts were to provide for the payment of fees. Plaintiff also agrees that DOE has accurately quoted portions of 42 U.S.C. § 10222(a).

## II. THE DEPARTMENT OF ENERGY'S PROMULGATION OF THE "STANDARD CONTRACT FOR DISPOSAL OF SPENT NUCLEAR FUEL AND/OR HIGH-LEVEL RADIOACTIVE WASTE" THROUGH NOTICE AND COMMENT RULEMAKING IN THE FEDERAL REGISTER

### A. The Proposed Rule

4. On February 4, 1983, the Department of Energy ("DOE"), in furtherance of its obligations pursuant to the NWPA, 42 U.S.C. § 10222, published a notice of proposed rulemaking in the Federal Register, proposing terms for the "Standard Contract for Disposal of Spent Nuclear Fuel and/or High-level Radioactive Waste" ("Standard Contract") mandated by the NWPA, 42 U.S.C. § 10222. <u>See</u> 48 Fed. Reg. 5458 (Feb. 4, 1983).

**<u>RESPONSE</u>:** Plaintiff agrees that DOE's Notice of Proposed Rulemaking was published as set forth by the Government. Plaintiff, however, rejects the Government's implication that the NWPA required DOE to use a notice and comment format to enter into "standard contracts" with each utility.

5. As required by the NWPA, the proposed rule contained a mechanism for defining each contract holder's financial obligations under the Standard Contract. Specifically, DOE proposed that each entity which entered into the Standard Contract would pay fees to the Secretary, for deposit into the Nuclear Waste Fund ("NWF"), in the following forms and amounts: (1) a one-time fee for SNF generated prior to April 7, 1983, and (2) continuing quarterly fees for SNF generated on or after April 7, 1983, in an amount of 1.0 mil per kilowatt-hour (or as otherwise adjusted) on electricity generated by the contract holder's nuclear power reactor. 48 Fed. Reg. at 5464 (Art. VIII).

**<u>RESPONSE</u>:** Plaintiff agrees that the proposed contract contained the terms cited requiring utilities to pay for disposal in the form of a one-time fee and quarterly fees, with the

clarification that the quarterly fee is based on electricity generated "and sold." Standard Contract Art. VIII.A.1, 10 C.F.R. § 961.11.

6. The proposed Standard Contract also provided a mechanism for determining both the order in which, and the rate at which, the various contract holders' SNF would be accepted. As for the order of SNF acceptance, the Standard Contract proposed that DOE would issue an "acceptance priority ranking" ("APR") of SNF and/or HLW, through which SNF and/or HLW would receive acceptance priority based generally upon its age:

> Acceptance Priority Ranking. Delivery commitment schedules for SNF and/or HLW may require the disposal of more material than the annual capacity of the DOE disposal facility (or facilities) can accommodate. The following acceptance priority ranking will be utilized:
>
> (a) Except as may be provided for in paragraph (2) below, <u>acceptance priority shall be based upon the age of the SNF and/or HLW as calculated from the date of discharge of such materials from the civilian nuclear power reactor to the date specified for transportation by DOE in the delivery commitment schedule</u>. DOE will first accept from Purchaser the oldest SNF and/or HLW for disposal in the DOE facility;
>
> (b) Notwithstanding the age of the SNF and/or HLW, priority may be accorded any SNF and/or HLW removed from a civilian nuclear power reactor that has reached the end of its useful life or has been shut down permanently for whatever reason.

48 Fed. Reg. 5458, 5464 (Feb. 4, 1983) (Art. VI.B.3) (emphasis added).

**<u>RESPONSE</u>:** Plaintiff disagrees with the Government's characterization that: **"**[t]he proposed Standard Contract also provided a *mechanism for determining both the order in which, and the rate at which, the various contract holders' SNF would be accepted*." (Emphasis added.) Plaintiff agrees that under the Standard Contract the *order* among utilities in which DOE was to accept SNF was based on the discharge date of a utility's SNF, subject to the possible exceptions identified in the contract. Proposed Standard Contract, Art.V.B.6 and VI.B.3.b, 48 Fed. Reg. 5458, 5464 (Feb. 4, 1983). Plaintiff disagrees that the proposed contract provisions cited by the

Government in their proposed findings establish the *rate* at which DOE was to accept and dispose of SNF.

The Acceptance Priority Ranking ("APR") does not establish the *rate* of SNF acceptance because it is nothing more than a list of SNF assemblies discharged from reactors ranked by the date of discharge. Proposed Standard Contract, Art. V.B.6, 48 Fed. Reg. at 5458, 5463. For example, the 1991 APR published by DOE does nothing more than indicate the order among utilities in which SNF will be removed and says nothing about the rate at which the Government will accept SNF. See, e.g., 1991 APR at 4; Pl. App.[2] at 87. While the priority ranking among utilities is based on the ranking of their oldest fuel, a utility could actually deliver any SNF for removal meeting the basic requirements for disposal under the contract. Standard Contract, Art. V.E., 48 Fed. Reg. 16,590, 16,601 ("Purchaser shall have the right to determine which SNF and/or HLW is delivered to DOE; provided, however, that purchaser shall comply with the requirements of this contract.") (emphasis in original); 1991 Delivery Commitment Schedule ("DCS") General Instructions ¶ 7(b), Pl. App. at 97 ("Once a purchaser has an allocation, any SNF owned by the Purchaser may be designated against the allocation. The DCS does not restrict the Purchaser to deliver the specified SNF that was the basis for the allocation.").

7. Although the proposed Standard Contract itself did not identify a specific rate by which DOE would accept contract holders' SNF, it provided for DOE's issuance of documents for planning purposes to assist in the eventual definitization of the specific rate and order of SNF acceptance and disposal:

> 5. DOE shall annually provide to the Purchaser pertinent information to support waste disposal program cost projections, project plans and progress reports.

---

[2] "Pl. App." refers to "Appendix To Plaintiff's Reply In Support Of Its Motion For Summary Judgment On Liability And Opposition To Defendant's Cross-Motion For Summary Judgment On Liability" (Sept. 20, 2004).

> 6. Beginning on April 1, 1991, DOE shall issue an annual acceptance ranking for receipt of SNF and/or HLW at the DOE repository. This priority ranking shall be based on the age of SNF and/or HLW as calculated from the date of discharge of such material from the civilian nuclear power reactor. The oldest fuel or waste will have the highest priority for acceptance, except as provided in paragraph B.3 of Article VI of this contract.

48 Fed. Reg. 5458, 5463 (Feb. 4, 1983) (Art. V.B.5 & Art. V.B.6).

**RESPONSE:** Plaintiff agrees that the proposed contract "did not identify a specific rate at which DOE would accept contract holders' SNF" and that DOE has accurately quoted portions of the proposed Standard Contract. Plaintiff disagrees with the proposed finding to the extent that the Government is attempting to characterize the requirement for annual reports and for the APR as setting a rate of acceptance. As discussed in its response to Defendant's proposed finding ¶ 6, which is incorporated herein, the APR does not establish the rate of SNF acceptance; instead, the APR is nothing more than a list of SNF assemblies discharged from reactors ranked by the date of discharge. In addition, DOE did not comply with the quoted requirement that the "acceptance ranking" be issued annually. For example, DOE failed to publish an APR between 1996 and July 2004. See Defendant's Response to Utility Plaintiffs' Requests for Admissions, Request to Admit 45, Pl. App. at 129-30; see also excerpts from 2004 APR/ACR, Pl. App. at 140-47.

