IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| ENTERGY NUCLEAR INDIAN POINT 2, LLC | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 03-2622C |
| | ) | (Judge Lettow) |
| UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

# DEFENDANT'S REPLY TO PLAINTIFF'S RESPONSE TO DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT ON LIABILITY

Defendant, the United States, respectfully submits this reply to "Plaintiff's Reply In Support Of Its Motion for Summary Judgment On Liability And Response In Opposition To The Defendant's Cross-Motion For Summary Judgment On Liability," dated September 20, 2004.

## DISCUSSION

### I. ENTERGY CONCEDES THAT IT MAY NOT SEEK DAMAGES PRIOR TO THE ASSIGNMENT OF THE STANDARD CONTRACT AND, THEREFORE, THERE CAN BE NO ENTRY OF LIABILITY PRIOR TO SEPTEMBER 6, 2001

In an apparent shift from its motion for summary judgment on liability, in which it contended that liability should be established as of January 31, 1998, Entergy Nuclear Indian Point 2 ("ENIP") now claims in its reply brief that it

> does not seek to receive damages incurred by ConEd prior to September 6, 2001, but only damages caused by DOE's breach after that date. Based on its purchase and sales agreement with ConEd, Plaintiff has a right to seek damages for the period after September 6, 2001 based on DOE's breach of the Standard Contract's January 31, 1998 performance commencement date.

Pl. Reply at 2. The Government accepts ENIP's concession that it did not suffer damages prior to the assignment of the Standard Contract on September 6, 2001, and that the entry of liability should thus not be entered before this date.

## II. ENTERGY'S ASSERTIONS CONCERNING THE LEGITIMACY OF THE DCS PROCESS ARE MISPLACED

ENIP makes several arguments concerning the legitimacy of the DCS process, asserting that the DCSs should not be utilized to determine DOE's obligation to individual nuclear utilities. As discussed below, ENIP is incorrect.

**First**, ENIP suggests that the submission of "a DCS form was not a condition precedent to DOE's obligation to take SNF from Plaintiff (or any other utility) under the Standard Contract." Pl. Reply at 13.[1] Yet, absent submission of a DCS for acceptance of SNF covered by the Standard Contract at issue here and DOE's approval of it, ENIP has not identified any practical manner in which activities contemplated under the Standard Contract, including the significant development time necessary for DOE to prepare transportation casks and coordinate their use for SNF acceptance from various contract holders, see 10 C.F.R. § 961.11, Art. IV.B.2, could ever be performed.

**Second**, ENIP contends that even if the submission of DCSs were a condition precedent, once DOE breached the Standard Contract, contract holders were excused from satisfying this condition. Pl. Reply at 14. However, this argument completely ignores the fact that the assignor of the Standard Contract in this case, Consolidated Edison Company of New York ("ConEd"), did submit DCSs. Thus ENIP's argument is largely rhetorical.

1 "Pl. Reply at ___" refers to plaintiff's reply to defendant's response to plaintiff's motion for summary judgment on liability and response to defendant's cross-motion, dated September 20, 2004. "Pl. App. __" refers to the appendix to that brief. "Def. Br. __" refers to defendant's August 3, 2004 response and cross-motion. "Def. App. __" refers to the appendix accompanying defendant's August 3, 2004 response to plaintiff's motion for summary judgment on liability and cross-motion for summary judgment on liability." Def. Reply App. __" refers to the appendix to this brief.

**Third**, although ENIP seems to complain that the DCS process envisioned by the Standard Contract is meaningless and unenforceable, ENIP has failed to identify any other means by which the activities contemplated by the Standard Contract could ever proceed.

Under ENIP's theory, DOE will magically know when each contract holder wants SNF accepted; each contract holder's desires will magically correspond to the "oldest fuel first" requirements of the Standard Contract; DOE will have no problems simply taking SNF from every contract holder when each wants acceptance, regardless of space, capacity, staffing, or transportation limitations; and DOE will have no problem with the significant financial repercussions and waste that it will suffer if a contract holder is not prepared to deliver SNF to DOE when DOE arrives at the contract holder's site with the appropriate transportation casks contemplated by the Standard Contract. By reading the DCS process out of the Standard Contract, ENIP has eliminated the only mechanism that would allow the parties to plan for, and commit themselves to, actual performance under the Standard Contract. Without enforcement of the DCS provisions, the Standard Contract cannot function.

