Page 4159

constructed under the Act, yes.
Q. Now, for the currently approved delivery commitment schedules, the ones that, before the last week's ACR and new delivery commitment schedule instructions came out, isn't it true that you don't see any good use for the information on those approved delivery commitment schedules because the Department's current plan for its waste management system uses different acceptance rates than those upon which the earlier delivery commitment schedules were based?
A. I think your statement is partially correct. It's true that our current plans in the ACR that we just put out last week are for greater acceptance rates beginning in 2010 through 2019 then in the first 10 years of the previous ACR, but it's also correct that some of the information provided by the utilities may no longer be valid, and they may have other plans for what they wish to have done beginning in 2010.
Q. So the bottom line, again, the real crux of my question is that you wouldn't see any good use for the information on the currently approved delivery commitment schedules?
A. Those supported operations beginning in

Page 4160

1998. I don't think they're valid for use supporting operations in 2010.
Q. And it's your belief that DOE has to renegotiate those delivery commitment schedules, isn't that correct?
MS. SULLIVAN: Objection, vague. Which delivery commitment schedules are we talking about?
MR. SHAPIRO: The previously approved delivery commitment schedules.
THE WITNESS: I think the disposition of those needs to be resolved. We haven't resolved in the Department how to address that yet, but the DCSes that would be coming in under the APR that we issued last week for 2010 would be for the same fuel that were covered by the DCSes that came in previously. So we'd have to resolve that with the utilities, yes.
THE COURT: Before I forget it, do you agree with Mr. Pollog that the DCSes, well, the allocation under the capacity report is strictly for an allocation of quantity and that you can, the utility can substitute any fuel, they can list any fuel?
THE WITNESS: On the DCS?
THE COURT: On the DCS.
THE WITNESS: Yeah, I believe, I agree with

Page 4161

Tom, and that was a position I held when I was at the utility and which DOE has put forth, that the age of the fuel, the allocation really gives you a place in line, a ticket. And when it comes time to proffer your DCS and actually deliver fuel, it's any fuel that meets the criteria under the contract.
THE COURT: I guess I was kind of misled. On page 15 of Defendant's Exhibit 7, which is the contract, in article, I think it was Article V – no, Article VI.
THE WITNESS: Article VI, sir?
THE COURT: Article VI, B1(a).
THE WITNESS: B(1)(a)?
THE COURT: B(1)(a), it says, "DOE would first accept from purchaser the oldest SNF and/or HLW for disposal in the view of facilities accepted otherwise provided in paragraph B, D and E."
THE WITNESS: Yes.
THE COURT: And B, D and E talk about exchanges or things like that, so I assume the contract required the utility to deliver the oldest fuel they had first.
THE WITNESS: I think this is another case where the contracting officer issued in her directions the guidance that utilities were free to

Page 4162

submit, or free to put forth any spent fuel they had that met the criteria as spent fuel under the contract and, again, explained that the allocation provision really made sense.
And that it gave you a place in line, but then let you manage your fuel inventories as you saw appropriate, so that was another clarification that was also, I believe, in the instruction transmittal letters from the DCSes.
BY MR. SHAPIRO:
Q. I want to get one more concern with the delivery commitment schedules, Mr. Zabransky. Under the contract, utilities have the express right to vary the quantities of spent fuel and high-level waste that DOE would pick up by 20 percent from the amounts on those approved delivery commitment schedules at many point before issuance of the final delivery schedule, isn't that correct?
A. I believe that's correct, yes.
Q. But if everybody adjusts their allocation upward by 20 percent, so that the quantity to be accepted is more than the total acceptance rate that the Department has planned for that year, you don't know how the Department would accommodate that contract work, do you?

Page 4163

A. The Department would be obligated to. We'd have to figure out some way to either store more fuel, work nights and weekends, work 24-hour shifts, whatever it took, but the contract gives the utilities rights to do that. Once we sign the DCSes, if they adjust them, we'll have to live with them.

Q. But you don't know how the Department would manage to accommodate that, do you?

A. I just said, Mr. Shapiro, we'd work back shifts, we'd work weekends, we'd park stuff, but it's our obligation to figure that out when and if it happens.

THE COURT: Would that possibly have any impact on accepting canistered fuel? For instance, if a number of canisters resulted in, say, being 10 percent over the allocation, if you accepted canistered fuel?

THE WITNESS: I think canistered fuel, one of the issues with that is if we have to accept it and repackage it immediately, which could be the case, that could severely limit the throughput of the facilities, so that would have to be factored into that.

