IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| ENTERGY NUCLEAR INDIAN POINT 2, LLC | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 03-2622C |
| | ) | (Judge Lettow) |
| UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION FOR LEAVE TO SUPPLEMENT ITS REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT ON LIABILITY AND IN OPPOSITION TO DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT ON LIABILITY

Defendant, the United States, respectfully submits this response to Plaintiff's Motion for Leave to Supplement its Reply in Support of its Motion for Summary Judgment On Liability and in Opposition to Defendant's Motion for Summary Judgment on Liability ("Motion to Supplement"), dated December 22, 2004. Because the plaintiff, Entergy Nuclear Indian Point 2, LLC ("ENIP"), has included the substance of its supplemental argument in its motion for leave, we respond to that substantive argument here.

## DISCUSSION

### I. ENIP'S MOTION TO SUPPLEMENT IS NOTHING MORE THAT A REHASHING OF ITS PREVIOUS ARGUMENTS WITHOUT ANY EVIDENCE OR SUPPORT

In its continuing attempts to discredit the delivery commitment schedule ("DCS") process established by the Department of Energy ("DOE") to assist in fulfilling DOE's responsibilities pursuant to the Standard Contract, ENIP sets forth a number of unsupported assertions in its motion to supplement. ENIP moves to supplement its previous briefs with a letter dated December 1, 2004, from David Zabransky, the contracting officer at DOE, to ENIP. The letter

indicates that DOE has concluded that the resumption of the DCS process in July 2004 was premature and that, once a revised date for the initial operation of Yucca Mountain has been determined, the DCS process will resume in accordance with the Standard Contract. See Correspondence, attached to Motion to Supplement.

ENIP correctly states in its motion that the Government believes that the contract provisions providing for the submission and approval of delivery commitment schedules ("DCSs") and final delivery schedules ("FDSs") constitute the sole contractual mechanism through which DOE's obligations to accept ENIP's SNF would be defined and that the Court cannot define those obligations without reference to the Standard Contract's acceptance scheduling provisions. Motion to Supplement at 3. ENIP has not demonstrated why the December 2004 DOE letter attached to its motion changes that basic assumption.

However, ENIP also uses its motion to supplement as another opportunity to re-state its challenges to the DCS process, again with no support other than attorney assertions. ENIP claims that the December 2004 DOE letter somehow proves that the DCS process "was flawed from the outset and administered in a manner inconsistent with the parties' obligations under the Standard Contract." Id. ENIP further asserts that the new DCS instructions distributed by DOE in July 2004 constitute an acknowledgment that the entire DCS process undertaken in the 1990s is irrelevant today. Id. ENIP believes that because DOE will need to restart the DCS process at some date in the future, the DSC process undertaken in the 1990s is "even more irrelevant." Id. Finally, as if saying it repeatedly makes it so, ENIP once again contends, without any evidence, that it has incurred "substantial damages to store SNF that DOE was contractually obligated to take." Id. at 4. As the Government will demonstrate, ENIP has offered nothing but hyperbole to

support these assertions.

## II. WITHOUT ANY ANALYSIS OR EXPLANATION, ENIP CHALLENGES THE DCS PROCESS AS FLAWED AND INCONSISTENT WITH THE PARTIES' OBLIGATIONS UNDER THE STANDARD CONTRACT

In a precursor letter to the December 2004 letter, DOE sent correspondence to each utility in July 2004 explaining that the DCS process would resume because the Yucca Mountain repository was scheduled to begin operation in 2010. See Exhibit 1. Pursuant to the Standard Contract, if ENIP wanted DOE to begin accepting its SNF in 2010, it was required to submit a DCS to DOE by no later than September 30, 2004. Id. at 1. DOE also encouraged "the submittal of DCSs for all the years in which you have allocations." Id. Further, DOE requested information from each utility "to assist us in our waste acceptance and transportation planning process. We recognize that your response to this information request is voluntary, and that any information provided will be non-binding on either party." Id. On September 29, 2004, ENIP submitted a DCS for 2010. See Exhibit 2.

ENIP complains that the December 2004 DOE letter somehow proves that the DCS process is horribly wrong and has been so since its inception. ENIP never elaborates upon its blanket statement that the DCS process is flawed and never explains why the process is inconsistent with the parties' obligations under the Standard Contract. As we have demonstrated in our earlier briefs, there is no evidence in the record that ENIP ever submitted any objections to the DCS process during the 1990s when the DOE issued its Annual Priority Ranking ("APR") and Annual Capacity Report ("ACR") in 1991, 1992 and 1995. Indeed, it appears that the first time ENIP ever asserted any objections to the DCS process was in its September 29, 2004 letter to DOE that accompanied ENIP's 2010 DCS.

