**Department of Energy**
Washington, DC 20585

JUL 2 7 2004

# Sample Letter

Contract Holder

Dear Contract Holder:

The Department of Energy plans to begin operation of the repository at Yucca Mountain beginning in 2010. In accordance with Article V.B of the Standard Contract for the Disposal of Spent Fuel and/or High-Level Radioactive Waste (Contract), the Department is hereby announcing the resumption of the Delivery Commitment Schedule (DCS) process.

In accordance with the provisions of the your Contract, your DCS submittals for year 2010 are due on or before September 30, 2004. Although you are only required to submit a DCS for your 2010 waste acceptance allocations, to assist us in our planning efforts, the Department encourages the submittal of DCSs for all the years in which you have allocations. In developing your DCS submittals, you should utilize the waste acceptance allocations in the July 2004 Acceptance Priority Ranking/Annual Capacity Report (APR/ACR). The 2004 APR/ACR, DCS Form and Instructions are enclosed. These can all be found on our website on http://www.ocrwm.doe.gov/wat/wat.shtml.

~~In developing the 2004 APR/ACR, the Department relied upon its records to determine the current~~ Purchaser of its disposal services. As utilized in the 2004 APR/ACR, the Purchaser is the corporate entity that has title to the spent nuclear fuel or high-level radioactive waste covered by the disposal contract. If you believe that the Department's designation of Purchaser is incorrect, please notify me of your concerns so that our records can be adjusted appropriately.

Additionally, the Department would like to take this opportunity to seek further information to assist us in our waste acceptance and transportation planning process. We recognize that your response to this information request is voluntary, and that any information provided will be non-binding on either party. We would encourage you to utilize your best efforts in responding to the following questions:

1. What are your current expectations regarding the characteristics (age, burnup, enrichment) of the spent nuclear fuel that you intend to deliver to the Department during the period 2010-2015?

Printed with soy ink on recycled paper

EXHIBIT 1

2. To the extent that you have not submitted DCSs for the period 2011-2019, what are your current plans for utilization (i.e., specific shipping facility) of any waste acceptance allocations that you may have during this period?

Should you consider any of the additional information you provide to be of a proprietary nature, please mark your response accordingly.

Should you have any questions, please feel free to contact me at 202-586-9198.

Sincerely,

David K. Zabransky
Contracting Officer

Enclosures (3)

Entergy

Entergy Services, Inc.
P. O. Box 31995
Jackson, MS 39286-1995

NFL-2004-0071
September 29, 2004

U.S. Department of Energy
David Zabransky, Contracting Officer
Office of Systems Analysis and Strategy Development (RW-20E)
1000 Independence Avenue, S.W.
Washington, D.C. 20585

Subject: Delivery Commitment Schedule
Indian Point Energy Center – Units 1 and 2
Contract No. DE-CR01-83NE44373

Dear Mr. Zabransky:

On behalf of Entergy Nuclear Indian Point 2, LLC (Entergy), this letter submits the attached Delivery Commitment Schedule (DCS) in response to the letter from the DOE Contracting Officer dated July 28, 2004 (the DCS letter). By submitting the DCS, Entergy is not necessarily agreeing that Entergy's capacity allocations set forth in the Acceptance Priority Ranking & Annual Capacity Report, DOE/RW-0567 (July 2004) are in accord with Entergy's rights under the Standard Contract. In this context, we note that Article V.B.1 of the Standard Contract entitles the Purchaser to "submit to DOE the delivery commitment schedule(s) which shall identify *all SNF and/or HLW the Purchaser wishes to deliver to DOE . . .*" (emphasis added).

The DCS letter and the accompanying instructions are based on DOE's *assumption* that DOE will begin accepting SNF in 2010. In fact, the September 30, 2004 date specified by DOE for filing DCSs is based on the *assumption* that DOE will begin to accept SNF by June 2010, i.e., 63 months after October 1, 2004. Recent developments, such as the Government's decision to accept the US Court of Appeals ruling voiding the EPA (and NRC) 10,000 year repository standard, the NRC's invalidating of the DOE's Licensing Support Network certification, and the continuing Yucca Mountain budget impasse, only reinforce the conclusion that an *optimistic* start date for SNF acceptance is 2015. Entergy's submittal of the DCS accompanying this letter is not to be considered as accepting in any way the validity of DOE's assumption that it will start to accept SNF in 2010, and further does not indicate that Entergy relieves DOE from its contractual requirement to have initiated delivery in 1998.

