# In the United States Court of Federal Claims

No. 03-2622-C

(Filed: March 9, 2005)

| | |
|---|---|
| ENTERGY NUCLEAR INDIAN POINT 2, LLC,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant. | Spent nuclear fuel case; standing; motion for summary judgment; RCFC 56; partial breach of contract; Nuclear Waste Policy Act of 1982; exception to rules of merger and bar for damages from partial breach; *Restatement (Second) Judgments* § 26 |

Alexander D. Tomaszczuk, Shaw Pittman LLP, McLean, VA, for plaintiff. With him on the briefs were Jay E. Silberg, Devon E. Hewitt, Michael G. Lepre, Daniel S. Herzfeld, and Jack Y. Chu, Shaw Pittman LLP, Washington, D.C.

Joshua E. Gardner, Commercial Litigation Branch, Civil Division, United States Department of Justice, for defendant. With him on the briefs were Peter D. Keisler, Assistant Attorney General, David M. Cohen, Director, and Harold D. Lester, Jr., Assistant Director. Of counsel was Jane K. Taylor, Office of General Counsel, United States Department of Energy.

## OPINION AND ORDER

LETTOW, Judge.

This case involves a contract for the storage and disposal of spent nuclear fuel ("SNF") and high-level radioactive waste ("HLW"). Entergy Nuclear Indian Point 2, LLC ("ENIP") is the owner of Indian Point 1 Nuclear Power Station and Indian Point 2 Nuclear Power Station (collectively the "Indian Point facilities"). These facilities were previously owned by Consolidated Edison Company of New York, Inc. ("Consolidated Edison"), which entered into a contract with the Department of Energy ("DOE") under the Nuclear Waste Policy Act of 1982 ("NWPA"), Pub. L. No. 97-425, 96 Stat. 2202 (Jan. 7, 1983) (codified as amended at 42 U.S.C.

§§ 10101-10270), obligating DOE to dispose of SNF and HLW generated at the Indian Point facilities, with such disposal to commence no later than January 31, 1998. ENIP purchased the Indian Point facilities on September 6, 2001. DOE had not then begun disposing of any facility's SNF, nor has DOE commenced such disposal to date. In the purchase agreement between ENIP and Consolidated Edison, the contract between DOE and Consolidated Edison for disposal of SNF and HLW was assigned to ENIP. Hr'g Tr. 24; Pl.'s App. 152 (Asset Purchase and Sale Agreement between Consolidated Edison and ENIP § 2.02(a)(xi) (as of Nov. 9, 2000)).[1] As ENIP and Consolidated Edison would have it, that assignment grants ENIP the right to recover any damages from claims against DOE accruing after the date it purchased the plant, and it reserves to Consolidated Edison claims for damages accruing prior to the closing date of ENIP's purchase of the Indian Point facilities. Both utilities have filed claims against the United States in this court.[2]

Conceptually, the claims and contentions in this case are a reprise of those that were the subject of a decision rendered a short time ago in the action styled *Entergy Nuclear Generation Co. v. United States*, __ Fed. Cl. __, 2005 WL 503724 (Mar. 3, 2005). ENIP filed its complaint on November 5, 2003, claiming that the government partially breached its contract, violated the implied covenant of good faith and fair dealing, and took ENIP's property without providing just compensation. ENIP subsequently filed a motion for summary judgment on liability for the partial breach of contract claim, arguing that DOE has failed to commence its disposal of SNF and HLW from the Indian Point facilities. The government responded with its own cross-motion for summary judgment on liability, which challenges ENIP's standing to seek damages prior to the date of its purchase of the plants, claims that ENIP has failed to show any resultant injury to satisfy this court's standard for summary judgment on liability, and seeks summary judgment that DOE is not liable to ENIP for any of the government's actions prior to the first post-assignment date when it would have disposed of the Indian Point facilities' SNF under DOE's disposal procedures. A hearing was held on the cross-motions on February 9, 2005. For the reasons stated below, the plaintiff's motion for summary judgment is granted, and the government's cross-motion is denied.

---

[1]Such an assignment was authorized by Paragraph 302(b)(3) of the NWPA, 42 U.S.C. § 10222(b)(3), which provides that "[t]he rights and duties of a party to a contract entered into under this section may be assignable with transfer of title to the spent nuclear fuel or high-level radioactive waste involved."

[2]Consolidated Edison's claim has been docketed as *Consolidated Edison Company of New York, Inc. v. United States*, No. 04-0033C (filed Jan. 13, 2004). This court previously denied without prejudice a motion to consolidate the *ENIP* and *Consolidated Edison* cases, ruling that consolidation was inappropriate "because the *ENIP* case is procedurally at a significantly more advanced stage," while recognizing "that further development of both cases may reduce the procedural disparity and that consolidation may be appropriate at some future time." *Entergy Nuclear Indian Point 2, LLC v. United States*, 62 Fed. Cl. 798, 803 (2004).