8. The proposed contract further provided that, following DOE's issuance of planning documents, rates of SNF acceptance, as well as the specific order of SNF acceptance from particular contract holders, would be defined through the contract holders' submission of, and DOE's approval of, delivery commitment schedules ("DCSs"):

> . . . The SNF and/or HLW shall be specified in a delivery commitment schedule as provided in Article IV below. The disposal services to be provided by DOE under this contract shall commence not later than January 31, 1998 and shall continue until such time as all SNF and/or HLW from the civilian nuclear power reactors specified in Appendix "A", annexed hereto and made a part hereof, has been disposed of as provided for in this contract.

48 Fed. Reg. 5458, 5462 (Feb. 4, 1983) (emphasis added). Specifically, in describing the purpose of the DCS in the preamble to its proposed rule, DOE stated that the procedures to be followed in defining any particular contract holder's allocations for SNF acceptance for any given year included the contract holder's obligation to describe the SNF that it would deliver to DOE, followed by submission of a DCS and of a final delivery schedule ("FDS"):

> *Article IV – Delivery of SNF and/or HLW* – Sets forth the procedures to be followed by Purchaser, including the requirement that the Purchaser describe the waste material to be delivered to DOE, the furnishing of a delivery commitment schedule 63 months prior to the specified delivery date, and a final delivery schedule which Purchaser submits 12 months prior to delivery. In case of an emergency DOE may, subject to prior approval, accept a Purchaser's waste material before the scheduled delivery date.

48 Fed. Reg. 5458, 5459 (Feb. 4, 1983) (italics in original; emphasis added).

**RESPONSE:** Plaintiff assumes that the Government's citation of the first block of quoted material is supposed to refer to the comments on Article II of the proposed Standard Contract on page 5463 of 48 Fed. Reg. rather than page 5462. Assuming that clarification, Plaintiff agrees that the Government has accurately quoted portions of the Notice of Proposed Rulemaking.

Further responding, Plaintiff disagrees with the Government's characterization of the quoted material as setting a rate of acceptance. The DCS process described in the proposed Standard Contract does not set a rate of acceptance. Indeed, the proposed Standard Contract specifically recognized that the DCSs submitted "may require the disposal of more material than the annual capacity of the DOE disposal facility (or facilities) can accommodate," Proposed Standard Contract, Art. VI.B.3, 48 Fed. Reg. at 5464, and provided that each standard contract holder for every year could increase or decrease the amount of SNF in any DCS by 20%. Proposed Standard Contract, Art. IV.B, 48 Fed. Reg. at 5463.

In addition, in its Instructions to Standard Contact Holders to Complete the DCSs ("DCS Instructions"), DOE made it even clearer that the DCSs did not establish a rate. The DCS Instructions, contrary to the Standard Contract itself, informed the utilities that they had to fill out the DCSs using whatever particular allocation the most recent Annual Capacity Report ("ACR") showed that the utility had for a particular year. 1991 DCS General Instructions ¶ 2, Specific Instructions 2.7; Pl. App. at 96, 101. Yet, as stated, the Standard Contract and ACR themselves explicitly provided that they were not binding on either party and, pursuant to the Standard Contract, were to be reissued every year. See Standard Contract Art. IV.B.5.b; 1991 ACR at 1-2; Pl. App. at 84-85. Moreover, the DCS Instructions also stated that DOE and the purchasers could "reevaluate" the DCS submissions. 1991 DCS General Instructions ¶ 7(c); Pl. App. at 97. Finally, the instructions made it clear that the utilities did not have to identify specific SNF assemblies that they planned to submit in five years; instead, the utilities were only asked to submit a non-restrictive date range of when the SNF they planned to provide had been (or would be) removed from reactors. 1991 DCS Specific Instructions ¶ 2.6; Pl. App. at 101.

9. In Article I.7 of the proposed Standard Contract, the term "delivery commitment" was defined as the SNF and/or HLW that a contract holder would deliver to DOE in a given year:

> The term "Delivery Commitment" means a promise by the Purchaser to deliver spent nuclear fuel and/or high-level radioactive waste to the DOE within a specified year.

48 Fed. Reg. 5458, 5462 (Feb. 4, 1983) (Art. I.7). The proposed contract provided that, after DOE had issued its proposed acceptance ranking, the contract holder was required to submit DCSs at least 63 months before the proposed delivery date:

> Delivery commitment schedule(s), in the form set forth in Appendix B, annexed hereto and made a part hereof, for delivery of SNF and/or HLW shall be furnished to DOE by Purchaser. After DOE has issued its proposed acceptance ranking, described in paragraph B.6 of Article V of this contract, the Purchaser shall submit delivery commitment schedule(s) at least sixty-three (63) months prior to the delivery date specified therein. DOE shall

> approve or disapprove such schedules within three (3) months after receipt. In the event of disapproval, DOE shall advise the Purchaser in writing of the reasons for such disapproval and request a revised schedule from the Purchaser, to be submitted to DOE with thirty (30) days after receipt of DOE's notice of disapproval. Purchaser shall have the right to adjust the quantities of SNF and/or HLW + or – 20%, and the delivery schedule +2 months, up to the submission of the final delivery schedule.

48 Fed. Reg. 5458, 5463 (Feb. 4, 1983) (Art. IV.B).

**RESPONSE:** Plaintiff agrees that the Government has accurately quoted provisions of the proposed Standard Contract. However, as stated in Plaintiff's response to proposed finding ¶ 8, which is incorporated herein, the DCS provisions in the proposed and the final Standard Contract did not establish a rate of acceptance. Furthermore, the definition of "Delivery Commitment" did not appear in the final version of the Standard Contract published in the Federal Register on April 18, 1983 or in Plaintiff's Standard Contract with DOE. Similarly, Art. IV.B. as quoted by the Government was also revised. See generally Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste, 48 Fed. Reg. 16,590 (Apr. 18, 1983).

10. The proposed Standard Contract also provided for the contract holders' subsequent submission of Final Delivery Schedules, which would serve to take the annual allocation defined in a DCS and further refine it to reflect as closely as possible the month(s) and day(s) upon which SNF acceptance would occur in that year:

> Final delivery schedule(s), in the form set forth in Appendix C, annexed here and made a part hereof, for delivery of SNF and/or HLW covered by an approved delivery commitment schedule(s) shall be furnished to DOE by Purchaser. The Purchaser shall submit to DOE final delivery schedules not less than 12 months prior to the delivery date specified therein. DOE shall approve or disapprove a final delivery schedule within forty-five (45) days after receipt. In the event of disapproval, DOE shall advise the Purchaser in writing of the reasons for such disapproval and shall request a revised schedule from the Purchaser, to be submitted to DOE within thirty (30) days after receipt of disapproval.

48 Fed. Reg. 5458, 5463 (Feb. 4, 1983) (Art. IV.C).

**<u>RESPONSE</u>:** The Government has slightly misquoted the provisions of the proposed Standard Contract. The last quoted sentence should read: "In the event of disapproval, DOE shall advise the Purchaser in writing of the reasons for such disapproval and shall request a revised schedule from the Purchaser, to be submitted to DOE within thirty (30) days after receipt of *DOE's notice of* disapproval." Assuming this clarification, Plaintiff agrees that the proposed Standard Contract called for submission of Final Delivery Schedules and that the proposed Standard Contract contained the provisions as quoted by the Government. For the reasons identified in Plaintiff's response to the Government's proposed finding ¶ 8, which is incorporated herein, Plaintiff disagrees with the Government's implication that the DCS process established an acceptance rate for the Standard Contract or that the DCS "defined" allocations for the utilities. As stated, the amount listed on the DCS was a mere reflection of the ACR, which the ACR and the Standard Contract stated were not binding. Standard Contract Art. IV.B.5.b, 48 Fed. Reg. at 16,601; 1991 ACR at 1-2; Pl. App. at 84-85.