**Fourth**, ENIP complains that the Court should ignore the 1991 Annual Capacity Report ("ACR") and the 1995 Acceptance Priority Ranking/Annual Capacity Reports ("APR/ACR"), which identified the SNF allocations that DOE anticipated it would be able to commit itself to satisfying during the first 10 years of SNF acceptance because the allocations there are "counterfeit." Pl. Reply 19; see 10 C.F.R. § 961.11, Art. IV.B.5 (identifying requirement for issuance of APR and ACR). First, ENIP's assertion that these allocations are "counterfeit" is unfounded. The 1991 ACR, the 1992 ACR, and the 1995 APR/ACR all contain the same acceptance rates, compare Def. App. 224 & 223 with Def. App. 239, and, in fact, contains a

higher rate than the "lower bounding case" proposed in the 1990 ACR for use with a Monitored Retrievable Storage ("MRS") facility. Pl. App. 63, 65.

ENIP's argument regarding the 1991 ACR and the 1995 APR/ACR is based essentially upon its theory that, once DOE began acceptance and after a short ramp-up period, DOE was contractually obligated to accept 3,000 Metric Tons Uranium ("MTUs") of SNF from contract holders every year. Pl. Reply 19. Yet, it has identified no contract language containing any such requirement, and, in fact, DOE specifically declined to include any such obligation in the contract. Def. App. 4-5, 35, 36, 105; Def. Reply App. 44-48; see 10 C.F.R. § 961.11. This Court has recently stated, in response to four SNF plaintiffs' requests that "the contract be reformed to provide an allegedly 'reasonable' post-1998 annual industry-wide acceptance rate of 3,000" MTUs, that this assertion appears unfounded:

> Plaintiffs appear to provide no objective basis for this reformation, relying instead on equitable principles and a widely-shared impression, among jurists and others, that the agency should be punished for transgressing against public safety. None of the demanded terms is found in the contract; and it is clear that the parties shared no meeting of the minds regarding those terms, as was made clear to all during contract negotiations.

Florida Power & Light Co. v. United States, No. 98-483C, slip op. at 9 n.12 (Fed. Cl. Oct. 14, 2004) (Sypolt, J.) (unpublished order).

Further, the acceptance rates contained in various planning documents to which ENIP cites at page 19 of its reply brief, including the recently issued 2004 APR/ACR, are generally based upon an assumption that an operating repository will be available when SNF acceptance begins. See also Def. Reply App. 41-42 ("Receipt rates in this table are only applicable if a CISF is approved"). However, as the United States Court of Appeals for the District of Columbia has

recognized, DOE was not obligated to have an operating repository available in 1998. Indiana Michigan Power Co. v. Department of Energy, 88 F.3d 1272, 1276, 1277 (D.C. Cir. 1996). Instead, it was obligated only to begin SNF acceptance in 1998 in some type of facility, such as an MRS facility, and the Standard Contract expressly permits DOE to accept SNF for delivery to a facility other than a repository. 10 C.F.R. § 961.11, Art. I(10) (defining "DOE facility"); see 48 Fed. Reg. 16590, 16591 (Apr. 18, 1983) (preamble to final rule creating Standard Contract terms: "The definition of 'DOE facility' (Article I.10) was expanded to expressly state, in accordance with the Act, that there may be an interim storage facility (or facilities) which DOE may utilize prior to emplacement in a repository"). DOE expressly informed contract holders in early ACRs that, beginning with the 1991 ACR, DOE would issue a firm waste acceptance schedule which would be the basis for the submission of delivery commitment schedules ("DCSs") by the purchasers. Each of the ACRs from 1987 through 1990 contained the following, or substantially similar, language:

> Beginning in 1991, the ACR acceptance ranking will be converted into an Annual Priority Ranking for receipt of SNF/HLW. In 1992, based on this priority ranking, the Purchasers will submit to DOE for approval, Delivery Commitment Schedules identifying the SNF/HLW that Purchasers propose to deliver to the DOE waste management system (WMS). Once approved, these schedules will become the basis for Final Delivery Schedules to be submitted by the Purchasers not less than 12 months before the date of DOE's anticipated acceptance of title to the SNF/HLW and subsequent transport to a DOE facility.