THE COURT: If you didn't have to reopen them and just, the total quantity might not exactly

Page 4164

match the allocation.

THE WITNESS: And that's one of the reasons I think that provision was put in there for, was that originally there was an understanding that the allocation was a very precise number to the nearest tenth of a ton, but that could result in a less than full cask, two and a half casks, which didn't make a lot of sense, and that by adjusting it plus or minus 20 percent was one way of dealing with that.

BY MR. SHAPIRO:

Q. I wanted to make sure I understood your last testimony correctly, Mr. Zabransky. So you're saying -- and let's take the current, the most recent ACR that ramps up to an acceptance rate of 3,000 MTUs per year?

A. Yes, it does.

Q. And let's say we're in one of those years with 3,000 MTUs acceptance and utilities with allocations and the allocations that are provided for under that ACR and APR and instructions that were sent along with them would equal that 3,000 MTU, wouldn't it?

A. Yes, it does.

Q. And so if all those utilities bumped up the amounts they want to deliver by 20 percent, and the

Page 4165

Department would have to handle roughly 3,600 MTUs?

A. Yes, it would.

Q. And it's your testimony that the Department would have the capability to manage to do that?

A. No, my testimony was the Department was aware of that when it issued the ACR, and we'll deal with that, that should have come to pass. It doesn't have the capabilities today, but it would have to get them.

Q. So the Department could get those capabilities?

A. I don't see any reason why it couldn't.

Q. I want to ask you just a couple of questions about annual capacity reports, just mentioned the most recent one, the one that was sent out last week, when is spent fuel presumed to start to be picked up by the Department in that annual capacity report?

A. The report issued last week supports operations beginning in 2010.

Q. Is that the date provided in the annual capacity report, or is it like the earlier one that just had a year one instead of an actual year assigned?

A. I believe that report, and I'm doing it

Page 4166

from memory, has a table that shows 400 tons of acceptance in 2010.

Q. I want to ask you a question or two about the prior ACR. That's the one that was issued in 1995.

A. Okay.

Q. Now, the rates in that annual capacity report, you can pull that out if you don't recall it, but the rates in that annual capacity report are considerably smaller than the acceptance rates in last week's July 2004 annual capacity report, isn't that true?

A. Those rates, I believe, were 400, 600 and then 900 through the balance of the 10-year period, yes, they're smaller.

Q. And isn't it true that the Department was trying to minimize its obligations to utilities by using those rates in the 1995 ACR?

A. That may have been one of the considerations that went into that. There was no plans for a repository before 2010 at that point in time, and there was no change from the prior 4, 6, 9, 9, 9 acceptance rates in the '95 ACR, yes.

Q. I'm not asking just what may have been. Is it your opinion the Department was trying to minimize

Page 4167

its obligations by putting in those rates in the 1995 ACR?

A. In my opinion, that was probably one of the things being thought about, yes.

Q. I'm still not quite getting a complete answer to my question. I think you qualified your last answer that said that was probably one of the considerations minimizing the Department's obligations. Wasn't it your opinion that the Department indeed was trying to minimize its obligations?

MS. SULLIVAN: Objection, asked and answered, argumentative.

THE WITNESS: And I think I said, yes, they were, but I'm not sure that was the only consideration for those rates.

BY MR. SHAPIRO:

Q. Now I, want to turn back to your time when you were at WEPCO and looking at ACRs in that time period. Again, we can pull one of these out, but you recall some of those annual capacity reports noted right on there that the ACR's for planning purposes only, and it's not contractually binding on either the Department or purchasers?

A. I believe they all say that, including the

Page 4168

current one.

Q. And when you were at WEPCO, you concluded from that, that WEPCO could not rely on the department to actually accept the fuel based on the ACR, isn't that correct?

A. I believe that WEPCO needed to execute DCSes and have them approved to have any commitment from the government.

Q. You couldn't rely on the ACR?

A. The ACR was the basis for the DCS, no, there's nothing to rely upon an ACR. It's a report.

Q. Now, we've talked about a couple different acceptance rates for the Department to receive spent fuel from utilities. There's the one that ramps up to 3,000 MTU and the current ACR. You believe that acceptance rate is reasonable, don't you?

A. That's the rate that's in our requirements documents, the facilities are being designed for, and that's the rate the Department has put forth as its willing to commit to in the new ACR, yes.

Q. So you believe that the acceptance rate in the 19 -- in the 2004 ACR is reasonable?

A. I believe that the rate in the ACR which presumes we'll have Yucca Mountain up and running is reasonable, yes.

Page 4169

Q. And, again, turning back to your time when you were at WEPCO, much earlier on in the process, you believe that a reasonable acceptance rate would have been one that would have reflected the aggregate rate of discharges, plus some amount of work-off, isn't that correct?