ENIP has provided no insight into its claim that this system of accepting the oldest fuel first from contract holders was not a responsible process that would provide an orderly way for DOE to accept and dispose of SNF from utilities, especially given potential limitations upon the actual amount of SNF that DOE can accept in any given year. In fact, the mechanisms established in the Standard Contract provide a reasonable method by which DOE will begin accepting SNF. See Defendant's Response to Plaintiff's Motion for Summary Judgment on Liability, And Cross-Motion For Summary Judgment On Liability, at 5-11 (filed July 29, 2004). ENIP's repeated assertion that the DCS process is flawed, and its current reliance upon the December 2004 letter from DOE to bolster its assertion, is unsupported.

## III. THE DCS PROCESS OF THE 1990'S IS RELEVANT TO AN ANALYSIS OF WHETHER, AND TO WHAT EXTENT, ENIP HAS INCURRED DAMAGES AND IS BASED UPON THE SAME METHODS OF ALLOCATING ACCEPTANCE POSITIONS AND PROCESSING DCS's AS THE NEW DCS PROCESS

Without any analysis or explanation, ENIP again makes sweeping condemnations of the DCS process, a process that is specifically identified in the Standard Contract. See 10 C.F.R. § 961.11, Art. II (SNF to be accepted by the DOE "shall be specified in a [DCS] as provided in Article V . . . ."). However, it is clear that the 2004 DCS process is identical to the prior DCS process, except that the acceptance rates identified by DOE in 2004 are higher. Therefore, the 2004 DCS process reaffirms the validity of the DCS process as an appropriate contractual mechanism for determining acceptance rights of utilities' SNF, rather than undermines its validity, as ENIP now asserts.

For example, Tennessee Valley Authority ("TVA") indicated that it would not submit a DCS for allocations in 2010 because the schedule set forth in the July 2004 Acceptance Priority

Ranking/Annual Capacity Report (APR/ACR) did not "provide TVA with a waste acceptance allocation for the year 2010." Correspondence from John Carden, TVA Contract Manager, to David Zabransky, dated August 24, 2004, Exhibit 2. Mr. Carden indicated that TVA would submit DCSs for the allocations set forth in the 2004 APR/ACR, "in accordance with the schedule set forth in our contract." Id. In response to this TVA correspondence, DOE explained that the method for allocating acceptance positions prior to the submission and approval of DCSs used in the 2004 APR/ACR is exactly the same as that used in the 1995 APR/ACR. See Correspondence from David Zabransky to John Carden, dated November 3, 2004, Exhibit 3. DOE explained further that "both the 1995 APR/ACR and the 2004 APR/ACR utilize an 'oldest fuel first' method of allocating acceptance positions in the acceptance queue as provided by the Standard Contract" and that the "method of allocation has not changed and is not expected to change, absent some future amendment to the Standard Contract." Id.

DOE also explained that, although there is a difference in the acceptance rates identified in the 1995 APR/ACR and the 2004 APR/ACR, because of the fact that different repositories were contemplated, because DOE anticipates utilizing the Yucca Mountain repository (rather than a monitored retrievable storage facility or "MRS"), the acceptance rates in the 2004 APR/ACR are higher than the earlier acceptance rates. Id. at 2. Because of the increased acceptance rate identified in 2004, the new DCSs were intended to replace, rather than supplement, any prior DCS that had been submitted. Id. However, DOE recognized that its prior approval of DCSs in the 1990s had created commitments under the Standard Contract "to accept specific amounts of SNF from specific Purchasers during specific periods of time" and that, "prior to approving new DCSs from Purchasers with previously approved DCSs," DOE would

seek "an agreement in writing" that the new DCSs "replace, rather than supplement." the previously approved DCSs. Id.

Consequently, the 2004 DCS process is identical to the earlier DCS process, but with a greater overall rate of acceptance based upon the availability of a federal repository. The original DCS process in the 1990s determined which contract holder would have had SNF accepted by DOE within the first ten years of operation.[1] ENIP has failed to establish any reason that the original DCS process did not define DOE's obligations to individual contract holders for at least the first several years of contract performance.

IV. ABSENT REFERENCE TO THE APPROVED DCSs THAT ENIP PREVIOUSLY OBTAINED, ENIP HAS FAILED TO ESTABLISH ANY BASIS UPON WHICH THE COURT COULD CONSIDER A LIABILITY RULING

Further, to the extent that ENIP is arguing that the Court should eliminate consideration of the DCSs that Consolidated Edison, the previous owner of the Indian Point nuclear utilities, submitted and DOE approved from its determination of when DOE was obligated to begin accepting SNF from ENIP, ENIP is eliminating from this case any basis upon which the Court could even consider entering a liability ruling at this stage of the proceedings. Absent the DCS process, ENIP has not established, and cannot establish, the date by which DOE was otherwise obligated under the Standard Contract to begin accepting ENIP's SNF. Without establishing that fact, ENIP cannot establish that DOE's partial breach in failing to begin SNF acceptance from