In addition, DOE must provide prompt notice of any change in its assumption as to the time at which acceptance will start. On DOE's acknowledgement of a delay in the 2010 acceptance start, Entergy expressly reserves the right at its option to treat the DCS accompanying this letter as void and to submit new DCSs based on the then current date for the start of

EXHIBIT 2

acceptance. Failure of the DOE to provide a realistic start date for acceptance will be considered a breach of its obligation of good faith and fair dealing.

Entergy is submitting the DCS accompanying this letter in response to DOE's request. This submission should not be interpreted as implying that the DCS is contractually binding. Nothing in the Standard Contract provides that DCSs are contractually binding, nor has DOE treated them as such. Submission of this DCS does not in any way relieve DOE of its responsibility under the contract to accept Entergy's SNF "as expeditiously as practicable upon the request of the generator or owner of such waste or spent nuclear fuel."

Consolidated Edison Company of New York, Inc., the previous owner of Indian Point Energy Center, Units 1 and 2, and previous contract holder of this spent fuel contract, pursuant to DOE's instructions beginning in 1992, submitted DCSs which were either approved or not acted upon by DOE. Neither the DOE letter of July 28, 2004, nor the instructions accompanying it, explain the status of those DCSs. Based upon this silence, and the fact that Entergy's allocations in the 2004 APR/ACR are based upon the same spent nuclear fuel that qualified Entergy for the earlier allocations, Entergy considers these previous DCSs null and void.

Entergy reserves the right to share allocations under all of the spent fuel contracts to which Entergy Corporation and its subsidiaries are a party such that Entergy may designate any allocation under any of the contracts to any reactor facility owned by any Entergy Corporation subsidiary. Furthermore, Entergy reserves the right to modify the attached DCS, and any future DCS, and change the reactor facility designated under any allocation.

Entergy notes that in several aspects, the DCS form provided with the DCS letter is inconsistent with the DCS form as it appears in the Standard Contract (Appendix C). This represents an unauthorized unilateral change to Entergy's contract (as well as an unauthorized change to 10 CFR Part 961). For example, the entry in Appendix C of the Standard Contract "DOE Assigned Delivery Commitment Date" does not appear in the DCS form accompanying the DCS letter. This has the effect of effectively deleting from the contract the 4 month flexibility window afforded to the Purchaser. Art. V.B.2. By submitting the DCS form accompanying this letter, Entergy does not waive any unauthorized unilateral modification to the Standard Contract, including Appendix C thereto. DOE's unilateral attempts to modify the Standard Contract reinforce the need for DOE to restart the ACR Issue Resolution Process or institute an equivalent process working jointly with the Purchasers.

In particular, Entergy notes that DOE *assumes* that each DCS is assumed to be for "Standard Fuel." General Instruction 7(f). This assumption in inconsistent with the Standard Contract, which does not require the provision of that information until 60 days before the scheduled transportation date. Art. IV.A.2(b) and VI.A.2; Appendix F. DOE should make no such assumption with respect the SNF covered by the DCS transmitted with this letter. In this context, Entergy also notes that DOE's statement in General Instruction 7(f) that "Purchaser *must* submit proposed handling/shipping procedures to DOE for evaluation and confirmation" for "other than standard fuel" is inconsistent with, and not authorized by, the Standard Contract.

Entergy's response to the DCS letter should not be construed as acknowledging that the DCS process set forth in the accompanying instructions is a workable one. In fact, Entergy remains convinced that there are numerous problems with the mechanisms currently assumed by DOE that will make real-world implementation difficult, if not impossible. Both DOE and the utility industry recognized these problems when they sought to work cooperatively in the 1990's to identify and resolve them. Some 35 implementation issues were defined and some cooperative efforts undertaken to resolve them. Unfortunately, what became known as the ACR Issue Resolution process was prematurely halted. We would urge that DOE promptly restart that process while there is still time to develop the necessary changes to the process and incorporate those changes into the Standard Contract and the individual Entergy contracts with DOE.

Entergy considers the information provided in the attached DSC to be confidential. Entergy is submitting the information on the condition that it will be treated as confidential and not publicly released. If Entergy is not correct in its understanding that the information will be treated as confidential, Entergy requests that DOE provide it with prompt notice so that Entergy can determine whether to retract and or redact such information.

Submission of this DCS does not waive, and Entergy specifically reserves, all pending or future claims or causes of action against DOE relating to its non-performance of the Standard Contract.

If you have any questions or require further information, please do not hesitate to call me at (601) 368-5750.