## BACKGROUND[3]

Prior decisions of the Courts of Appeals for the District of Columbia and the Federal Circuit, as well as by the Court of Federal Claims, have described the continuing controversy over disposal of spent nuclear fuel.[4] Given this background, the facts recounted below are limited to those relevant to the parties' arguments and the disposition of the pending motions.

### *A. The NWPA*

On January 7, 1983, the NWPA was enacted, authorizing the Secretary of DOE to "enter into contracts with any person who generates or holds title to high-level radioactive waste, or spent nuclear fuel, of domestic origin for the acceptance of title, subsequent transportation, and disposal of such waste or spent fuel." 42 U.S.C. § 10222(a)(1). Facilities could not renew their licenses unless they entered or were actively negotiating in good faith towards entering such a contract. *Id.* § 10222(b)(1)(A). The NWPA called upon the contracting utilities to pay a one-time fee for electricity generated and sold prior to April 7, 1983, and a continuing fee for electricity generated and sold after that date. *Id.* § 10222(a)(2)-(3). *See Wisconsin Elec. Power Co. v. Department of Energy*, 778 F.2d 1 (D.C. Cir. 1985) (resolving the basis upon which the continuing fee would be calculated). In exchange for the payment of fees, the Act mandated that contracts include a provision requiring the Secretary to begin disposing of SNF or HLW no later than January 31, 1998. 42 U.S.C. § 10222(5)(B).

After notice and a comment period, DOE promulgated a Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste, codified at 10 C.F.R. § 961.11 ("Standard Contract"). *See* 48 Fed. Reg. 5,458 (Feb. 4, 1983). The Standard Contract allowed utilities either to pay the one-time fee in full without interest, or defer payment with interest, or prorate payment over forty quarters with interest accruing on the unpaid portion. Standard Contract, art. VIII.B.2. As required by the NWPA, the Standard Contract required DOE to begin disposal no later than January 31, 1998. *Id.*, art. II.

---

[3]The recitation of facts in this section does not constitute findings by the court. All of the stated facts either are undisputed or are alleged and assumed to be true for the purposes of one or both of the pending motions. Where material facts are disputed, the disagreement is noted and resolution is reserved for further proceedings.

[4]*See Boston Edison Co. v. United States*, __ Fed. Cl. __, __ n.3, 2005 WL 375603, at *1 n.3 (Feb. 15, 2005) (listing decisions rendered regarding disputes over disposal of SNF and HLW); *see also Entergy Nuclear Generation Co.*, __ Fed. Cl. at __ & n.2, 2005 WL 503724, at *1 & n.2.

*B. The Standard Contract*

The Standard Contract established a system whereby DOE would collect and dispose of SNF and HLW. For planning purposes, DOE was to issue an annual capacity report ("ACR") every year beginning no later than July 1, 1987. *Id.*, art. IV.B.5(b). This report would "set forth the projected annual receiving capacity for the DOE facility(ies) and the annual acceptance ranking relating to DOE contracts for the disposal of SNF and/or HLW including, to the extent available, capacity information for ten (10) years following the projected commencement of operation of the initial DOE facility." *Id.* ACRs would determine the amount of SNF or HLW that DOE would accept in a given year. Acceptance priority rankings ("APRs") would determine which SNF would be collected, and the general rule was that the oldest fuel or waste would be given the highest priority. *Id.*, art. IV.B.5(a).

Utilities could submit delivery commitment schedules ("DCSs") to DOE beginning on January 1, 1992. *Id.*, art. V.B.1. DCSs would identify "all SNF and/or HLW the Purchaser wishes to deliver to DOE beginning sixty-three (63) months thereafter." *Id.* DOE was to approve or disapprove such schedules within three months of submission. If it disapproved a submission, DOE was to advise the utility of the reasons for disapproval and request a revised schedule within thirty days. *Id.* DOE was obliged to take action on the revised schedule within sixty days of its receipt. *Id.*, art. V.B.2. No later than one year prior to the scheduled delivery, utilities were to submit final delivery schedules ("FDSs"). *Id.*, art. V.C. Utilities could adjust the quantities of SNF in either direction by up to twenty percent if they did so at least two months prior to the submission of the FDS. *Id.*, art. V.B.2. Utilities could also engage in "SNF put-option trading" whereby utilities could exchange approved DCSs, provided that DOE would receive notice no later than six months prior to the scheduled delivery and approve the transaction. *Id.*, art.V.E. This option permitted the market to influence the order of SNF disposal, which presumably would benefit those facilities with less storage space.