11. The proposed rule provided that written comments had to be submitted by March 7, 1983. 48 Fed. Reg. at 5458.

**<u>RESPONSE</u>:** Plaintiff agrees.

**B. <u>Comments Upon The Proposed Rule</u>**

12. DOE received numerous comments in response to the proposed rule. One commenter, Northern States Power Company, stated that "[t]he context of the contract is <u>inverted</u>." A. 38 (emphasis in original).[3] The proposed rule provided that "[t]he term 'Delivery Commitment' means a promise by the Purchaser to deliver spent nuclear fuel and/or high-level radioactive waste to the DOE within a specified year." 48 Fed. Reg. 5458, 5462 (Feb. 4, 1983) (Art.I.7). NSP stated that, "[r]ather than a context of spent fuel 'delivery commitments' as a

[3] In its proposed findings, the Government refers to its appendix in support of its motion for summary judgment as "A. __". For clarity's sake, in its Responses Plaintiff refers to the Government's Appendix as "Gov't App. __".

binding obligation placed upon the utility, the contracts should be restated as in terms of 'acceptance commitments' as a binding obligation placed upon DOE." A. 38.

**RESPONSE:** Plaintiff agrees that Northern States Power Company commented in part as quoted above, but reserves all rights to challenge the admissibility and relevance of those comments.

13. Another commenter, Public Service Company of Colorado, stated that "[t]he [proposed] standard contract requires utilities to commit to spent nuclear fuel delivery schedules more than five years in advance of delivery, with the option of extending the delivery commitment date by only two months." A. 51 (emphasis added). It suggested that "[s]uch a restriction on delivery scheduling is entirely unwarranted" and that "[l]ong term waste delivery schedules (5 to 8 year advance projections) should specify waste deliveries to later years as actual plant operations become known." Id.

**RESPONSE:** Plaintiff agrees that Public Service Company of Colorado commented in part as quoted above, but reserves all rights to challenge the admissibility and relevance of those comments.

14. Edison Electric Institute ("EEI"), an association of investor-owned utilities, and the Utility Nuclear Waste Management Group ("UNWMG"), a consortium of 43 utilities with specific interests relating to nuclear waste management, suggested that the "definition of 'Delivery Commitment' (Article I.7) is unnecessary and should be deleted," since the term "'Delivery Commitment Schedule' is described in detail in Article IV.B and Appendix B," and since the definition of "Delivery Commitment" "adds nothing and could be inconsistent with Article IV.B and Appendix B" of the Standard Contract. A. 6.

**RESPONSE:** Plaintiff agrees that EEI and UNWMG commented in part as quoted above, but reserves all rights to challenge the admissibility and relevance of those comments.

15. Another commenter requested deletion of the "Delivery Commitment" definition, stating that "[d]efining this as a 'promise' introduces ambiguity as to whether this is a contract commitment or a non-binding planning arrangement," and suggested that "[t]he 'Delivery Commitment Schedule' described in Article IV.B is the applicable term." A. 108 (emphasis added); see A. 120 (Comments (after Georgia Power), at 1).

**RESPONSE:** Plaintiff agrees that Middle South Services, Inc. and Georgia Power commented in part as quoted above, but reserves all rights to challenge the admissibility and relevance of those comments.

16. Another commenter, Northeast Utilities, recognized that, in the proposed rule, "DOE is requiring that utilities firm their delivery commitment five years prior to delivery and allows only minor changes within that five year period." A. 73 (emphasis added).

**RESPONSE:** Plaintiff agrees that Northeast Utilities commented in part as quoted above, but reserves all rights to challenge the admissibility and relevance of those comments.

17. Another commenter, Mississippi Power & Light Company, stated as follows in its comments:

> Article I, Definition 7 – The definition of "Delivery Commitment" is unnecessary and should be deleted. Article IV.B and Appendix B describe in detail the "Delivery Commitment Schedule." If the definition must remain we suggest it be revised as follows: ". . . within a specified year, and a promise by DOE to receive such deliveries within a specified year in accordance with Article IV.B."

A. 85 (emphasis in original).

**RESPONSE:** Plaintiff agrees that Mississippi Power & Light Company commented in part as quoted above, but reserves all rights to challenge the admissibility and relevance of those comments.

18. Yet another commenter suggested that the DCS provision, requiring submission 63 months in advance of delivery, was "much too restrictive," recognizing that "[t]his commitment should be eliminated or, as a minimum, the flexibility to the Purchaser should be increased" by, as one suggestion, "reducing the commitment leadtime to 36 months . . . ." A. 106 (emphasis added); see A. 116 ("[i]t should not be necessary to submit firm (within + or - 20%) commitment schedules sixty-three (63) months prior to the delivery date").

**RESPONSE:** The Government's Proposed Finding misquotes the comment in the parenthetical; the final sentence should read "*delivery* commitment schedules." Assuming this clarification, Plaintiff agrees Houston Lighting and Power Company and Dairyland Power Cooperative commented in part as quoted above, but reserves all rights to challenge the admissibility and relevance of those comments.

19. Another commenter, Cleveland Electric Illuminating Company, requested that the "Delivery Commitment Schedule" be changed "for the sake of additional clarification" to "Preliminary Delivery Commitment Schedule." A. 53, 55.

**<u>RESPONSE</u>:** Plaintiff agrees that Cleveland Electric Illuminating Company commented in part as quoted above, but reserves all rights to challenge the admissibility and relevance of those comments.

20. In their comments to the proposed rule, EEI and UNWMG recognized the importance of having DOE receive Delivery Commitment Schedules from all contract holders for a given year:

> If DOE is to be able to establish a reasonable planning basis for its delivery commitments, it should receive proposed delivery commitment schedules from all purchasers at the same time and covering the same time frame. Unless delivery commitment schedules are submitted on a consistent basis, DOE will not be able to plan on a consistent basis. Retaining the 63 month timetable, all purchasers should submit delivery schedules by July 1 covering any deliveries they wish to make during the fiscal year commencing 63 months later.

A.11.

**<u>RESPONSE</u>:** Plaintiff agrees that EEI and UNWMG commented in part as quoted above, but reserves all rights to challenge the admissibility and relevance of those comments. Plaintiff objects to the Government's additional comment regarding the "importance" of the procedure suggested.

21. Many commenters suggested a contract change to provide that, if DOE disapproved a contract holder's DCS and the contract holder did not accept the alternate schedule that DOE identified in response, the contract could provide for mandatory negotiation among the parties to arrive at an acceptable schedule. A. 100-01; <u>see</u> A. 53; 86.

**<u>RESPONSE</u>:** Plaintiff disagrees with the Government's characterization regarding "many commenters." Plaintiff agrees that Pacific Gas and Electric Company commented in part as quoted above, but reserves all rights to challenge the admissibility and relevance of those comments. Cleveland Electric Illuminating Company and Mississippi Power & Light Company

made similar but not identical comments as cited above, and Plaintiff reserves all rights to challenge the admissibility and relevance of those comments.