Pl. App. 16 (1987 ACR); see Pl. App. 38 (1988 ACR), 60 (1990 ACR); Def. App. 204 (1985 Mission Plan), 220, 222 (1991 ACR); Def. Reply App. 38-40; see also Def. App. 209 (1987 ACR: "projections in this initial report are based on current plans and best available information;

they are not contractually binding"). Given that DOE was entitled under the Standard Contract to accept SNF at an MRS facility in 1998, rather than directly at a repository, proposed rates for SNF acceptance at a repository do not somehow become contractually binding obligations upon DOE. See National By-Products, Inc. v. United States, 186 Ct. Cl. 546, 558-59, 405 F.2d 1256, 1263 (1969) ("[b]efore a representation can be contractually binding, it must be in the form of a promise or undertaking . . . and not a mere statement of intention, opinion, or prediction"). Accordingly, ENIP cannot base its theory of liability upon DOE's obligation to use higher acceptance rates than those that DOE had proposed to use for SNF acceptance at an MRS.[2]

In any event, neither ENIP nor ConEd ever contested or complained about those allocations until they filed their respective lawsuits in 2003 and 2004, respectively. ENIP's suggestion that it can wait 12 years after the issuance of those acceptance allocations in 1991 and then, and only then, complain that the allocations granted were "counterfeit" and that damages should be based upon some scenario not in existence 12 years earlier. Established precedent of this Court and its predecessor, the Court of Claims, which requires the contractor to protest a material breach of contract upon learning of that breach, or else waive the breach. Ling-Temco-Vought, Inc. v. United States, 201 Ct. Cl. 135, 146, 475 F.2d 630, 637 (1973) (quoting Northern Helex Co. v. United States, 197 Ct. Cl. 118, 125-26, 455 F.2d 546, 551 (1972)); see Aleutian

---

[2] ENIP suggests that the Court should use the 2004 ACR that DOE recently published as establishing the mandatory minimum annual acceptance rate to impose into the Standard Contract. Pl. Reply 19. However, the 2004 ACR assumes the existence of a repository in 2010, and the acceptance rates that it contains are based upon that assumption. Pl. Reply App. 144 ("projected nominal acceptance rate is based on the assumption of SNF acceptance beginning in 2010 at the Yucca Mountain Geologic Repository" (emphasis added)); Def. Reply App. 29. It certainly is irrelevant to a "mandatory" rate applicable to SNF acceptance at an MRS in 1998.

Constructors v. United States, 24 Cl. Ct. 372, 384 (1991); Government Sys. Advisors, Inc. v. United States, 21 Cl. Ct. 400, 411, vacated on other grounds, 25 Cl. Ct. 554 (1990).[3]

**Fifth**, ENIP's assertion that, because the Standard Contract does not identify a minimum mandatory acceptance rate, the Court's role is to identify a "reasonable" rate for inclusion in the Standard Contract, and that a 3,000 MTU rate is a "reasonable" one for "incorporation" into the contract, Pl. Reply 25 n.12, is simply wrong. Because the Standard Contract does not contain any provision requiring that DOE accept SNF from nuclear utilities at an annual rate of 3,000 MTUs, ENIP has no basis for seeking to impose that rate upon DOE. Further, and importantly, because of the manner in which the acceptance schedule mechanism in the Standard Contract is drafted, this Court may not simply identify a rate that it believes "reasonable" and incorporate it into the contract. In light of the manner in which the acceptance schedule contract provisions in this contract were written, DOE can, at best, be held responsible for failing to accept SNF at the minimum rate at which it could have been obligated to perform its SNF acceptance activities in accordance with the Standard Contract.

---

[3] ENIP complains that DOE violated the Standard Contract because it "did not allow utilities to submit DCSs identifying 'all SNF and HLW [they wished] to deliver to DOE," because the 1991 ACR and separate DCS instructions "required" that "utilities submit DCS forms identifying for delivery *only* those SNF allocations reflected in DOE's most recent ACR." Pl. Br. 17. Although DOE, in its DCS instructions, indicated that it had notified contract holders of the acceptance allocations to which it would be willing to commit itself through the 1991 ACR and the DCS instructions, contract holders were certainly entitled to submit DCSs requesting other allocations, subject to DOE's right to disapprove them and subject to the contract holder's right to utilize the Standard Contract's "Disputes" provision, 10 C.F.R. § 961.11, Art. XVI, to resolve any disagreement about the DCS disapproval. In fact, other contract holders exercised their right to submit DCSs with allocation requests different from those in the 1991 ACR. See, e.g., Def. Reply App. 49-52, 53-54. Clearly, contract holders understood that the DCS instructions did not eliminate their contractual rights.