A. I believe that's the case, yes.

Q. And it's your personal opinion that an appropriate rate of acceptance under the standard contract would be a rate which kept pace with discharges and removed some of the backlog, that's correct?

A. Again, to the extent that's accomplishable, I think that's an appropriate thing for the Department to commit to.

Q. And you do think that is accomplishable by the Department?

A. That's the current plans for 2010, the Department's planning to accomplish it, yes.

Q. And, again, turning back to your time at WEPCO, when you were there, it was your position and understanding that an acceptance rate that ramped up to 3,000 MTU would be such a rate that was sufficient to work off the backlog and the discharges in a reasonable time frame?

Page 4170

A. That would have been the company's desire and my desire, yes.

Q. And it was your position and WEPCO's position when you were there that the Department had to be prepared to accept spent fuel from the utilities on a schedule which would obviate the construction of deployment of additional at-reactor storage capacity after January 31, 1998?

A. I believe that's the position we communicated to the Department in response to some of their mission plans, yes.

Q. You believe that's the position that you communicated, or you're unsure?

A. I believe it is. I mean, you're asking me for something that happened 20 years ago, but I think that's we said, yes.

Q. I think we may have that document. Let's confirm.

A. Okay.

Q. Mr. Zabransky, you're being handed what is actually an excerpt from what we have been calling here Plaintiffs' Exhibit 95, which is the complete three volume set of the 1985 mission plan. And you may know or recall the third volume of that set includes, I believe, all of the comments sent in by

DOE F 1325.8 (8-89) EFG (07-90)

HOO.920107.0011

United States Government Department of Energy

# memorandum

DATE: December 20, 1991

REPLY TO ATTN OF: RW-432

SUBJECT: ACTION: Approval for Publication of the 1991 Annual Capacity Report

TO: Director, Office of Civilian Radioactive Waste Management, RW-1

Through: Deputy Director, Office of Civilian Radioactive Waste Management, RW-2

Background:

The Standard Contract for the Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste (10 CFR Part 961) that the Department of Energy has executed with owners or generators of civilian spent nuclear fuel and high-level radioactive provides for annual publication of the Annual Capacity Report (ACR).

The 1990 ACR stated that it would be the last ACR to be issued and would be replaced by the Acceptance Priority Ranking (APR). However, based on discussions with Contract holders and their representatives, the Department elected to continue to publish the ACR. This change in plans was conveyed to Contract holders in a May 15, 1991, letter from the Department's Contracting Officer.

Discussion:

The ACR is required to project both an annual acceptance ranking of Contract holders and the annual receiving capacity of the Federal waste management system (FWMS) for ten years following projected commencement of facility operations. The 1991 APR assigns the highest acceptance priority, on an industry-wide basis, to the owners of the oldest spent nuclear fuel (SNF). The ACR applies a waste acceptance rate to the APR, resulting in individual allocations to the Contract holders of FWMS capacity.

The 1991 ACR assumes that FWMS operations commence in 1998 and the system configuration is that authorized by the Nuclear Waste Policy Amendments Act of 1987, specifically a Monitored Retrievable Storage facility with a 10,000 MTU storage limit prior to repository operations.

The 1991 ACR differs from previously published ACRs for two reasons. First, while the information in the ACR has traditionally been used for planning purposes only, the allocations in the 1991 ACR will also serve as the basis for submission of Delivery Commitment Schedules (DCS) by the Contract holders. These DCSs, which will provide planning information for waste acceptance activities, may be submitted to the Department as early as January 1, 1992.



DEFENDANT'S EXHIBIT 023

EDB0011764

Second, the 1990 ACR presented lower and upper bounding annual waste acceptance rates and corresponding Contract holder allocations of capacity. Although no annual waste acceptance rate has been baselined, the 1991 ACR uses a single acceptance rate that is very similar to the lower bounding rate in the 1990 ACR. While not stated in the ACR, this rate was selected because it is theoretically sufficient to eliminate, in the aggregate, the need for additional at-reactor, out-of-pool storage starting in 1998.

As in previous years, the 1991 ACR includes an update on the progress of the cooperative interactions between the Department and Contract holders to address issues of mutual concern arising from implementation of the Contract. The ACR is distributed to Contract holders, nuclear industry trade associations and other interested parties. Response to previous ACRs has been generally favorable, although some Contract holders have expressed concern about slippages in the waste acceptance schedule beyond 1998. Consistent with past ACRs, this report states that waste acceptance will begin after commencement of facility operations.