[1] To determine in the first instance if any damages have been incurred and then correctly measure damages, if any, for those utilities which did have allocations in the first ten years, we would identify and calculate the costs of operating the nuclear facilities in both the actual world (the breach world) and the but-for world (the world where DOE started accepting SNF in January, 1998). A fundamental component of that calculation must be the year of initial acceptance for each utility in the but-for world.

other commercial nuclear utilities on January 31, 1998, somehow caused ENIP to incur some monetary damage. If, for example, DOE was not obligated to begin SNF acceptance from ENIP until 2020, ENIP's identification of DOE's failure to begin accepting SNF from other reactors in 1998, without more, cannot establish that ENIP itself suffered some damage sufficient to entitle it to a liability (as opposed to a partial breach) ruling. See "Defendant's Response To Plaintiff's Motion For Summary Judgment On Liability, And Defendant's Cross-Motion For Summary Judgment On Liability," at 6-8 (filed July 29, 2004) (existence of breach is only one element of liability, and, before plaintiff is entitled to liability ruling, plaintiff must establish as part of its proof that it suffered some damage, beyond mere speculation, before it can obtain liability ruling (citing cases)).

In light of the manner in which the acceptance schedule contract provisions in this contract were written, DOE can, at best, be held responsible for failing to accept SNF at the minimum rate at which it could have performed its obligations in accordance with the Standard Contract. The Standard Contract's schedule terms provide DOE with the option of selecting any one of numerous potential acceptance scenarios, subject only to review by the Energy Board of Contract Appeals ("EBCA") for abuse of discretion, meaning that the schedule terms act as a form of "alternative contract." "An alternative contract is one in which a party promises to render some one of two or more alternative performances [any] one of which is mutually agreed upon as the bargained-for equivalent given in exchange for the return performance by the other party." 11 A. Corbin, Corbin on Contracts § 1079, at 394 (interim ed. 1979); see Restatement of Contracts § 344 cmt. a, at 565 (1932) ("[a]n alternative contract is one wherein A promises B some one of two or more alternative performances"). "A promise of one of several alternative performances

will give the choice of alternatives, unless the contrary is stated, to the person who is to render the performance." 11 W. Jaeger, Williston on Contracts § 1407, at 592 (3d ed. 1968); see 11 A. Corbin, supra, § 1079, at 394 ("[t]he choice among these alternatives, the power of election, is usually given to the promisor"). In such circumstances, "he has power to discharge his contractual duty by performing either alternative." 11 A. Corbin, supra, § 1079, at 394; see Restatement of Contracts § 344 cmt. a, at 565 (1932) ("[t]he option may be given to A, in which case he has power to discharge his duty by performing either alternative").

If the promisor breaches its obligations under the alternative contract, the measure of damages is not an amount that the promisee or the Court determines is most attractive or most reasonable of the possible alternative methods of performance that the promisor could have elected, but instead is the "least valuable," or least costly to the promisor, of the possible alternative performances:

> The damages to which the promisee would be entitled in case of breach of such a promise would be based on the least valuable of the alternative performances. . . . A promise to give any one of a thousand specified things as the promisor may choose, though it cannot be enforced specifically, is not too indefinite to have a clear meaning, and the promisee's damages would be the value of the least valuable of the one thousand things. The same is true of a promise to perform whenever within a specified period of time the promisor may choose.

1 R. Lord, supra, § 4:24, at 557-58 (emphasis added). The Restatement of Contracts succinctly defines this rule as follows:

> The damages for breach of an alternative contract are determined in accordance with that one of the alternatives that is chosen by the party having an election, or, in case of breach without an election, in accordance with the alternative that will result in the smallest recovery.

Restatement of Contracts § 344, at 565 (1932) (emphasis added); see Koby v. United States, 53 Fed. Cl. 493, 501 (2002) ("general rule is that, unless the contract specifically preserved the right of election for the promisee, 'in the case of breach without an election (of alternatives), [damages] (shall be) in accordance with the alternative that will result in the smallest recovery'" (quoting In the Matter of Community Med. Ctr., 623 F.2d 864, 867-68 (3d Cir. 1980)) (brackets and parentheses in original); Branhill Realty, 60 F.2d at 923 ("[w]here a promisor has agreed to alternative performances, in case of breach without an election, the damages are measured by the alternative that will result in the smallest recovery"); 11 W. Jaeger, supra, § 1407, at 593 (where "no choice has been made" between the various alterative methods of performance, "either expressly by the promisor or automatically by the terms of the contract or by law, the measure of damages . . . is the value of the alternative least onerous to the defendant" (emphasis added)); see also White v. Delta Constr. Int'l, Inc., 285 F.3d 1040, 1043 (Fed. Cir. 2002) ("damages for breach of contract shall place the wronged party in as good a position," but not a better position, "as it would have been in, had the breaching party fully performed its obligation" (emphasis added)).[2]

"The *ratio dicendi* for this rule is that the court may not place the promisee in a better position than had the contract been performed – it presumes that the promisor had bargained for the flexibility of the alternatives and, therefore, should be liable for no more than the least expensive alternative he could have chosen." Koby, 53 Fed. Cl. at 501; see Liberty Bank v.