Sincerely,

FBR:rag
Attachment

Refs. 19, 20, 21, 22, 23, 53, 134, 151

NWPA-830C
(Revised 05/97)

OMB No. 1901-0260
(Expires 07/31/06)

# U.S. DEPARTMENT OF ENERGY
# APPENDIX C – DELIVERY COMMITMENT SCHEDULE

This information is being collected under mandatory authorities vested in the U.S. Department of Energy under Public Law 97-425 and Article V.B. of the Standard Contract for Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste (10 CFR 961). Data collected on this form are not considered to be confidential. Public reporting burden for this collection of information is estimated to average 5 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the Office of Statistical Standards, EI-73, 1000 Independence Ave., S.W., Washington, D.C. 20585 and to the Office of Information and Regulatory Affairs, Office of Management and Budget, Washington, D.C. 20503.

## 1.0 IDENTIFICATION INFORMATION

1.1 Name of Purchaser:
Entergy Nuclear Indian Point 2, LLC

1.2 DCS Identification Number:
10-1102-4373-01

1.3 Contact Person:
(a) Name: Frank B. Rives
(b) Telephone : (601) 368-5750

1.4 Contract Number:
DE-CR01-83NE44373

1.5 Reactor/Facility Information:
(a) Name: Indian Point Energy Center, Unit 2
(b) Address: 295 Broadway, Suite 3
(c) City: Buchanan
(d) State: NY (e) Zip Code: 10511

## 2.0 DELIVERY COMMITMENT INFORMATION

2.1 Type Cask Required (Maximum loading lifting weight, in tons): 110

2.2 Proposed Shipping Mode: Truck ☐; Rail ☒; Barge ☐

2.3 Proposed Delivery Year: 2010

2.4 Range of Discharge Dates: 01/01/1976 to 12/03/2004
(Earliest to Latest) (mm/dd/yyyy) (mm/dd/yyyy)

2.5 Metric Tons Uranium: (Initial) 3.0

2.6 Number of Assemblies: BWR PWR 7 Other

## 3.0 CERTIFICATIONS

**Purchaser hereby certifies that the spent nuclear fuel to be delivered pursuant to this Delivery Commitment Schedule is of domestic origin, has been discharged from a civilian nuclear power reactor, is covered by Purchaser's Contract (identified in Item 1.3 above) and that Purchaser has the legal right to deliver such spent nuclear fuel to DOE.**

3.1 [signature] 9/29/04
Authorized Purchaser Signature Date

3.2 Frank B. Rives
Name (Please Type or Print)

3.3 Director, Nuclear Fuels
Title (Please Type of Print)

TITLE 18 USC 1001 makes it a crime for any person to knowingly and willfully make to any agency of the United States any false, fictitious, or fraudulent statements as to any matter within its jurisdiction.

## 4.0 NOTIFICATION OF DOE ACTION

4.1 ☐ Approved ☐ Disapproved

4.2 ______________________
Technical Representative Title Date

______________________
Contracting Officer Date

TVA

Tennessee Valley Authority, 1101 Market Street, Chattanooga, Tennessee 37402-2801

August 24, 2004

Mr. David Zabransky, Contracting Officer
U. S. Department of Energy
Office of Systems Analysis and Strategy Development
RW-20E/Forrestal Building
1000 Independence Ave., SW
Washington, DC 20585

DELIVERY COMMITMENT SCHEDULE - DOE CONTRACT NUMBER: DE-CR01-83NE44420; TVA CONTRACT NUMBER: 1629

Dear Mr. Zabransky:

This is in response to your letter to TVA dated July 28, 2004, which announced the resumption of the Delivery Commitment Schedule (DCS) process and enclosed the July 2004 Acceptance Priority Ranking/Annual Capacity Report (APR/ACR). TVA understands from these documents that DOE has abandoned the March 1995 APR/ACR waste acceptance allocation schedule. Because the information provided in DOE's July 2004 APR/ACR does not provide TVA a waste acceptance allocation for the year 2010, TVA does not plan to submit a DCS for 2010. TVA will submit DCSs for the allocations accorded it in the APR/ACR in accordance with the schedule set forth in our contract.

This response by TVA to DOE's July 2004 APR/ACR is being made without prejudice to, or waiving, any of TVA's rights under the contract or TVA's positions in the current litigation between the parties.

If you have any question regarding the above, please contact me at (423) 751-7960.

Thank you for your assistance.

John B. Carden III
Contract Manager
Procurement -- TVAN Contracts

EXHIBIT 3

Printed on recycled paper

**Department of Energy**
Washington, DC 20585

NOV 0 3 2004

QA: N/A

John B. Carden III
Contract Manager
Procurement – TVAN Contracts
Tennessee Valley Authority
1101 Market Street
Chattanooga, Tennessee 37402-2801

Dear Mr. Carden:

This letter responds to your August 24, 2004 letter that replied to my July 28, 2004 letter announcing the resumption of the Delivery Commitment Schedule (DCS) process. Your letter indicates that Tennessee Valley Authority (TVA) will not be submitting DCSs for allocations accorded it by the 2004 Acceptance Priority Ranking/Annual Capacity Report (APR/ACR) until required by the schedule set forth in the disposal contract between TVA and the Department of Energy (DOE).