For a time in the 1990s, DOE issued ACRs and accepted and approved DCSs, but DOE subsequently halted the process. DOE has not approved of any DCSs since at least March 1997. *See* Pl.'s App. 129 (Admission by Def.). At or around that time, DOE suspended the DCS process such that no DCS would be approved. *See* Pl.'s App. 2, 4 (Dep. of David Zabransky, Contracting Officer, DOE (Apr. 17-18, 2002)) (admitting that "[b]ecause of the suspension of the DCS process it's impossible for a utility to have a DCS approved").[5] DOE returned DCS submissions to utilities without approval or disapproval, and waived the requirement of submitting a revised DCS. Pl.'s Reply at 16.

---

[5]ENIP avers that no DCS submitted after 1995 would have been approved. Plaintiff's Reply in Support of Its Motion for Summary Judgment on Liability and Response in Opposition to Defendant's Cross-Motion for Summary Judgment on Liability ("Pl.'s Reply") at 16-17. It alleges that in addition to holding DCSs submitted by utilities, DOE also unilaterally voided DCSs that had been previously approved in 1996. *Id.* at 17.

Then, in July 2004, DOE resurrected the DCS process, calling for utilities to file new DCS applications based on a revised 2010 start date instead of the 1998 deadline specified in the NWPA and in the Standard Contract. Pl.'s App. 132-37 (2004 Instructions to Utilities for Completing DCS). DOE instructed utilities to submit DCS applications for 2010 by September 30, 2004 to comply with the 63-month period required by the Standard Contract. *Id.* at 132.[6] This reinstitution of the DCS process was short-lived. In December 2004, DOE again suspended the DCS process, informing the utilities that "resumption of the DCS process was premature." Plaintiff's Supplemental Brief ("Pl.'s Supp. Br."), Ex. 1 (Letter from David Zabransky, Contracting Officer, DOE, to Frank Rives, Entergy Operations, Inc. (Dec. 1, 2004)). DOE further informed utilities that it would resume the DCS process "[a]fter the Department has determined a revised date for the initial operation of the Yucca Mountain repository." *Id.*

### *C. Indian Point Facilities*

Consolidated Edison signed a Standard Contract with the Department of Energy on June 17, 1983. Plaintiff's Proposed Findings of Uncontroverted Fact ("PFUF") ¶ 1; Defendant's Response to Plaintiff's Proposed Findings of Uncontroverted Fact ("DRPFUF") ¶ 1. This contract involved the disposal of SNF and HLW at both Indian Point facilities. Compl. ¶ 2; Hr'g Tr. 5-6.[7] The Standard Contract provided that "[t]he rights and duties of the [utility] may be assignable with transfer of title to the SNF and/or HLW involved; provided, however, that notice of any such transfer shall be made to DOE within ninety (90) days of transfer." Standard Contract, art. XIV. This assignment provision mirrored language in the NWPA. *See* 42 U.S.C. § 10222(b)(3) (quoted *supra*, at 2 n.1). Consolidated Edison exercised this contractual right on September 6, 2001, when ENIP purchased the Indian Point facilities. Compl. ¶ 2. On that same date, Consolidated Edison notified DOE of the sale, stating that it had "assigned [its] rights and obligations under the Contract to [ENIP], with the exception of all claims and causes of action in respect of damages to property or economic loss related to or pertaining to the Department of Energy's breaches or defaults under the Contract accrued as of September 6, 2001, whether

---

[6]The DCS process initiated in 2004 was premised on an average annual disposal capability of a repository that was more than double that used for planning purposes in the 1990s. *Compare* Pl.'s App. 144 (DOE APR & ACR (July 2004)) (projecting capacity for 10-year period to be 22,200 Metric Ton Units ("MTU")), *with* Def.'s App. 239 (DOE APR & ACR (March 1995)) (projecting capacity for 10-year period to be 8,200 MTU). The amount of SNF and HLW to be deposited has grown over the years, and as a result, the positions of particular holders of SNF and HLW in the queue for priority of disposal may have shifted. New DCSs in 2004 would replace, rather than supplement, the previously-approved DCSs. *See Entergy*, __ Fed. Cl. at __ n.4, 2005 WL 503724, at *3 n.4.

[7]Indian Point 1 Nuclear Power Station is shut down and exists in a condition known as "safe store;" it is not presently capable of operating. Hr'g Tr. at 7, 9. Indian Point 2 Nuclear Power Station remains operational, and the SNF previously generated by both Indian Point facilities is stored at the station site. Compl. ¶ 2.

relating to periods prior to or following September 6, 2001." Def.'s App. 303 (Letter from Consolidated Edison to Herbert Watkins, Contracting Officer, DOE (Sept. 6, 2001)). Both Consolidated Edison and ENIP have interpreted this agreement to mean that Consolidated Edison may seek recovery for any claims that had accrued as of the purchase date, and ENIP may sue for later accruing claims. Plaintiff's Response to Defendant's Proposed Findings of Fact ("PRDFUF") ¶ 44; Pl.'s Reply at 5-6; Hr'g Tr. at 15, 21, 44. The government has not accepted ENIP's and Consolidated Edison's interpretation of the assignment, pointing to "a disparity between the notice to DOE and what is contained in the asset purchase agreement." Hr'g Tr. 28.[8] The government advises that it "ha[s] not yet formulated a position [on] . . . how [it is] going to address this issue." *Id*. at 28-29. For purposes of the pending cross-motions, this disagreement is not material.