C. The Final Rule

22. On April 18, 1983, DOE issued the Standard Contract as a final rule. The final rule, as promulgated, made several important modifications to the Standard Contract set forth in the proposed rule. First, although the proposed rule provided that "services provided to the Purchaser by DOE under this contract are related to disposal of SNF," 48 Fed. Reg. 5458, 5462 (Feb. 4, 1983), that "disposal" was defined as emplacement in a permanent repository, id., and that such "disposal" services would begin by January 31, 1998, id., the final Standard Contract eliminated any requirement for DOE to begin SNF "disposal" in a permanent repository by January 31, 1998. Instead, the final Standard Contract only required DOE to begin SNF acceptance by January 31, 1998, after the commencement of "facility" operations:

> This contract applies to the delivery by Purchaser to DOE of SNF and/or HLW of domestic origin from civilian nuclear power reactors, acceptance of title by DOE to such SNF and/or HLW, subsequent transportation and, with respect to such material, establishes the fees to be paid by the Purchaser for the services to be rendered hereunder by DOE. The SNF and/or HLW shall be specified in a delivery commitment schedule as provided in Article V below. The services to be provided by DOE under this contract shall begin, after commencement of facility operations, not later than January 31, 1998 and shall continue until such time as all SNF and/or HLW from the civilian nuclear power reactors specified in Appendix A, annexed hereto and made a part hereof, has been disposed of.

10 C.F.R. § 961.11, Art. II (emphasis added). The "facility" to which the final Standard Contract refers is either a permanent repository to be constructed pursuant to the NWPA or such other facility to which SNF might be shipped by DOE prior to its transportation to a permanent repository:

> The term "DOE facility" means a facility operated by or on behalf of DOE for the purpose of disposing of spent nuclear fuel and/or high-level radioactive waste, or such other facility(ies) to which spent nuclear fuel and/or high-level radioactive waste may be shipped by DOE prior to its transportation to a disposal facility.

Id. § 961.11, Art. I.10 (emphasis added). As the preamble to the final rule expressly recognized, the final Standard Contract would not obligate DOE to have an operational permanent repository by January 31, 1998:

> The definition of "DOE facility" (Article I.10) was expanded to expressly state, in accordance with the Act, that there may be an interim storage facility (or facilities) which DOE may utilize prior to emplacement in a repository.

48 Fed. Reg. 16590, 16591 (Apr. 18, 1983).

**RESPONSE:** Plaintiff agrees that the final version of the contract made the specific changes referenced by the Government in the preamble and Articles I.10 and II of the Standard Contract. Plaintiff disagrees with the Government's characterization of the effect of those changes. First, in Indiana Michigan Power Company v. Department of Energy, 88 F.3d 1272 (D.C. Cir. 1996), the D.C. Circuit specifically rejected the Government's argument that the language "after commencement of facility operations" relieved the Government of any obligation to begin removing waste in January 1998. Id. at 1276-77. In addition, as the Indiana Michigan decision recognized and DOE has admitted, Congress and DOE expected that DOE would have a repository in operation by January 1998. See id. at 1277.

23. As for the order of SNF acceptance, the final Standard Contract retained the proposed rule's intention to provide SNF acceptance priority among contract holders upon an "oldest fuel first" basis, 10 C.F.R. § 961.11, Art. VI.B.1, and, like the proposed rule, provided for DOE's issuance of an acceptance priority ranking beginning April 1, 1991. 10 C.F.R. § 961.11, Art. IV.B.5.a.

**RESPONSE:** Plaintiff agrees that, under the final version of the Standard Contract, the priority ranking among utilities would be based on an "oldest fuel first" basis, and that the Government was to issue an *annual* APR beginning April 1, 1991.

24. As for identification of the rate of SNF acceptance, although the proposed rule stated that DOE would "annually provide to the Purchaser pertinent information to support waste disposal program cost projections, project plans and progress reports," 48 Fed. Reg. 5458, 5463 (Feb. 4, 1983), the final Standard Contract provided, "at the request of a substantial number of commenters," 48 Fed. Reg. 16590, 16592 (Apr. 18, 1983), that DOE would issue an annual capacity report "for planning purposes" beginning no later than July 1, 1987 to set forth information regarding "the projected annual receiving capacity for the DOE facility(ies)" for the 10 years following the projected commencement of the initial DOE facility:

> Beginning not later than July 1, 1987, DOE shall issue an annual capacity report for planning purposes. This report shall set forth the projected annual receiving capacity for the DOE facility(ies) and the annual acceptance ranking relating to DOE contracts for the disposal of SNF and or HLW including, to the extent available, capacity information for ten (10) years following the projected commencement of operation of the initial DOE facility.

10 C.F.R. § 961.11, Art. IV.B.5.b.

**RESPONSE:** Plaintiff agrees that the final contract requires the yearly publication of a report titled "Annual Capacity Report." Plaintiff notes that the Standard Contract expressly stated that the ACRs were for "planning purposes" and that the ACRs themselves explicitly stated they were not binding on either party. Standard Contract, Art. IV.B.5.b; see, e.g., 1991 ACR at 1-2; Pl. App. at 84-85. Plaintiff agrees that DOE stated that the ACR provision was added "at the request of a substantial number of commenters . . . ." 48 Fed. Reg. 16,592.

Further responding, Plaintiff notes that DOE stated that it would issue an "*annual* report for planning purposes." 48 Fed. Reg. at 16592 (emphasis added). DOE has repeatedly failed to comply with this requirement. For example, DOE failed to issue an ACR in 1989, and failed to publish an ACR between 1996 and July 2004. See Defendant's Response to Utility Plaintiffs' Requests for Admissions, Request to Admit 45; Pl. App. at 129-30; see also, excerpts from 2004 APR/ACR, Pl. App. at 140-47.

25. The final Standard Contract also deleted some provisions from the proposed rule regarding the DCSs, but with the intention only of eliminating redundant provisions. As the "Sectional Analysis of Contract" portion of the final rule provided, DOE's intention was to retain the purpose of the DCSs, as had been defined in the proposed rule:

> The definition of "delivery commitment" which appeared in the proposed rule (48 FR 5462, Article I.7) has been deleted as this aspect is adequately covered in the contract itself (See Articles IV and V).

48 Fed. Reg. 16590, 16591 (Apr. 18, 1983). Accordingly, adopting the purpose of the DCSs from the proposed rule, the final Standard Contract established a procedure through which, after

DOE's issuance of the 1991 annual capacity report ("ACR") and acceptance priority ranking ("APR"), contract holders would be required to begin submission of DCSs (beginning January 1, 1992) for any SNF and/or HLW that they wanted DOE to accept 63 months later:

> 1. Delivery commitment schedule(s), in the form set forth in Appendix C annexed hereto and made a part hereof, for delivery of SNF and/or HLW shall be furnished to DOE by Purchaser. After DOE has issued its proposed acceptance priority ranking, as described in paragraph B.5 of Article IV hereof, beginning January 1, 1992 the Purchaser shall submit to DOE the delivery commitment schedule(s) which shall identify all SNF and/or HLW the Purchaser wishes to deliver to DOE beginning sixty-three (63) months thereafter. DOE shall approve or disapprove such schedules within three (3) months after receipt. In the event of disapproval, DOE shall advise the Purchaser in writing of the reasons for such disapproval and request a revised schedule from the Purchaser, to be submitted to DOE within thirty (30) days after receipt of DOE's notice of disapproval.
>
> 2. DOE shall approve or disapprove such revised schedule(s) within sixty (60) days after receipt. In the event of disapproval, DOE shall advise the Purchaser in writing of the reasons for such disapproval and shall submit its proposed schedule(s). If these are not acceptable to the Purchaser, the parties shall promptly seek to negotiate mutually acceptable schedule(s). Purchaser shall have the right to adjust the quantities of SNF and/or HLW plus or minus (+/-) twenty percent (20%), and the delivery schedule up to two (2) months, until the submission of the final delivery schedule.