The Standard Contract's schedule terms provide DOE with the option of selecting any one of numerous potential acceptance scenarios, subject only to review by the Energy Board of Contract Appeals for abuse of discretion. Def. Response, at 11-12 & n.3. Those schedule terms act as a form of "alternative contract." "An alternative contract is one in which a party promises to render some one of two or more alternative performances [any] one of which is mutually agreed upon as the bargained-for equivalent given in exchange for the return performance by the other party." 11 A. Corbin, Corbin on Contracts § 1079, at 394 (interim ed. 1979); see Restatement of Contracts § 344 cmt. a, at 565 (1932) ("[a]n alternative contract is one wherein A promises B some one of two or more alternative performances"). "A promise of one of several alternative performances will give the choice of alternatives, unless the contrary is stated, to the person who is to render the performance." 11 W. Jaeger, Williston on Contracts § 1407, at 592 (3d ed. 1968); see 11 A. Corbin, supra, § 1079, at 394 ("[t]he choice among these alternatives, the power of election, is usually given to the promisor"). In such circumstances, "he has power to discharge his contractual duty by performing either alternative." 11 A. Corbin, supra, § 1079, at 394; see Restatement of Contracts § 344 cmt. a, at 565 (1932) ("[t]he option may be given to A, in which case he has power to discharge his duty by performing either alternative").

If the promisor breaches its obligations under the alternative contract, the measure of damages is not an amount that the promisee or the Court determines is most attractive or most reasonable of the possible alternative methods of performance that the promisor could have elected, but instead is the "least valuable," or least costly to the promisor, of the possible alternative performances:

> The damages to which the promisee would be entitled in case of breach of such a promise would be based on the least valuable of the alternative performances. . . . A promise to give any one of a thousand specified things as the promisor may choose, though it cannot be enforced specifically, is not too indefinite to have a clear meaning, and the promisee's damages would be the value of the least valuable of the one thousand things. The same is true of a promise to perform whenever within a specified period of time the promisor may choose.

1 R. Lord, supra, § 4:24, at 557-58 (emphasis added). The Restatement of Contracts succinctly defines this rule as follows:

> The damages for breach of an alternative contract are determined in accordance with that one of the alternatives that is chosen by the party having an election, or, in case of breach without an election, in accordance with the alternative that will result in the smallest recovery.

Restatement of Contracts § 344, at 565 (1932) (emphasis added); see Koby v. United States, 53 Fed. Cl. 493, 501 (2002) ("general rule is that, unless the contract specifically preserved the right of election for the promisee, 'in the case of breach without an election (of alternatives), [damages] (shall be) in accordance with the alternative that will result in the smallest recovery'" (quoting In the Matter of Community Med. Ctr., 623 F.2d 864, 867-68 (3d Cir. 1980)) (brackets and parentheses in original); Branhill Realty Co. v. Montgomery Ward & Co., 60 F.2d 922, 923 (2d Cir. 1932) ("[w]here a promisor has agreed to alternative performances, in case of breach without an election, the damages are measured by the alternative that will result in the smallest recovery"); 11 W. Jaeger, supra, § 1407, at 593 (where "no choice has been made" between the various alterative methods of performance, "either expressly by the promisor or automatically by the terms of the contract or by law, the measure of damages . . . is the value of the alternative least onerous to the defendant" (emphasis added)); see also White v. Delta Constr. Int'l, Inc., 285

F.3d 1040, 1043 (Fed. Cir. 2002) ("damages for breach of contract shall place the wronged party in as good a position," but not a better position, "as it would have been in, had the breaching party fully performed its obligation" (emphasis added)).[4]

"The *ratio dicendi* for this rule is that the court may not place the promisee in a better position than had the contract been performed – it presumes that the promisor had bargained for the flexibility of the alternatives and, therefore, should be liable for no more than the least expensive alternative he could have chosen." Koby, 53 Fed. Cl. at 501; see Liberty Bank v. Talman Home Mortgage Corp., 877 F.2d 400, 407 n.10 (5th Cir. 1989) ("[t]he rationale for this rule is simply: the promisor is held liable only for the cost of the least expensive alternative he could have chosen 'as a recognition of the flexibility which had been bargained for by the party in breach'"). To the extent that the Court determines that acceptance schedules have not already been defined through DCSs and that it must define the appropriate manner in which acceptance schedules, for purposes of evaluating plaintiffs' damages claims, should be identified, the Court must identify schedules that account for DOE's flexibility, absent an agreement to a particular DCS, to have selected among numerous SNF and HLW acceptance scenarios and apply the rule of alternative contracts that any plaintiff's damages for DOE's failure to accept SNF and/or HLW must be based upon "the value of the alternative least onerous to the defendant." 11 W. Jaeger, supra, § 1407, at 593.