Recommendation:

That you approve the attached 1991 ACR for publication.

Ronald A. Milner

Ronald A. Milner
Associate Director for
Storage and Transportation

Attachment

APPROVED: John N. Bartlett

DISAPPROVED: ________

DATE: 27 Dec 1991

DOE F 1325.8 (5-89)

7 9 5 7 7 9 5 7 1 HQO.910104.0085

United States Government Department of Energy

# memorandum

DATE: DEC 2 1 1990

REPLY TO ATTN OF: RW-422

SUBJECT: ACTION: Approval for Publication of the 1990 Annual Capacity Report

TO: Director, Office of Civilian Radioactive Waste Management, RW-1

Deputy Director, Office of Civilian Radioactive Waste Management, RW-2

Background:

The Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste (10 CFR 961) that the Department of Energy has executed with owners or generators of civilian spent nuclear fuel and high-level radioactive waste requires annual publication of the Annual Capacity Report (ACR).

Discussion:

The ACR is required to project both the annual receiving capacity of the waste management system and an annual acceptance ranking of Contract holders for 10 years following projected commencement of facility operations. The information in the ACR is for planning purposes only, and is scheduled to be replaced, as required by the Contract, by a contractually binding Annual Acceptance Priority Ranking Report on April 1, 1991. The first two ACRs were published in June 1987 and June 1988, respectively. In April 1990, the Department informed all Contract holders that the 1989 ACR would not be published prior to the development of revised waste acceptance schedules based on the Secretary's reassessment of the program to Congress.

Since the waste acceptance schedule has not yet been approved and this is the last opportunity according to the terms of the Contract for an ACR to be issued, upper and lower bounding waste acceptance rates were used to provide the required information. Both cases assume availability of an Monitored Retrievable Storage (MRS) facility for spent fuel receipt in 1998. The lower bounding case was based on the system configuration authorized by the Nuclear Waste Policy Amendments Act of 1987, which includes an MRS facility with the 10,000 MTU storage limit prior to repository operations. The upper bounding case is the same waste acceptance schedule used in the last ACR and would require early MRS siting and modifications to the storage capacity limits specified in the Amendments Act.

DB0001517

DEFENDANT'S EXHIBIT 130



EDB-001-1518

EDB0011518

HQO.19990112.0001 QA: L

DOE/RW-0406

Office of Civilian Radioactive Waste Management

# Civilian Radioactive Waste Management System Requirements Document

DEPARTMENT OF ENERGY UNITED STATES OF AMERICA

## Revision 05

(A00000000-00811-1708-00003)

January 1999

U. S. Department of Energy
Office of Civilian Radioactive Waste Management

HQO.19990112.0001.0001



PLAINTIFF'S EXHIBIT
P0254
Yankee Atomic Elec. Co. et al

Table 3. CISF Receipt Rates[7] (In MTHM or Equivalent/Year)

| Phase | Year of Operation | Commercial SNF[8] | Government Managed Nuclear Materials |
|---|---|---|---|
| I | 1 | 1200 | TBD 3 |
| I | 2 | 1200 | TBD 3 |
| II | 3 and 4 | 2000 | TBD 4 |
| II | 5 | 2700 | TBD 4 |
| II | 6 and subsequent | 3000 | TBD 4 |
| II | TBD 2 | 3000 | TBD 4 |

B. The CISF shall have a minimum storage capacity of 10,000 MTHM of SNF.

C. The CISF shall have a HLW storage capacity of (TBD 6).

D. The CISF shall be capable of preparing SNF and HLW for off-site transport.

## 3.6 INTERFACE REQUIREMENTS

This section identifies the interface requirements between CRWMS system elements. Acceptance criteria for nuclear materials are documented in the Waste Acceptance System Requirements Document (WA-SRD) (DOE/RW-0351P).

### 3.6.1 Waste Acceptance and Transportation - Government Agency Interface Requirements

Waste Acceptance and Transportation shall interface with appropriate federal, state, tribal, and local government agencies to meet legal, regulatory and operational requirements for acceptance and transportation of SNF and HLW, such as route selection, approval, scheduling and notification, emergency planning and response, and security.

[7] Receipt rates in this table are only applicable if a CISF is approved.

[8] This could include MOX SNF in Phase II.

Yankee Atomic Electric v U.S Nos.: 98-126C, 98-154C, 98-474C August 2, 2004

**Heritage Reporting Corporation**

**Page 3378 to Page 3660**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone: 202-628-4888*
*FAX: 202-371-0935*