[2] "An inconsistent and, it seems, erroneous rule has been laid down in a few cases which hold that if the promisor fails to make an election the promisee thereupon has the option." 11 W. Jaeger, supra, § 1407, at 594. However, this minority view is incorrect. Id.; see Community Med. Cntr., 623 F.2d at 868 (explaining that minority view "has garnered scholarly approval in only one situation – where the contract itself contains language granting the promisee the right to elect remedies"). Any grant of election of remedies to the utility plaintiffs would eliminate the discretion that the Standard Contract grants to DOE.

Talman Home Mortgage Corp., 877 F.2d 400, 407 n.10 (5th Cir. 1989) ("[t]he rationale for this rule is simply: the promisor is held liable only for the cost of the least expensive alternative he could have chosen 'as a recognition of the flexibility which had been bargained for by the party in breach'"). To the extent that the Court determines that acceptance schedules have not already been defined through DCSs and that it must define the appropriate manner in which acceptance schedules, for purposes of evaluating plaintiffs' damages claims, should be identified, the Court must identify schedules that account for DOE's flexibility, absent an agreement to a particular DCS, to have selected among numerous SNF and HLW acceptance scenarios and apply the rule of alternative contracts that any plaintiff's damages for DOE's failure to accept SNF and/or HLW must be based upon "the value of the alternative least onerous to the defendant." 11 W. Jaeger, supra, § 1407, at 593.

In this case, the Standard Contract provides a specific mechanism for defining the schedule of SNF acceptance, requiring the contract holder to submit DCSs and FDSs if it wants to define specific acceptance rights, the Government's review of those DCSs and FDSs, the Government's eventual identification of a proposed schedule if it does not approve of the contract holder's request, and the contract holder's right to challenge DOE's proposed schedule at the EBCA. 10 C.F.R. §§ 961.11, Arts. V.B & XVI.A. If the process proceeds to the stage in which DOE identifies the DCS or FDS amount to the contract holder, that selection is subject to review by the EBCA only for abuse of discretion. See 10 C.F.R. § 961.11, Art. XVI.A; see also Reservation Ranch v. United States, 39 Fed. Cl. 696, 714 (1997) ("when the parties to a contract vest one party with the discretion to make a critical factual determination under the contract, this court narrowly reviews that determination to ascertain whether that discretion was arbitrarily or

capriciously exercised"), aff'd, 217 F.3d 850 (Fed. Cir. 1999). Because the Standard Contract provides DOE with broad discretion in determining the acceptance schedule for the Standard Contract, the acceptance schedule mechanism is essentially an "alternative contract" provision, and this Court cannot determine a "reasonable" schedule, substituting its views for the agency's, but instead can, at best, identify the minimum schedule under which DOE could have accepted SNF without breaching the Standard Contract. Because the Standard Contract does not contain any performance standards or requirements, other than a start date for the acceptance of SNF, DOE's discretion in identifying an acceptance schedule is extremely broad, including the right to select a slow rate of SNF acceptance. Here, ENIP has not even attempted to define DOE's acceptance schedule obligations to ENIP under the Standard Contract. Given that ENIP has presented no evidence to support any findings regarding that rate, ENIP has failed to provide any evidence that it incurred at least some damage from DOE's 1998 delay and, therefore, has failed to establish its entitlement to a liability ruling.

## CONCLUSION

For the foregoing reasons, although the Government does not oppose plaintiff's request to "supplement" its prior filings, we respectfully request that the Court further consider the documents attached to this pleading and, for the reasons stated above and in our prior pleadings, deny plaintiff's motion for summary judgment and grant the Government's cross-motion.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/ Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director

s/Joshua E. Gardner
JOSHUA E. GARDNER
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 305-7583
Fax: (202) 307-2503

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
Department of Energy
1000 Independence Avenue, S.W.
Washington, D.C. 20585

January 10, 2005

Attorneys for Defendant

CERTIFICATE OF FILING

I hereby certify that on January 10, 2005, a copy of the foregoing "DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION FOR LEAVE TO SUPPLEMENT ITS REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT ON LIABILITY AND OPPOSITION TO DEFENDANT'S CROSS- MOTION FOR SUMMARY JUDGMENT ON LIABILITY" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Joshua E. Gardner