Your letter states that "TVA understands that DOE has abandoned the March 1995 APR/ACR waste acceptance allocation schedule." As an initial point of clarification, the method of allocating acceptance positions prior to the submission and approval of DCSs used in the 2004 APR/ACR is precisely the same as the method used in the 1995 APR/ACR. Specifically, both the 1995 APR/ACR and the 2004 APR/ACR utilize an "oldest fuel first" method of allocating acceptance positions in the acceptance queue as provided by the Standard Contract. That method of allocation has not changed and is not expected to change, absent some future amendment to the Standard Contract.

With regard to the acceptance schedule identified in the 2004 APR/ACR, that schedule reflects DOE's current planning for acceptance of SNF at the Yucca Mountain repository once operations begin in 2010, assuming that various factors upon which DOE's planning is based remain unchanged.

With regard to your suggestion that DOE has "abandoned" the 1995 APR/ACR "schedule," it is unclear whether you are referring to the rates at which DOE now anticipates it will be able to accept SNF from Purchasers under the Standard Contract beginning in 2010 or whether, instead, you are referring to an abandonment of the DCSs that were approved in conjunction with the 1991 ACR, the 1992 ACR, and the 1995 APR/ACR. Because TVA has never obtained any approved DCSs, we presume that TVA wants to ensure that DOE anticipates its ability to approve DCSs to be submitted in the future based upon the allocations identified in the 2004 APR/ACR. To the extent that TVA's concern relates to DOE's ability to approve future-submitted DCSs, we anticipate that, based upon current progress at the Yucca Mountain site, we will approve DCSs submitted in accordance with the allocations identified in the 2004 APR/ACR. Although Purchasers are certainly entitled to submit DCSs requesting acceptance of

Printed with soy ink on recycled paper

EXHIBIT 4

SNF under different allocation scenarios, DOE does not anticipate that it will be able to approve those requests in light of its obligations to allocate SNF acceptance positions to all Purchasers on an "oldest fuel first" basis and in light of the limitations upon the amount of SNF that DOE can accept in any given year. However, Articles V.B, V.C, and XVI of the Standard Contract provide a mechanism for resolving any disputes about acceptance allocations and disapprovals of DCS submissions.

To the extent that TVA has concerns about the interrelationship between previously approved DCSs and any new DCSs that DOE receives, the DCS approval process should eliminate those concerns. DOE understands that, when it approved DCSs from 1992 through 1997, it created commitments to accept specific amounts of SNF from specific Purchasers during specific periods of time, and, as you know, DOE's delay in accepting SNF in accordance with those DCSs is now the subject of litigation in the United States Court of Federal Claims. Although DOE had hoped when the earlier DCSs were being reviewed beginning in 1992 that it would be able to begin SNF acceptance in 1998 for storage in a monitored retrievable storage facility and based its acceptance rates upon that scenario, DOE currently anticipates being able to begin SNF acceptance at the Yucca Mountain repository in 2010. Because of the different types of facilities contemplated for acceptance in 1998 and in 2010, DOE believes that, once it begins accepting SNF, it will be in a position to accept SNF at a different rate at a repository than it had anticipated when it previously reviewed and approved DCSs for acceptance at a monitored retrievable storage facility. Accordingly, in the 2004 APR/ACR, we have identified new allocations based upon anticipated acceptance rates that are higher than those in the 1991, 1992, and 1995 ACRs.

Because of the increased anticipated acceptance rates and the currently anticipated acceptance dates, it will be difficult to plan for acceptance of SNF based upon the previously approved DCSs, which contain allocations that do not conform to the current anticipated rates. In addition, Purchasers may now wish to change the location from which the SNF is to be accepted or the dates of discharge identified in the original DCS submissions. Accordingly, any new DCSs that Purchasers submit may reflect these changes or request acceptance of the additional SNF covered by the new allocations granted. We anticipate that any new DCSs that are approved will replace, rather than supplement, the previously approved DCSs. To eliminate any potential confusion regarding the relationship between previously approved DCSs and new DCSs, we will seek, prior to approving new DCSs from any Purchasers with previously approved DCSs, an agreement in writing that any new DCSs that are approved actually replace, rather than supplement, the previously approved DCSs. That agreement will be reflected in any future DCS approvals.

Please contact me if you have any questions.

Sincerely,

David Zabransky
Contracting Officer
Office of System Analysis & Strategy Development