Consolidated Edison submitted, and DOE approved, DCSs for 2.92 MTU to be disposed between January 31, 1998 and January 30, 1999, for 27.66 MTU to be disposed between January 31, 1999 and January 30, 2000, and for 32.74 MTU to be disposed between January 31, 2000 and January 30, 2001. Defendant's Proposed Findings of Uncontroverted Fact ("DFUF") ¶¶ 37-39; PRDFUF ¶¶ 37-39; Def.'s App. 252-54 (1998, 1999, and 2000 DCSs). The 1995 APR/ACR allowed for disposal of ENIP's SNF in years 1, 2, 3, 5, 7, 8, and 9 of disposal, which would have been 1998, 1999, 2000, 2002, 2004, 2005, and 2006 if DOE had begun its disposal by the 1998 deadline. DFUF ¶ 35; PRDFUF ¶ 35. The parties dispute the remaining DCS submissions. ENIP avers that Consolidated Edison submitted a DCS for DOE to dispose of 27.10 MTU of SNF between January 31, 2002 and January 30, 2003, which DCS was initially approved by DOE and subsequently voided. Pl.'s App. 161; Pl.'s Reply at 15 n.5.[9] The government claims that Consolidated Edison submitted a 2002 DCS application for only 5 MTU, which application was approved by DOE. DFUF ¶ 41; Def.'s App. 255.[10] ENIP also claims that Consolidated

[8]Apart from the awkward language of the notice of assignment (excepting "claims . . . as of September 6, 2001, whether relating to periods prior to or following September 6, 2001"), the Purchase and Sale Agreement distinguished "Auctioned Assets" from "Retained Assets." The Auctioned Assets that were purchased by ENIP included "all claims or causes of action for the refund or return of any payments made or to be made . . . pursuant to the DOE Standard Contract . . . but specifically excluding any claims or causes of action in respect of damages to property or economic loss related or pertaining to the Department of Energy's breach or default under the DOE Standard Contract accrued prior to Closing." Pl.'s App. 152.

[9]ENIP's Reply cites the 2002 DCS as allowing for 32.74 MTU, while the 2002 DCS included in ENIP's appendix, and cited by ENIP's Reply for the appropriate allocation, lists 27.10 MTU. *Compare* Pl.'s Reply at 15 n.5, *with* Pl.'s App. 161.

[10]ENIP challenges the authenticity of Consolidated Edison's 2002 DCS application because of several defects. Among other problems, the document identifies the contact person as "Mr. Whomever," contains an incomplete DCS Identification Number, misspells the street address of the facility at issue, and lacks a signature from a representative of the facility. Def.'s

Edison submitted DCS applications for 2004, 2005, and 2006 (years 7, 8, and 9), all of which were returned without DOE's approval or disapproval. PRDFUF ¶ 41; Pl.'s App. 162-67. DOE stated that it was "not able at this time to approve your DCS submittal" and waived the 30-day requirement for filing a revised DCS. Pl.'s App. 166 (Letter from Herbert Watkins, Contracting Officer, DOE, to Joseph Pezzello, Principal Engineer, Consolidated Edison (Oct. 25, 2000)).[11]

When the DCS process resumed in 2004, ENIP submitted an application for disposal of SNF in 2010. *See* Defendant's Response to Plaintiff's Motion for Leave to Supplement Brief ("Def.'s Supp. Br."), Ex. 2, at 4. In a letter accompanying this submission, ENIP advised that it "specifically reserve[d] all pending or future claims or causes of action against DOE relating to its non-performance of the Standard Contract." *Id.* at 3 (Letter from Frank Rives, Entergy, to David Zabransky, Contracting Officer, DOE (Sept. 29, 2004)).

*D. This Lawsuit*

ENIP filed its complaint on November 5, 2003, alleging that the government had partially breached the Standard Contract and the implied covenant of good faith and fair dealing, and that the government's failure to remove the Indian Point facilities' SNF constituted an uncompensated taking. *See* Compl. ¶¶ 22-34. In 2004, ENIP filed a motion for summary judgment on liability for DOE's partial breach of contract. The government filed a cross-motion, which challenged ENIP's standing to bring claims for liability prior to its purchase of the Indian Point facilities, averred that any finding of liability prior to the first DCS delivery date after ENIP purchased the facilities is inappropriate, and claimed that ENIP has failed to provide sufficient evidence of damages to be awarded summary judgment on liability. Specifically, the government claims that ENIP did not accrue any rights against DOE prior to January 31, 2002, at the earliest. Defendant's Corrected Response to Plaintiff's Motion for Summary Judgment on Liability, and Defendant's Cross-Motion for Summary Judgment on Liability ("Def.'s Cross-Mot.") at 13. At the parties' request, supplemental briefs were filed regarding the suspension of the 2004 DCS process, with the last such brief being submitted on January 24, 2005. The hearing held on February 9, 2005 further clarified the positions of the parties regarding the cross-motions.