10 C.F.R. § 961.11, Art. V.B (emphasis added). Unlike the proposed rule, the DCS submission provision of the final Standard Contract included a requirement that, if a contract holder found a DCS that DOE required to be unacceptable, "the parties shall promptly seek to negotiate mutually acceptable schedule(s)." Id.

**RESPONSE:** Plaintiff agrees that the Government's proposed finding accurately quotes portions of the final Standard Contract.

Plaintiff disagrees with the Government's characterization of the quoted material. For example, Plaintiff disagrees with the assertion that DOE eliminated the definition of "delivery commitment" because it was "redundant." The Federal Register notice, as quoted by the Government, merely states that the definition was "adequately addressed" by other provisions of

the contract. 48 Fed. Reg. at 16, 591. In fact, EEI's comments on the proposed draft contract stated, "[t]he definition adds nothing and could be inconsistent with Article IV.B and Appendix B." Gov't App. at 6.

Furthermore, Plaintiff objects to the Government's implication that, despite deletion of the definition for "delivery commitment," the "purpose" of DCSs as reflected in that definition somehow was retained in the final Standard Contract. The final Standard Contract should be interpreted in its own right, without reference to the "purpose" of a rejected definition from the proposed draft contract – if the "purpose" of that rejected definition can even be reliably ascertained.

Further responding, Plaintiff disagrees with the Government's implication that the quoted material establishes a rate of acceptance. The DCS process described in the Standard Contract does not set a rate of acceptance. The Standard Contract itself provided that the utilities could submit a DCS for "all SNF and/or HLW the [utility] wishes to deliver to" DOE. Standard Contract Art. V.B.1.; 48 Fed. Reg. at 16,601. Indeed, the Standard Contract specifically recognized that the DCSs submitted "may require the disposal of more material than the annual capacity of the DOE disposal facility (or facilities) can accommodate," Standard Contract Art. VI.B.1, 48 Fed. Reg. at 16,602, and provided that each Standard Contract holder for every year could increase or decrease the amount of SNF in any DCS by 20%. Standard Contract, Art. V.B.2, 48 Fed. Reg. at 16,602.

Finally, Plaintiff disagrees with the Government's implication that the Standard Contract links the DCS process to the ACR.

26. The final Standard Contract, like the proposed rule, contained (1) language providing for the submission of FDSs after the submission and approval of DCSs and (2) a new sentence that required the parties "promptly [to] seek to negotiate mutually acceptance schedules" if the FDS that DOE was willing to approve was unacceptable to the contract holder:

> Final delivery schedule(s), in the form set forth in the Appendix D, annexed hereto and made a part hereof, for delivery of SNF and/or HLW covered by an approved delivery commitment schedule(s) shall be furnished to DOE by Purchaser. The Purchaser shall submit to DOE final delivery schedules not less than twelve (12) months prior to the delivery date specified therein. DOE shall approve or disapprove a final delivery schedule within forty-five (45) days after receipt. In the event of disapproval, DOE shall advise the Purchaser in writing of the reasons for such disapproval and shall request a revised schedule from the Purchaser, to be submitted to DOE within thirty (30) days after receipt of DOE's notice of disapproval. DOE shall approve or disapprove such revised schedule(s) within sixty (60) days after receipt. In the event of disapproval, DOE shall advise the Purchaser in writing of the reasons for such disapproval and shall submit its proposed schedule(s). If these are not acceptable to the Purchaser, the parties shall promptly seek to negotiate mutually acceptable schedule(s).

10 C.F.R. § 961.11, Art. V.C.

**RESPONSE:** Plaintiff agrees that the Standard Contract contains the quoted provision in Article V.C providing for the submission of Final Delivery Schedules one year prior to delivery.

27. Finally, the final Standard Contract contained an integration clause, precluding reliance upon any representation, promise, or condition not expressly incorporated into the contract:

> This contract, which consists of Articles I through XXII and Appendices A through G, annexed hereto and made a part hereof, contains the entire agreement between the parties with respect to the subject matter hereof. Any representation, promise, or condition not incorporated in this contract shall not be binding on either party. No course of dealing or usage of trade or course of performance shall be relevant to explain or supplement any provision contained in this contract.

10 C.F.R. § 961.11, Art. XXII.

**RESPONSE:** Plaintiff agrees that the Standard Contract contains the quoted language in Article XXII. Plaintiff disagrees with the Government's legal characterization of the quoted

language's effect where, as here, the Standard Contract does not contain a term establishing the rate of acceptance.

**III. <u>CONSOLIDATED EDISON'S EXECUTION OF ITS STANDARD CONTRACT</u>**

28. On June 17, 1983, Consolidated Edison Company of New York, Inc. ("ConEd"), the predecessor to Entergy Nuclear Indian Point 2, LLC ("ENIP"), executed its Standard Contract with DOE. <u>See</u> Complaint ¶ 9. ConEd's Standard Contract contained the same terms and conditions as the final rule promulgated by DOE on April 14, 1983, 10 C.F.R. § 961.11. A. 358-91.

**<u>RESPONSE</u>:** Plaintiff agrees that ConEd executed the Indian Point 1 and 2 Power Stations Standard Contract on June 17, 1983 and that ConEd was the predecessor owner of the Indian Point 1 and 2 Power Stations. <u>See</u> Complaint ¶ 9. Further responding, Plaintiff disagrees with this proposed finding of fact insofar as it states that the Standard Contract was issued on April 14, 1983. The Standard Contract actually was issued on April 18, 1983. Plaintiff agrees that its contract generally contains the same terms and conditions as the final Standard Contract promulgated by DOE on April 18, 1983. Plaintiff, however, rejects any implication that DOE was required to use a notice and comment format to enter into "standard contracts" with each utility.

**IV. <u>DOE'S ISSUANCE OF THE 1987 MISSION PLAN AMENDMENT</u>**

29. In June 1985, DOE issued the Mission Plan, in accordance with the requirements of 42 U.S.C. § 10221 (1982), which was to "provide an informational basis sufficient to permit informed decisions to be made in carrying out the repository program and the research, development, and demonstration programs required under this chapter." 42 U.S.C. § 10221 (1982).

**<u>RESPONSE</u>:** Plaintiff agrees that DOE issued a Mission Plan in 1985 as required by the NWPA and that, to the extent supported by the text of the NWPA, the 1985 Mission Plan contained the quoted statements.

30. In the 1987 Mission Plan Amendment, which DOE submitted to Congress in June 1987, DOE noted the importance of the Annual Capacity Report that would be issued in 1991, which would provide the basis for the submission of DCSs:

> Under the terms of the contract that has been signed between the DOE and the owners and generators of spent fuel and high-level waste, an annual capacity report with projected annual receiving capacities and rankings will be issued by the DOE for planning purposes beginning in 1987. In 1991, the DOE is required to begin publishing annual acceptance priority rankings for spent-fuel receipt by the DOE. <u>Beginning January 1, 1992, the utilities are to submit to the DOE for approval delivery commitment schedules based on these rankings. These schedules will form the basis for final delivery schedules</u> to be submitted by the utilities not less than 12 months before the actual delivery dates.