[4] "An inconsistent and, it seems, erroneous rule has been laid down in a few cases which hold that if the promisor fails to make an election the promisee thereupon has the option." 11 W. Jaeger, supra, § 1407, at 594. However, this minority view is incorrect. Id.; see Community Med. Cntr., 623 F.2d at 868 (explaining that minority view "has garnered scholarly approval in only one situation – where the contract itself contains language granting the promisee the right to elect remedies"). Any grant of election of remedies to the utility plaintiffs would eliminate the discretion that the Standard Contract grants to DOE.

In this case, the Standard Contract provides a specific mechanism for defining the schedule of SNF acceptance, requiring the contract holder to submit DCSs and Final Delivery Schedules ("FDSs") if it wants to define specific acceptance rights, the Government's review of those DCSs and FDSs, the Government's eventual identification of a proposed schedule if it does not approve of the contract holder's request, and the contract holder's right to challenge DOE's proposed schedule at the EBCA. 10 C.F.R. §§ 961.11, Arts. V.B & XVI.A. If the process proceeds to the stage in which DOE identifies the DCS or FDS amount to the contract holder, that selection is subject to review by the EBCA only for abuse of discretion. See 10 C.F.R. § 961.11, Art. XVI.A; see also Reservation Ranch v. United States, 39 Fed. Cl. 696, 714 (1997) ("when the parties to a contract vest one party with the discretion to make a critical factual determination under the contract, this court narrowly reviews that determination to ascertain whether that discretion was arbitrarily or capriciously exercised"), aff'd, 217 F.3d 850 (Fed. Cir. 1999). Because the Standard Contract provides DOE with broad discretion in determining the acceptance schedule for the Standard Contract, the acceptance schedule mechanism is essentially an "alternative contract" provision, and this Court cannot determine a "reasonable" schedule, substituting its views for the agency's, but instead can, at best, identify the minimum schedule under which DOE could have accepted SNF without breaching the Standard Contract. Because the Standard Contract does not contain any performance standards or requirements, other than a start date for the acceptance of SNF, DOE's discretion in identifying an acceptance schedule is extremely broad, including the right to select a rate of SNF acceptance.

To the extent that ENIP believes that the DCSs to which the parties agreed do not establish the baseline for DOE's acceptance commitments, it has no basis upon which to assert

that DOE is obligated to accept its SNF at a greater rate or even at the same rate as that identified in those DCS. Without the approved DCSs, nothing in the Standard Contract would obligate DOE to accept ENIP's SNF at any particular rate. Where DOE did not yet have a repository in place that would ensure that it could accept SNF at a particular pace, it certainly would have the discretion to elect to minimize its acceptance obligations. Assuming that the Court disregards approved DCSs as a basis for assessing liability, ENIP has identified no valid basis upon which the Court could determine the date by which DOE would be required to begin accepting ENIP's SNF under an "oldest fuel first" allocation system or the minimum pace at which it would be obligated to continue that acceptance. Accordingly, it cannot identify that, absent the approved DCS that its assignor obtained, DOE would have been obligated to begin accepting its SNF at any particular point in time. Absent its ability to establish that deadline, ENIP could not establish that it has suffered any injury-in-fact from DOE's January 31, 1998 "breach." See Puritan Assocs. v. United States, 215 Ct. Cl. 976, 978 (1977); Def. Response 6-7. As a result, it has no basis for a liability ruling.[5]

## CONCLUSION

For the foregoing reasons, the Court should grant our motion for summary judgment regarding liability and deny ENIP's motion.

---

[5] In its response brief, ENIP asserted that, in every case in which liability has been considered, the Court has found DOE liable for partial breach. Pl. Reply 8 & n.2. However, on September 30, 2004, this Court denied plaintiff's motion for summary judgment on liability, as well as the Government's cross-motion, in an unpublished order in Power Authority of the State of New York v. United States, No. 00-703 (Fed. Cl.), finding that the Government's arguments regarding the rate of SNF acceptance raised genuine issues of material fact as to whether the plaintiff had suffered any injury-in-fact. Here, because the plaintiff has failed to identify any injury-in-fact, we are entitled to summary judgment for the reasons explained in our cross-motion.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/ Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director

s/Joshua E. Gardner
JOSHUA E. GARDNER
Trial Attorney
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
1100 L Street, N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
Tele: (202) 305-7583
Fax: (202) 307-2503

Attorneys for Defendant

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

November 19, 2004

CERTIFICATE OF FILING

I hereby certify that on November 19, 2004, a copy of the foregoing "DEFENDANT'S REPLY TO PLAINTIFF'S RESPONSE TO DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT ON LIABILITY" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Joshua E. Gardner