---

App. 255; Pl.'s Reply at 15 n.5.

[11]The government's proposed findings of fact are silent on these later DCS submissions. The government's appendix, however, includes two proposed DCS submissions for 2007, both of which share the same indicia of unreliability as Consolidated Edison's proposed 2002 DCS. *See* Def.'s App. 256-57.

## STANDARD FOR DECISION

A court should grant summary judgment when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." RCFC 56(c); *see Anderson v. Liberty Lobby*, 477 U.S. 242, 247-48 (1986). The party seeking summary judgment bears the initial burden of showing the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In determining whether summary judgment is appropriate, courts should resolve any doubts in favor of the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986). If no rational trier of fact could find for the non-moving party, the court should grant summary judgment. *Id.* at 587. When considering cross-motions for summary judgment, courts should evaluate each motion on its own merits and deny both motions if genuine disputes over material facts exist. *Mingus Contractors, Inc. v. United States*, 812 F.2d 1387, 1390-91 (Fed. Cir. 1987).

## ANALYSIS

Federal courts address threshold jurisdictional issues prior to considering the underlying merits of a case. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 93-102 (1998). The Court of Federal Claims has subject matter jurisdiction over ENIP's claims under the Tucker Act, 28 U.S.C. § 1491. *See Boston Edison*, __ Fed. Cl. at __, 2005 WL 375603, at *5-10. *Contra Florida Power & Light Co. v. United States*, __ Fed. Cl. __, 2005 WL 318678 (Jan. 31, 2005).

The government has raised a jurisdictional challenge to ENIP's standing to assert claims prior to the date on which it purchased the Indian Point facilities. Def.'s Cross-Mot. at 4-7. As a result, the court will address the issue of standing first, followed by plaintiff's motion for summary judgment and the additional contentions raised in the government's cross-motion.

### *STANDING*

To proceed with any claim in federal court, plaintiffs must satisfy the constitutional minimum for standing, which requires that the plaintiff have suffered or be suffering an injury in fact. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). To meet this legal standard, an injury must be concrete and particularized, as well as actual or imminent, fairly traceable to the actions of the defendant, and redressable by a favorable decision on the merits. *Id*. at 560-61. When a standing issue is raised at the summary judgment stage, the plaintiff's burden to show standing corresponds to the standards for summary judgment. *Id*. at 561. The government challenges ENIP's injury in fact prior to September 6, 2001, the date it purchased the Indian Point facilities. Def.'s Cross-Mot. at 3-7. ENIP responds by stating that it is not seeking any damages incurred prior to that date. Pl.'s Reply at 3. This aspect of the case accordingly focuses on ENIP's standing to seek damages after it purchased the Indian Point facilities, not before.

In a contract case, as this court has explained elsewhere, the appropriate measure of damages for a partial breach of contract is the expectation interest. *See Boston Edison*, __ Fed.

Cl. at __, 2005 WL 375603, at *11. ENIP has alleged several ways in which its expectation interest has been damaged. In storing the spent fuel that DOE failed to dispose, ENIP allegedly has spent $27,429,317. Hr'g Tr. at 10. This figure includes amounts expended to design, license, and construct a dry storage facility, to purchase HOLTEC HI-STORM 100-dry-fuel containers, to purchase ancillary equipment needed for dry storage, to replace a fuel building crane, to modify existing structures to permit cast loading, and to pay for private fuel storage. *Id.*; Pl.'s Reply at 11. These expenses were allegedly incurred by ENIP to mitigate its losses on and after the date of breach, which in ENIP's case could not be prior to September 6, 2001, and they could be recovered as incidental losses if ENIP's allegations are proven. *See Boston Edison*, __ Fed. Cl. at __, 2005 WL 375603, at *15 (stating that re-racking costs could be recovered as incidental losses if the evidence at trial shows that the expenses were made to mitigate the utility's losses); *cf. Home Sav. of Am. v. United States*, __ F.3d __, 2005 WL 517920, at *9 (Fed. Cir. Mar. 7, 2005) (affirmance of trial court's finding that thrift's replacement of supervisory goodwill lost as result of breach with equity capital was reasonable mitigation). Based on these alleged costs and losses, ENIP has satisfied the requirements for standing at this time.[12]