A. 207 (emphasis added).

**<u>RESPONSE</u>:** Plaintiff agrees that the 1987 Mission Plan Amendment contained the quoted statements. Further responding, Plaintiff notes that the "acceptance priority rankings for spent-fuel receipt by DOE" does not establish the rate of SNF acceptance because it is nothing more that a list of fuel assemblies discharged from reactors ranked by the date of discharge. Standard Contract Art. IV.B.5.a, 48 Fed. Reg. at 16,601. For example, the 1991 APR published by DOE does nothing more than indicate the order among utilities in which SNF will be removed, but says nothing about the rate at which the Government will accept SNF. <u>See</u>, <u>e.g.</u> 1991 APR at 4; Pl. App. at 87. Further responding, Plaintiff disagrees with the Government's characterization of the "importance" of the 1991 ACR (and that such report "would provide the basis for the submission of DCSs") because, among other things, the quoted statement does not even refer specifically to the 1991 ACR, but only to the 1991 APR. In addition, nothing in the

Standard Contract required utilities to submit DCSs identifying for delivery *only* those SNF allocations set forth in the ACR. See Commonwealth Edison Co. v. United States, 56 Fed. Cl. 652, 665 (2003).

## V. DOE'S ISSUANCE OF ANNUAL CAPACITY REPORTS

31. Beginning in 1987, in compliance with the NWPA and the language of the Standard Contract, DOE issued an "Annual Capacity Report." DOE's ACR expressly stated that "the ACR is for planning purposes only and thus is not contractually binding on either DOE or the Purchasers." A. 210; 212; 216. Further, each of the ACRs from 1987 through 1990 contained the following, or substantially similar, language:

> Beginning in 1991, the ACR acceptance ranking will be converted into an Annual Priority Ranking for receipt of SNF/HLW. In 1992, based on this priority ranking, the Purchasers will submit to DOE for approval, Delivery Commitment Schedules identifying the SNF/HLW that Purchasers propose to deliver to the DOE waste management system (WMS). Once approved, these schedules will become the basis for Final Delivery Schedules to be submitted by the Purchasers not less than 12 months before the date of DOE's anticipated acceptance of title to the SNF/HLW and subsequent transport to a DOE facility.

A. 210; 213; 216 (emphasis added).

**RESPONSE:** Plaintiff agrees that DOE issued its first ACR in 1987 and that the referenced ACRs contained the language quoted in the proposed finding. Further responding, Plaintiff notes that in the case of the 1987 and 1988 ACRs, the projected annual acceptance rates ranged up to a steady state operation of 2,650 metric tons uranium ("MTU") and 3,000 MTU respectively. 1987 ACR at 7; Pl. App. at 20; 1988 ACR at 5; Pl. App. at 41. Additionally, the 1990 ACR included an "upper bounding" case that projected annual acceptance rates that ranged up to a steady state rate of 3,000 MTU. 1990 ACR at 7; Pl. App. at 65.

Further responding, Plaintiff notes that, from 1996 until DOE's July 2004 APR/ACR, DOE ceased issuing ACRs in violation of the NWPA and the Standard Contract. See

Defendant's Response to Utility Plaintiffs' Requests for Admissions, Request to Admit 45, Pl. App. at 129-30.

32. Although DOE announced that the 1990 ACR would be the last, DOE decided that it would continue publication of the ACR "after discussion with the Purchasers." A. 407. DOE provided the following guidance regarding the DCSs in the 1991 ACR:

> The Purchasers' allocations for each delivery year are presented in Tables A.1 through A. 10 in Appendix A, and should be used as the basis for submitting DCSs. An allocation is a specified acceptance capacity (measured in MTU) in a particular year for an individual Purchaser."

A. 408.

**RESPONSE:** Plaintiff agrees that the 1991 ACR contained the quoted language. Further responding, Plaintiff notes that the 1991 ACR also states that "the ACR is for planning purposes only and thus is not contractually binding on either DOE or the Purchasers." Gov't App. at 221-22.

33. The 1991 and 1992 ACRs contained identical projected SNF acceptance rates for the first ten years of SNF acceptance:

Table 1. Projected Nominal Waste Acceptance Rates for Spent Nuclear Fuel

| Year | SNF (MTU) |
|---|---|
| Year 1 | 400 |
| Year 2 | 600 |
| Year 3 | 900 |
| Year 4 | 900 |
| Year 5 | 900 |
| Year 6 | 900 |
| Year 7 | 900 |
| Year 8 | 900 |
| Year 9 | 900 |
| Year 10 | 900 |
| TOTAL | 8,200 |

A. 411; 473.

**RESPONSE:** DOE has not accurately reproduced the Tables from the 1991 and 1992 ACRs. First, the Tables referenced by the Government appear to be Table "2.1" from each ACR, not Table "1." Second, the "Year" column in those tables listed specific calendar years from "1998" through "2007," rather than "Year 1" through "Year 10" as set forth by the Government's proposed finding. See Gov't App. at 224, 233.

34. In 1995, DOE issued a combined Acceptance Priority Ranking and Annual Capacity Report, to "establish[] the order in which the Department allocates the projected acceptance capacity for commercial [SNF]" and to appl[y] projected nominal acceptance rates for the system to the priority ranking in the APR, resulting in individual allocations for the owners and generators expressed in metric tons per uranium (MTU)." A. 291. The 1995 ACR contained substantially similar SNF acceptance rates as the 1991 and 1992 ACRs, shown above. A. 294. The 1995 ACR also contained the following statement:

> The ACR (see Appendix B) applies a 10-year projected nominal waste acceptance rate to the APR, resulting in individual capacity allocations. . . . The projected nominal acceptance rates also reflect the capacity limit imposed by the Act on such a storage facility prior to repository operations. These projected nominal waste acceptance rates are presented in Table 1. The Department will continue to process DCS submittals on an annual basis.

A. 293-94. The 1995 ACR further provided that, "<u>[t]hese capacity allocations, as listed in the ACR, form the basis for the Purchasers' submittal of Delivery Commitment Schedules (DCS)</u>." A. 291 (emphasis added). The 1995 ACR also provided that, "[a]s specified in the Standard Contract, the ACR is for planning purposes only and, thus, is not contractually binding on either DOE or the Purchasers." A. 291.

**RESPONSE:** Plaintiff agrees that the Government issued a combined APR/ACR in 1995 and that it contained the statements quoted above. Further responding, Plaintiff points out that the Government's proposed finding omits the following language from the block quote cited above:

> In the previous ACR, the projected nominal acceptance rate was based on the assumption of SNF acceptance beginning in 1998 at a Monitored Retrievable Storage facility prior to repository operations. Due to the uncertainty associated with the date of commencement of operation of the waste management system, the

> annual nominal waste acceptance rates are presented by year(s) of operation of the system rather than by specific calendar year(s).

Gov. App. at 238-39.

Further responding, Plaintiff agrees that the 1995 APR/ACR contained substantially similar acceptance rates as the 1991 and 1992 ACRs, although the 1995 APR/ACR specifically removed any calendar years associated with particular rates.

35. Under the 1995 ACR, ConEd had projected allocations in 1998, 1999, 2000, 2002, 2004, 2005 and 2006. See generally A.241.

**RESPONSE:** Plaintiff disagrees that the 1995 APR/ACR identified the years in which ConEd had allocations. Further responding, however, Plaintiff acknowledges that the 1995 APR/ACR shows that ConEd had projected allocations for Years 1, 2, 3, 5, 7, 8, and 9. Plaintiff does not agree that this means it had no rights to make SNF deliveries to DOE during other time periods set forth in those Tables (or otherwise).