To have standing to bring a breach of contract claim, plaintiffs must also be in privity of contract with the government or a third party beneficiary of a contract with the government. *Anderson v. United States*, 344 F.3d 1343, 1351 (Fed. Cir. 2003); *Sacramento Mun. Util. Dist. v. United States*, 63 Fed. Cl. 495, 500 (2005). Consolidated Edison signed a Standard Contract with the Department of Energy. PFUF ¶ 1. Assignments of Standard Contracts are permissible under article XIV of the Standard Contract and authorized by the NWPA. *See supra*, at 2 n.1 and 5 (quoting the NWPA and the Standard Contract, art. XIV). The Standard Contract for the Indian Point facilities was assigned to ENIP in accordance with these provisions, and DOE received notice in accordance with the Contract, giving ENIP privity of contract with the government. Def.'s App. 303. Accordingly, the government's motion for summary judgment with respect to standing is denied.

*PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT*

ENIP seeks summary judgment on liability for the partial-breach-of-contract claim. It argues that the Standard Contract required that DOE begin disposal of its SNF by January 31, 1998. Because DOE has still failed to begin disposal over seven years later, ENIP seeks summary judgment on DOE's liability for partial breach of contract. Plaintiff's Motion for

---

[12]The government argues that ENIP has failed to provide admissible evidence that it suffered an injury in fact. Hr'g Tr. at 22. While ENIP's showing could have been presented in a different and more preferable form, ENIP has provided the requisite factual basis that it has standing. When a plaintiff challenges governmental action or inaction and the plaintiff, rather than a third party, is the object of that action or inaction, "there is ordinarily little question that the action or inaction has caused him injury." *Lujan*, 504 U.S. at 561-62. In light of this relatively low threshold, the allegations by ENIP, and the attendant circumstances, the court is satisfied that ENIP has allegedly suffered sufficient injury in fact to maintain the present action.

Summary Judgment on Liability ("Pl.'s Mot.") at 1-3. ENIP further avers that the partial breach of contract took place on January 31, 1998, and that the breach has caused ongoing damages, including the need to construct a dry storage facility. *Id.*; Pl.'s Reply at 10-12. ENIP's posture regarding the date of breach must be viewed in light of the fact that it does not seek damages prior to the date of its acquisition of the Indian Point facilities, which was when the Standard Contract was assigned by Consolidated Edison to ENIP. Pl.'s Reply at 3.

The precise date of the breach is an issue of fact to be determined at trial. *Cf. Boston Edison*, __ Fed. Cl. at __, 2005 WL 375603, at *16, 19. This issue is disputed; the government claims that the breach *as to ENIP* did not take place until January 31, 2002, at the earliest. Def.'s Cross-Mot. at 13.[13] The court may determine that the date of breach *as to ENIP* was September 6, 2001, the date of ENIP's purchase of the Indian Point facilities accompanied by the assignment of the Standard Contract, because DOE was in breach of its obligations under the contract as of the date of the assignment. On the other hand, the date of breach as to ENIP could be as late as January 31, 2002, as the government claims, or some other date based on the evidence.

The government's primary response to ENIP's motion is to emphasize the distinction between the standards for breach and for liability. Liability for a partial-breach-of-contract claim requires both a showing of partial breach and of a minimal amount of resultant injury. *Puritan Assocs. v. United States*, 215 Ct. Cl. 976, 978 (1977) ("[E]ven if, as here, the assessment of damages is reserved for the quantum phase of the case, the plaintiff as part of its proof of entitlement, must show it was damaged to some extent, by defendant's derelictions."). This small threshold is necessary to demonstrate that the issue of liability is not purely academic. *See Cosmo Constr. Co. v. United States*, 451 F.2d 602, 605-06 (Ct. Cl. 1971). The government argues that ENIP has failed to meet this lenient standard, and thus that ENIP's motion for summary judgment on liability should be denied. Def.'s Cross-Mot. at 7. However, just as ENIP's injury in fact satisfied standing requirements, ENIP has shown the requisite resultant injury to support a determination of liability. Its alleged expenses for storing fuel total more than $27 million. Hr'g Tr. at 10. In addition, DOE's failure to collect SNF from any utilities may have caused damages by eliminating the possibility of engaging in SNF put-option trading under Article V.E of the Standard Contract. DOE is also likely to reinitiate the DCS process, at which point the administrative costs of the DCS process may constitute an additional incidental loss.

---

[13]ENIP's claim that the breach took place on January 31, 1998 relies in part on the Federal Circuit's statement that "[t]he breach involved all the utilities that had signed the contract – the entire nuclear industry." *Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336, 1342 (Fed. Cir. 2000). This statement was made in the context of the court's determination that the scope of the government's breach respecting the Yankee plants was broader than that envisioned by the delays provision of the Standard Contract. *Id.* The statement does not foreclose the possibility that DOE partially breached its contract with other utilities at a date earlier than January 31, 1998. *See Tennessee Valley Auth. v. United States*, 60 Fed. Cl. 665, 674-75 (2004) (addressing *Maine Yankee* but finding a breach of a Standard Contract based upon DOE's refusal to act on proffered DCSs beginning in 1997).