Further responding, the 1995 APR/ACR (and its predecessors the 1991 and 1992 ACRs) used a 900 MTU steady-state acceptance rate rather than the 3,000 MTU steady-state acceptance rate as contemplated by the NWPA and virtually uniformly reflected in DOE OCRWM documents. See generally Indiana Mich. Power Co. v. United States, 57 Fed. Cl. 88 (2003); Commonwealth Edison, 56 Fed. Cl. at 665-66. Additionally, the 1991 ACR, issued in December 1991, assumes events that never happened (and DOE likely knew were unlikely to happen). For example, the 1991 ACR assumes "a site for a Monitored Retrievable Storage (MRS) facility will be obtained and the facility will initiate operations in 1998; and the statutory schedule linkages between the MRS facility and the repository set forth in the Nuclear Waste Policy Act of 1982, as amended (NWPA) will be modified." 1991 ACR at v, Gov't App. at 220. The 1991 ACR assumes the use of an MRS, despite the General Accounting Office report in September 1991

(issued two months before the 1991 ACR), which concluded that "[f]or a number of reasons, it is unlikely that DOE will meet its objective to have an MRS facility operating by 1998." GAO, Nuclear Waste: Operation of a Monitored Retrievable Storage Facility is Unlikely by 1998 at 19 (Sept. 1991), Pl. App. at 139. What was foreseeable in 1991, was borne out in 1995. By the time the Government issued the 1995 APR/ACR the Government was no longer actively attempting to site an MRS. See Zabransky Dep. at 345 (April 17, 2002), Pl. App. at 3 ("At that point in time in 1994 . . . [t]here was no active program looking for a voluntary MRS"); see also Response to Proposed Finding of Fact ¶ 34.

## VI. THE DELIVERY COMMITMENT SCHEDULE SUBMISSIONS FROM CONSOLIDATED EDISON

36. On May 11, 1992, the DOE contracting officer issued a letter to each of the contract holders, along with instructions for the submission of DCSs. The contracting officer stated that "[t]he allocations in the 1991 Annual Capacity Report (ACR) should be the basis for the DCS submittals." See, e.g., A. 143-52, 153-62, 163-72. The accompanying instructions provided that purchasers could "begin submitting to the Department of Energy (DOE) Delivery Commitment Schedules (DCS) that identify all spent nuclear fuel (SNF) the Purchasers plan to deliver to DOE beginning 63 months thereafter." A. 145, 155, 165. The instructions stated that "[t]he DCS provides the Purchasers with the opportunity to inform DOE of their plans for utilizing their allocations of projected Federal waste management system (FWMS) acceptance capacity." A. 145, 155, 165. They further provided that, "[f]or each allocation listed in the 1991 ACR (or subsequent ACRs, as appropriate), a Purchaser must submit at least one DCS for that allocation at least 63 months prior to the date that the allocation occurs (e.g., if a Purchaser has an allocation in 1998, a DCS must be submitted for that allocation by September 30, 1992)." Id.

**RESPONSE:** Plaintiff agrees that ConEd (from whom Plaintiff was assigned the Indian Point 1 and 2 Standard Contract) received a letter and accompanying instructions from DOE (with the clarification that DOE's letter to Plaintiff was dated March 4, 1992 not May 11, 1992), and that the Government has accurately quoted certain portions of the letter and instructions. Plaintiff denies that this letter accurately reflects the requirements of its Standard Contract with DOE. Further responding, Plaintiff disagrees with the implication in the letter that a Standard

Contract holder's deliveries could be limited by the 1991 ACR allocation. See Commonwealth Edison, 56 Fed. Cl. at 665-66; Indiana Mich., 57 Fed. Cl. at 98.

37. On or about December 4, 1992, DOE approved a DCS that ConEd had submitted for acceptance of 2.92 MTU of SNF between January 1, 1998 and January 30, 1999. A. 253-54. Through its approval of this DCS, DOE agreed to accept 2.92 MTU of SNF from ConEd at some point between January 31, 1998 and January 30, 1999.

**RESPONSE:** Plaintiff agrees that ConEd submitted a delivery commitment schedule to DOE for approval as described above and that DOE appears to have approved the DCS. Plaintiff disagrees, however, with any implication that this submission dictated the scope of DOE's waste acceptance obligations under the Standard Contract with respect to Plaintiff in light of DOE's eventual abandonment of the DCS process, its manipulation of the DCS process to minimize its liability, and its eventual breach of the Standard Contract. For example, ConEd submitted DCSs for allocations for Years 7, 8, and 9 (according to the 1995 APR/ACR), which DOE neither approved nor disapproved in contravention of the Standard Contract. Pl. App. at 162-67; Standard Contract Art. V.B.1, 10 C.F.R. § 961.11. Furthermore, DOE voided at least one DCS submitted by ConEd that DOE had previously approved. See Pl. App. at 161.

Further responding, in August 2004, DOE issued new instructions (along with the new 2004 APR/ACR) directing utilities to submit DCSs and effectively acknowledging that the entire process conducted in the 1990s is irrelevant. 2004 DCS Instructions, Pl. App. at 132-137. In particular, the 2004 DCS Instructions state, "DOE recognizes that many Purchasers have submitted and DOE has approved DCSs based upon the January 31, 1998 operations date included in the Standard Contract. Purchasers should submit new DCSs based upon the currently planned operation date of 2010." 2004 DCS Instructions ¶ 7(a), Pl. App. at 133.

38. On or about February 25, 1994, DOE approved a DCS that ConEd had submitted for acceptance of 27.66 MTU of SNF between January 31, 1999 and January 30, 2000. Through

its approval of this DCS, DOE agreed to accept 27.66 MTU of SNF from ConEd at some point between January 31, 1999 and January 30, 2000.

**RESPONSE:** Plaintiff agrees that ConEd submitted a delivery commitment schedule to DOE for approval as described above and that DOE appears to have approved the DCS. Plaintiff disagrees, however, with any implication that this submission dictated the scope of DOE's waste acceptance obligations under the Standard Contract with respect to Plaintiff in light of DOE's eventual abandonment of the DCS process, its manipulation of the DCS process to minimize its liability, and its eventual breach of the Standard Contract. For example, ConEd submitted DCSs for allocations for Years 7, 8, and 9 (according to the 1995 APR/ACR), which DOE neither approved nor disapproved in contravention of the Standard Contract. Pl. App. at 162-67; Standard Contract Art. V.B.1, 10 C.F.R. § 961.11. Furthermore, DOE voided at least one DCS submitted by ConEd that DOE had previously approved. See Pl. App. at 161.

Further responding, in August 2004, DOE issued new instructions (along with the new 2004 APR/ACR) directing utilities to submit DCSs and effectively acknowledging that the entire process conducted in the 1990s is irrelevant. 2004 DCS Instructions, Pl. App. at 132-137. In particular, the 2004 DCS Instructions state, "DOE recognizes that many Purchasers have submitted and DOE has approved DCSs based upon the January 31, 1998 operations date included in the Standard Contract. Purchasers should submit new DCSs based upon the currently planned operation date of 2010." 2004 DCS Instructions ¶ 7(a), Pl. App. at 133.

39. On or about December 2, 1994, DOE approved a DCS that ConEd had submitted for acceptance of 32.74 MTU of SNF between January 31, 2000 and January 30, 2001. Through its approval of this DCS, DOE agreed to accept 32.74 MTU of SNF from ConEd at some point between January 31, 2000 and January 30, 2001.