*Boston Edison*, __ Fed. Cl. at ___, 2005 WL 375603, at *16. Trial on damages will determine the amount to be awarded as relief for the breach, but ENIP has shown to the court's satisfaction that it has suffered resultant injury. Accordingly, ENIP's motion for summary judgment on liability is granted.

*GOVERNMENT'S CROSS-MOTION FOR SUMMARY JUDGMENT*

The government's principal argument is that it should not be held liable for a partial breach prior to the first failed post-assignment DCS delivery. According to the government, the January 31, 1998 deadline required DOE to begin disposing SNF from only those utilities that had an approved DCS for the 1998 year. Def.'s Cross-Mot. at 11. According to this argument, a breach has occurred only at the point when DOE has failed to abide by the commitments made in an approved DCS. Because ENIP is not seeking any damages incurred prior to September 6, 2001, the government argues that it is not liable to ENIP until it failed to satisfy its obligations under the first post-assignment DCS, which scheduled delivery between January 31, 2002 and January 30, 2003. *Id.* at 13. Even if the court were to accept the questionable premise that previously filed DCSs could determine the date of breach,[14] the government's argument is unavailing in this case. DOE approved Consolidated Edison's DCSs for 1998, 1999, and 2000. DFUF ¶ 37-39; PRDFUF ¶ 37-39. If DOE partially breached contracts only when it failed to collect SNF according to DCSs, it would have partially breached the Standard Contract at issue in this case when it failed to dispose of the Indian Point facilities' SNF under the DCS that matured in 1998. In short, under that scenario, the contract would have already been partially breached when ENIP purchased the facilities. Correlatively, post-assignment steps taken (and paid for) by ENIP to mitigate the damages incurred as a result of DOE's continuing non-performance would be recoverable, even if those expenses were made immediately after ENIP

[14]The aborted effort in 2004 to renew the DCS process, the 63-month requirement of the Standard Contract for prior notification through submission of a DCS, and the problems surrounding the opening of a repository all suggest that DOE is unlikely to begin disposing of utilities' SNF in the foreseeable future. *See Nuclear Energy Inst. v. Environmental Prot. Agency*, 373 F.3d 1251 (D.C. Cir. 2004) (addressing issues surrounding the selection of Yucca Mountain, Nevada, as the site for the nation's nuclear waste repository). In these circumstances, the DCSs submitted in the 1990s and in 2004 are of questionable viability.

Moreover, both the D.C. and Federal Circuits have determined that "the NWPA imposes an unconditional obligation on the Department [of Energy] to begin disposal of the SNF by January 31, 1998." *Northern States Power Co. v. Dep't of Energy*, 128 F.3d 754, 761 (D.C. Cir. 1997). *See also Maine Yankee*, 225 F.3d at 1343; *Indiana Michigan Power Co. v. United States*, 88 F.3d 1272, 1275-76 (D.C. Cir. 1996). This obligation has not been overridden by DOE's efforts to adjust requirements via the DCS process, and thus the government's argument that the DCS process governs liability and recovery of damages has also been unsuccessful in this court. *See, e.g.*, *Sacramento Mun. Util. Dist.*, 63 Fed. Cl. at 503-05; *Commonwealth Edison Co. v. United States*, 56 Fed. Cl. 652, 655-56 (2003). Nonetheless, at this juncture, the court need not determine whether DCSs have any definitive role.

purchased the Indian Point facilities. Therefore, even assuming the validity of the government's DCS argument, ENIP could have suffered injury immediately upon its purchase of the Indian Point facilities. The government's motion for partial summary judgment on this ground is denied.

The government also argues that the Standard Contract is an alternative contract. Defendant's Reply to Plaintiff's Response to Defendant's Cross-Motion for Summary Judgment ("Def.'s Reply") at 8-11. An alternative contract is one where "a party promises to render some [sic] one of two or more alternative performances either one of which is mutually agreed upon as the bargained-for equivalent given in exchange for the return performance by the other party." 11 Arthur L. Corbin, *Corbin on Contracts* § 1079 (2004). When such a contract has been breached, the amount of damages awarded to the non-breaching party has traditionally been the value of the least valuable service the promisor could have chosen. *Restatement of Contracts* § 344 (1932). The government argues that DOE had sufficient discretion in its DCS and FDS approval processes under the Standard Contract such that it should be required to pay the minimal value of the services it could have provided to ENIP.