**RESPONSE:** Plaintiff agrees that ConEd submitted a delivery commitment schedule to DOE for approval as described above and that DOE appears to have approved the DCS. Plaintiff

disagrees, however, with any implication that this submission dictated the scope of DOE's waste acceptance obligations under the Standard Contract with respect to Plaintiff in light of DOE's eventual abandonment of the DCS process, its manipulation of the DCS process to minimize its liability, and its eventual breach of the Standard Contract. For example, ConEd submitted DCSs for allocations for Years 7, 8, and 9 (according to the 1995 APR/ACR), which DOE neither approved nor disapproved in contravention of the Standard Contract. Pl. App. at 162-67; Standard Contract Art. V.B.1, 10 C.F.R. § 961.11. Furthermore, DOE voided at least one DCS submitted by ConEd that DOE had previously approved. See Pl. App. at 161.

Further responding, in August 2004, DOE issued new instructions (along with the new 2004 APR/ACR) directing utilities to submit DCSs and effectively acknowledging that the entire process conducted in the 1990s is irrelevant. 2004 DCS Instructions, Pl. App. at 132-137. In particular, the 2004 DCS Instructions state, "DOE recognizes that many Purchasers have submitted and DOE has approved DCSs based upon the January 31, 1998 operations date included in the Standard Contract. Purchasers should submit new DCSs based upon the currently planned operation date of 2010." 2004 DCS Instructions ¶ 7(a), Pl. App. at 133.

40. Consistent with the 1995 ACR, ConEd did not submit a DCS for acceptance of any SNF for January 31, 2001 through January 30, 2002. Consequently, DOE did not agree to accept any of ConEd's SNF during this time.

**RESPONSE:** Plaintiff has no basis to agree or disagree that ConEd did not submit a delivery commitment schedule to DOE for approval as described above. Plaintiff disagrees, however, with any implication that this lack of a submission dictated the scope of DOE's waste acceptance obligations under the Standard Contract with respect to Plaintiff in light of DOE's eventual abandonment of the DCS process, its manipulation of the DCS process to minimize its liability, and its eventual breach of the Standard Contract. For example, ConEd submitted DCSs

for allocations for Years 7, 8, and 9 (according to the 1995 APR/ACR), which DOE neither approved nor disapproved in contravention of the Standard Contract. Pl. App. at 162-67; Standard Contract Art. V.B.1, 10 C.F.R. § 961.11. Furthermore, DOE voided at least one DCS submitted by ConEd that DOE had previously approved. See Pl. App. at 161.

Further responding, in August 2004, DOE issued new instructions (along with the new 2004 APR/ACR) directing utilities to submit DCSs and effectively acknowledging that the entire process conducted in the 1990s is irrelevant. 2004 DCS Instructions, Pl. App. at 132-137. In particular, the 2004 DCS Instructions state, "DOE recognizes that many Purchasers have submitted and DOE has approved DCSs based upon the January 31, 1998 operations date included in the Standard Contract. Purchasers should submit new DCSs based upon the currently planned operation date of 2010." 2004 DCS Instructions ¶ 7(a), Pl. App. at 133.

41. At some point, DOE approved a DCS that ConEd had submitted for acceptance of 5 MTU of SNF between January 31, 2002 and January 30, 2003. Through its approval of this DCS, DOE agreed to accept 5 MTU of SNF from ConEd at some point between January 31, 2002 and January 30, 2003.

**RESPONSE:** Although the Government has not provided a citation to its appendix, Plaintiff presumes the Government is referring to Gov't App. at 255. Plaintiff has no basis to agree or disagree as to whether the submission referred to by the Government came from ConEd and whether it was actually approved. First, this alleged DCS submission lists as contact person "Mr. Whomever" from Indian Point Unit 1. Second, the DCS is not signed by the authorized Purchaser representative. Third, the signature of the alleged approving DOE technical representative is undated. For all these reasons, Plaintiff questions (and objects) to the authenticity of this document and Gov't App. at 256-57, which bear the same questionable characteristics.

Even assuming arguendo that this DCS submission was authentic, Plaintiff disagrees with any implication that this submission dictated the scope of DOE's waste acceptance obligations under the Standard Contract with respect to Plaintiff in light of DOE's eventual abandonment of the DCS process, its manipulation of the DCS process to minimize its liability, and its eventual breach of the Standard Contract. For example, ConEd submitted DCSs for allocations for Years 7, 8, and 9 (according to the 1995 APR/ACR), which DOE neither approved nor disapproved in contravention of the Standard Contract. Pl. App. at 162-67; Standard Contract Art. V.B.1, 10 C.F.R. § 961.11. Furthermore, DOE voided at least one DCS submitted by ConEd that DOE had previously approved. See Pl. App. at 161. (These DCSs that DOE either failed to act upon or voided are noticeably absent from the Governments findings and its appendix, while the Government included copies of alleged DCSs of questionable authenticity in their stead.)

Further responding, in August 2004, DOE issued new instructions (along with the new 2004 APR/ACR) directing utilities to submit DCSs and effectively acknowledging that the entire process conducted in the 1990s is irrelevant. 2004 DCS Instructions, Pl. App. at 132-137. In particular, the 2004 DCS Instructions state, "DOE recognizes that many Purchasers have submitted and DOE has approved DCSs based upon the January 31, 1998 operations date included in the Standard Contract. Purchasers should submit new DCSs based upon the currently planned operation date of 2010." 2004 DCS Instructions ¶ 7(a), Pl. App. at 133.

## VII. ENIP'S COMPLAINT AND ASSIGNMENT OF CONTRACT

42. DOE did not begin accepting SNF and/or HLW from the nuclear utilities under the Standard Contract by January 31, 1998.

**RESPONSE:** Plaintiff agrees.

43. On September 6, 2001, ENIP purchased Indian Point 1 and 2 from ConEd. Compl. ¶ 2.

**RESPONSE:** Plaintiff agrees.

44. By letter dated September 6, 2001, ConEd notified DOE that it had assigned the Standard Contract between it and DOE to ENIP. Compl. ¶ 2. In the letter, ConEd states that it has "effective September 6, 2001, assigned ConEdison's rights and obligations under the Contract to Entergy, with the exception of all claims and causes of action in respect of damages to property or economic loss related to or pertaining to the Department of Energy's breaches or defaults under the Contract accrued as of September 6, 2001, whether relating to periods prior to or following September 6, 2001." A. 303

**RESPONSE:** Plaintiff agrees that ConEd assigned the Indian Point 1 and 2 plants Standard Contract to Plaintiff on September 6, 2001 and that the assignment letter includes the language quoted. Further responding, Plaintiff and ConEd have interpreted the assignment language of their purchase and sale agreement (which language varies slightly from that used by ConEd in the assignment letter) to mean that ConEd may pursue claims for damages incurred prior to September 6, 2001 and Plaintiff may pursue claims for damages incurred after September 6, 2001. See Purchase and Sale Agreement, Pl. App. at 152.

Dated: September 13, 2004

Respectfully submitted,

S/ Alex D. Tomaszczuk by s/ Daniel S. Herzfeld
Alex D. Tomaszczuk
**SHAW PITTMAN LLP**
1650 Tysons Boulevard
McLean, VA 22102
(703) 770-7940
(703) 770-7901 (fax)

Counsel of Record for Plaintiff
Entergy Nuclear Indian Point 2, LLC

OF COUNSEL
Jay E. Silberg
Devon E. Hewitt
Michael G. Lepre
Daniel S. Herzfeld
Jack Y. Chu
**SHAW PITTMAN LLP**
2300 N Street, N.W.
Washington, D.C. 20037
(202) 663-8000
(202) 663-8007 (fax)