As this court has stated elsewhere, the government misconceives of its discretion under the Standard Contract and is incorrect in its contention that the Standard Contract constitutes an alternative contract. *See Entergy*, __ Fed. Cl. at __, 2005 WL 503724, at *7. The government has not presented any evidence that the Standard Contract contained alternative modes of performance that the parties deemed roughly equivalent at the time the contract was signed, a requirement of alternative contracts. *Id.* The government instead seems to be arguing that it has virtually unfettered discretion to determine its obligations under the contract, which, if true, would render the contract illusory. *See Ridge Runner Forestry v. Veneman*, 287 F.3d 1058, 1061 (Fed. Cir. 2002) (internal citations omitted) (stating that unenforceable illusory promises are characterized by words that "do not purport to put any limitation on the freedom of the alleged promisor, but leave his future action subject to his own future will"). In short, the Standard Contract is not an alternative contract, and the government's cross-motion for partial summary judgment is denied.[15]

*ENIP'S DAMAGES*

Given the court's holding that DOE partially breached ENIP's Standard Contract and the likelihood that DOE will not begin disposal of SNF and HLW for years to come, the court should address what damage claims it will consider at trial. After trial, the court will award a final judgment. As a general rule, "[w]hen a valid and final judgment rendered in an action

---

[15]The government's cross-motion does not specify whether it also seeks summary judgment on ENIP's claims alleging a breach of the implied covenant of good faith and fair dealing and an uncompensated taking. To the extent that the motion seeks summary judgment on these claims, the government has failed to show an absence of genuine disputes over material facts, and the motion is accordingly denied.

extinguishes the plaintiff's claim pursuant to the rules of merger or bar (see [*Restatement (Second) Judgments*] §§ 18, 19 [1982]), the claim extinguished includes all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose." *Restatement (Second) Judgments* § 24(1). *See also Young Eng'rs, Inc. v. International Trade Comm'n*, 721 F.2d 1305, 1314-15 (Fed. Cir. 1983); *Entergy*, __ Fed. Cl. at __, 2005 WL 503724, at *8; *Tennessee Valley Auth.*, 60 Fed. Cl. at 676-78. Several exceptions to this general rule exist, and cases for partial breach of the Standard Contract are particularly appropriate for waiver of the merger and bar requirements. *Restatement (Second) Judgments* § 26(1) provides that

> the general rule of § 24 does not apply to extinguish the claim, and part or all of the claim subsists as a possible basis for a second action by the plaintiff against the defendant [when] . . . (b) The court in the first action has expressly reserved the plaintiff's right to maintain the second action; or . . . (e) For reasons of substantive policy in a case involving a continuing or recurrent wrong, the plaintiff is given an option to sue once for the total harm, both past and prospective, or to sue from time to time for the damages incurred to the date of suit, and chooses the latter course.

The court hereby adopts the exceptions to the rule of merger and bar in accordance with *Restatement (Second) Judgments* § 26(1)(b) and (e). At trial, the scope of ENIP's damages claims shall be limited to those damages incurred between the date on which ENIP purchased the Indian Point facilities, September 6, 2001, and the date of its most recent fiscal year prior to the start of trial. ENIP may bring additional claims for damages incurred during later fiscal years, provided such claims comply with the court's statute of limitations. *See Entergy*, __ Fed. Cl. at __, 2005 WL 503724, at *8; *Tennessee Valley Auth.*, 60 Fed. Cl. at 677-78.[16]

## CONCLUSION

For the reasons set out above, ENIP's motion for partial summary judgment on liability for the partial-breach-of-contract claim is GRANTED, except the date of the breach will be determined, if necessary, at trial. The government's cross-motion for partial summary judgment is DENIED.

---

[16]As in *Entergy* and *Tennessee Valley Authority*, this court's six-year statute of limitations, *see* 28 U.S.C. § 2501, does not foreclose reliance on the exceptions to merger and bar set out in *Restatement (Second) Judgments* § 26(1)(b) and (e). The statute of limitations does not begin to run until the claimant has suffered damages, although such damages need not be calculable with precision. *Alder Terrace, Inc. v. United States*, 161 F.3d 1372, 1377 (Fed. Cir. 1988) (quoting *Terteling v. United States*, 167 Ct. Cl. 331, 339 (1964)). In short, after a judgment has been rendered in this case, any future claims by ENIP for damages will accrue once it has suffered additional damages, and to be timely ENIP's claims on those additional damages must be filed within six years of their first incurrence by ENIP.

Trial on the date of breach and the measure of damages is necessary. The scope of ENIP's claim for redress shall be limited to those damages incurred between September 6, 2001 and the close of its most recent fiscal year prior to the commencement of trial. ENIP shall retain the right to bring claims for damages incurred after its most recent fiscal year prior to trial, in accordance with *Restatement (Second) Judgments* 26(1)(b) and (e). The parties shall submit a joint status report on or before May 9, 2005, setting forth a plan for completion of discovery and a proposed schedule for further proceedings in this case, addressing the requirements of RCFC Appendix A ¶¶ 5 and 12 (final sentence).

It is so ORDERED.

s/ Charles F. Lettow
Charles F. Lettow
Judge